UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| **COMMERCIAL LENDER LLC,**<br>A Delaware Limited Liability Company<br>PO Box 3801<br>Vernon, CT 06066<br><br>And<br><br>**RCN CAPITAL, LLC,**<br>A Connecticut Limited Liability Company<br>75 Gerber Road East<br>South Windsor, CT 06074<br><br>Plaintiffs,<br><br>v.<br><br>**CHRISTOPHER ACTIE,**<br>739 Westhills Parkway<br>Baltimore, MD 21229-1118<br><br>**JASON TAYLOR,**<br>4044 Ganford Court<br>Jarrettsville, MD 21084<br><br>**APPRAISAL NATION, LLC,**<br>500 Gregson Drive Suite 120<br>Cary, NC 27511-6232<br>Serve on Agent for Service:<br>State Department of Assessments and Taxation, 700 East Pratt Street, Suite 2700, Baltimore, MD 21202<br><br>**INCENTER APPRAISAL MANAGEMENT, LLC,** | Case No.: |

550 Pinetown Road, Suite 208
Fort Washington, PA 19034
Serve on Resident Agent:
CSC-Lawyers Incorporating Service Company, 7 St. Paul Street, Suite 820, Baltimore, MD 21202

**BNL APPRAISAL LLC,**
2 Stonegate Drive, Suite 201
Monroe, NY 10950
Serve on Resident Agent:
Registered Agents Inc., 5000 Thayer Center, Suite C, Oakland, MD 21550

**TAMARISK APPRAISALS LLC,**
645 Madison Ave., 19th Floor
New York, NY 10022
Serve on Resident Agent:
Telos Legal Corp., 245 W. Chase Street, Baltimore, MD 21201

**JONATHAN SPAICH,**
3 Wagner Street
Annapolis, MD 21401

**DEBBIE GRIFFIN,**
8405 Old National Pike
Boonsboro, MD 21713

**KAREN WILSON,**
4120 Trenthan Drive
Pikesville, MD 21208

**ROBERT GOLDT,**
124 Hydrangea Way
Simpsonville, SC 29681

**ELIZABETH ANDERSON,**
213 Loudoun Street SE
Leesburg, VA 20175

**TY SHATZER,**
134 Barrens Valley Road
Dillsburg, PA 17323

**BRAD HARLEY,**
18 Campus Boulevard, Suite 100,
Newtown Square, PA 19073

**KENNETH COTE,**
57 Gaudet Street
North Providence, RI 02911

**CLEARCAPITAL.COM, LLC. FKA CLEARCAPITAL.COM, INC.,**
300 E 2nd Street, Suite 1405
Reno, Nevada 89501
Serve on Resident Agent:
The Corporation Trust Incorporated
2405 York Road
Suite 201
Lutherville, MD 21093-2264

**REXTAR TITLE SERVICES, LLC,**
1004 Dulaney Valley Road
Towson, MD 21204
Serve on Resident Agent:
Marco V. Rodriguez, 1004 Dulaney Valley Road
Towson, MD 21204

**COMMERCE TITLE COMPANY, INC.,**
1777 Reisterstown Road, Suite 200W
Baltimore, MD 21208
Serve on Resident Agent:

Eli Newman, Suite 200W 1777 Reisterstown Road, Baltimore, MD 21208

**MARVEL TITLE & ESCROW LLC,**
1004 Dulaney Valley Road.
Towson, MD 21204.
Serve on Resident Agent: Marco V. Rodriguez, 1004 Dulaney Valley Rd, Towson, MD 21204

**MARCO V. RODRIGUEZ,**
1004 Dulaney Valley Road,
Towson, MD 21204

**HERBERT GODINEZ,**
2516 Hudson Street
Baltimore, MD 21224

**DAVID KRAMER,**
5 Harrow Court
Pikesville, MD 21208

**ELI J. NEWMAN, ESQ.,**
6104 Benhurst Road
Baltimore, MD 21209

**SHRAGA LERNER,**
3205 Northbrook Road
Baltimore MD 21208

**BENJAMIN EIDLISZ,**
10 Brookside Drive
Pomona, NY 10970

**ELUZER GOLD,**
6 Mannan Place
Spring Valley, NY 10977

**KESEF VENTURES LLC,**
2611 Garrison Boulevard.
Baltimore MD 21216

**LEVY VENTURES L.L.C.,**
2718 Orleans Street
Baltimore MD 21224

**ZAHAV VENTURES, LLC,**
500 Thayer Center, Suite C
Oakland MD 21550

**SLDL PROPERTIES LLC,**
3205 Northbrook Road
Baltimore, MD 21208

**1258 GLYNDON LLC,**
3205 Northbrook Road
Baltimore MD 21208

**SUNRAY MANAGEMENT LLC,**
3500 Boston Street, Suite C
Baltimore MD 21224

**SPRINGWOOD PARTNERS LLC,**
3500 Boston Street, Suite C
Baltimore MD 21224

**GREENBAY ONE LLC,**
3500 Boston Street, Suite C
Baltimore MD 21224

**DIAMOND PROPERTIES LLC,**
3500 Boston Street, Suite C
Baltimore MD 21224

**OAKWOOD CAP LLC,**
3500 Boston Street, Suite C
Baltimore, MD 21224

**BELTWAY LENDING, LLC,**
7400 Bradshaw Road
Kingsville, MD 21087

**MENORAH REALTY LLC DBA BROOKWOOD CAPITAL,**
19 Balmoral Drive
Spring Valley, NY 10977

**AND**

**MIRIAM GLUCK.**
35 Forest Road, Unit 304
Monroe, NY 10950.

Defendants.

## COMPLAINT

Commercial Lender LLC and RCN Capital, LLC (collectively, "Lenders" or "Plaintiffs"), Plaintiffs, by their attorneys, Rudow Law Group, LLC, and William M. Rudow, Esq., hereby sue Christopher Actie and Jason Taylor (collectively, "Appraisers"); Appraisal Nation, LLC, an appraisal management company ("AN"); Incenter Appraisal Management LLC ("IAM"), BNL Appraisal LLC ("BNL"), and Tamarisk Appraisals, LLC ("TA") (AN, IAM, BNL, and TA are collectively, "AMC" or "Appraisal Management Companies"), Jonathan Spaich, Debbie Griffin, Karen Wilson, Robert Goldt, Elizabeth Anderson, Ty Shatzer, Brad Harley, and Kenneth Cote (collectively, "CDA Appraisers"); ClearCapital.Com, LLC *FKA* ClearCapital.Com, Inc. ("CDA Company"); Rextar Title Services, LLC, and Marvel Title & Escrow LLC (collectively, "Title Companies"); Herbert Godinez, Marco V. Rodriguez, Eli J.

Newman, Esq., and David Kramer (collectively, "Escrow Agents"); Kesef Ventures, LLC, Zahav Ventures, LLC, SLDL Properties LLC, 1258 Glyndon LLC, Sunray Management LLC, Springwood Partners LLC, Greenbay One LLC, Diamond Properties LLC, Oakwood Capital LLC, and Levy Ventures L.L.C. (collectively, "Fraudsters"); Eluzer Gold, Benjamin Eidlisz, and Shraga Lerner (collectively, "Conspirators"); and Beltway Lending, LLC ("Correspondent Lender"), Menorah Realty LLC dba Brookwood Capital, and Miriam Gluck (collectively, "Broker") and in support thereof respectfully represent:

## INTRODUCTION

1. Conspirators, acting individually and through the Fraudster entities they owned, controlled, operated, and/or utilized, knowingly conspired to conduct the affairs of an enterprise through a pattern of racketeering activity, the object of which was to commit mortgage fraud. The Fraudsters shared a common purpose of purchasing distressed properties and reselling them to the Borrowers at prices that materially exceeded the properties' true market value by, inter alia, submitting and causing the submission of materially false statements and documents concerning property values, leases, rental values, and/or property ownership. Each Fraudster knowingly agreed that at least one member of the conspiracy would commit racketeering acts—including, but not necessarily limited to, specific acts of 18 U.S.C. § 1341 ("Mail Fraud") and 18 U.S. Code § 1343 ("Wire Fraud")—in furtherance of the scheme, and took actions that furthered the enterprise's fraudulent objectives. As a direct and proximate result of Fraudsters' conduct and overt acts in furtherance of the conspiracy,

Plaintiffs suffered over $10,000,000 in losses, including interest, from the Lenders' loan proceeds.

2. The Conspirators and/or Fraudsters purchased the fifty-nine (59) houses in Baltimore City identified in the Loan Chart below, many of which were rundown, unrenovated, vacant and decrepit. Upon information and belief, the Conspirators and/or Fraudsters purchased up to five hundred (500) houses in Baltimore City.
3. The Conspirators and/or Fraudsters secured appraisals that overstated the value of the houses in order to support the Loans from the Lenders.
4. The Conspirators and Fraudsters sold these properties to various related entities wholly owned by Defendant Eluzer Gold.
5. The sales were financed by fifty-nine (59) loans from the Lenders in reliance on the purported equity created by inflated appraisals and confirmed by contemporaneous appraisal reviews.
6. When the Lenders started foreclosing, they found out that the appraisals of the properties securing their loans were materially inflated, leaving the Lenders holding fifty-nine (59) bad loans ("Loans") totaling approximately nine million six hundred sixty-nine thousand seven hundred dollars ($9,669,700.00) in principal balance losses, plus interest, costs, costs to preserve and protect the properties, and other losses, less worthless collateral.
7. The Lenders did not discover, and in the exercise of reasonable diligence could not have discovered, the materially inflated appraisals, the concealed A-to-B acquisitions, the inaccurate settlement information, or the other misconduct alleged in this Complaint until [INSERT the date on which each Lender first learned that the Appraisals were materially inflated and that

the sellers had acquired the properties shortly before at materially lower prices, and the event that produced that knowledge—for example, the date the first broker price opinion or REO valuation was obtained in the foreclosure process].

8. The conduct alleged in this Complaint was self-concealing and not evident from the face of the documents sent to Plaintiffs. The Appraisals omitted the recent lower-priced acquisitions of the same properties. The CDA Reviews confirmed the values the Appraisals reported and concealed the true values. The Settlement Statements represented that each transaction had closed on the terms the Lenders required. Nothing in the Loan files as delivered to the Lenders disclosed the facts alleged here, and the Lenders had no reason to question the collateral values until the Loans defaulted and the properties were independently valued.

## JURISDICTION

9. The Court has original federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims under 18 U.S.C. §§ 1962(c), 1962(d), and 1964(c), et seq. (Civil RICO and a RICO Conspiracy), in violation of 18 U.S.C. § 1341 (Mail Fraud), and 18 U.S.C. § 1343 (Wire Fraud).

10. The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' state-law claims because those claims are so related to Plaintiffs' federal RICO claims that they form part of the same case or controversy under Article III of the United States Constitution. The state and federal claims arise from a common nucleus of operative facts—the same fifty-nine (59) Loans, the same properties, the same closings, the same

representations, material omissions, and the same participants—and would ordinarily be expected to be tried in a single judicial proceeding. Supplemental jurisdiction extends to the state-law claims asserted against Defendants who are not named in the RICO counts because those claims arise from the same Loans and the same closings as well.

11. This Court has personal jurisdiction over each Defendant named in Counts XV and XVI under 18 U.S.C. § 1965. Each such Defendant resides in, is found in, has an agent in, or transacts his, her, or its affairs in a judicial district of the United States, and process may be served upon each of them in the district where that Defendant resides, is found, has an agent, or transacts his, her, or its affairs.

12. This Court has personal jurisdiction over each remaining Defendant under Md. Code, Cts. & Jud. Proc. § 6-103 and the Due Process Clause of the Fourteenth Amendment. Each non-resident Defendant purposefully directed its conduct at Maryland, and Plaintiffs' claims arise out of that conduct.

13. Each non-resident Appraiser and CDA Appraiser performed the Appraisal or CDA Review at issue under a Maryland appraiser's license, valued real property located in Baltimore City, and delivered the resulting report for use in a Maryland loan closing. Each non-resident appraisal management company and the CDA Company solicited and accepted engagements to procure valuations of Maryland real property, retained Maryland-licensed appraisers to perform them, and delivered the resulting reports for use in Maryland loan closings.

14. Each non-resident Conspirator, Fraudster, Flipper, Borrower, and Broker acquired, held, conveyed, or received proceeds from the sale of

Baltimore City real property; executed or caused the execution of deeds, notes, guaranties, and deeds of trust recorded in the Land Records of Baltimore City; and transmitted funds to and received funds from Maryland settlement accounts.

## VENUE

15. A substantial part of the events or omissions giving rise to the claims occurred in Baltimore City, Maryland, and all of the property that is the subject of the action is located in Baltimore City, Maryland (28 U.S.C. § 1391(b)(2)) because:

i) Each Loan was made in Baltimore City;
ii) Each Loan was secured by real property located in Baltimore City;
iii) Each property securing each Loan was appraised under a Maryland appraiser's license by an appraiser retained by an appraisal management company;
iv) Each appraisal was reviewed under a Maryland appraiser's license by a review appraiser retained by ClearCapital.Com, LLC;
v) Each Loan was closed by a Maryland escrow agent; and
vi) Each Loan was closed by a Maryland title company.

## PARTIES

16. Plaintiff Commercial Lender LLC, is a Delaware Limited Liability Company, with its principal place of business at South Windsor, CT 06074.

17. Plaintiff RCN Capital, LLC is a Connecticut Limited Liability Company, with its principal place of business at 75 Gerber Road East, South Windsor, CT 06074.

18. Christopher Actie resides at 739 Westhills Parkway, Baltimore, MD 21229-1118.

19. Jason Taylor resides at 4044 Ganford Court, Jarrettsville, MD 21084.

20. Appraisal Nation, LLC, regularly conducts business in Maryland, and is a North Carolina Limited Liability Company, with its principal place of business at 500 Gregson Drive Suite 120, Cary, NC 27511-6232.

21. Incenter Appraisal Management LLC regularly conducts business in Maryland and is a Delaware company with a principal place of business at 550 Pinetown Road, Suite 208, Fort Washington, PA 19034.

22. BNL Appraisal LLC regularly conducts business in Maryland and is a Maryland limited liability company with a principal place of business at 2 Stonegate Drive, Suite 201, Monroe, NY 10950.

23. Tamarisk Appraisals LLC regularly conducts business in Maryland and is a Delaware company with a principal place of business located at 645 Madison Avenue, New York, NY 10022.

24. Jonathan Spaich is an individual with an address of 3 Wagner Street, Annapolis, MD 21401.

25. Debbie Griffin is an individual with an address of 8405 Old National Pike, Boonsboro MD 21713.

26. Karen Wilson is an individual with an address of 4120 Trenthan Drive, Pikesville, MD 21208.

27. Robert Goldt is an individual with an address of 124 Hydrangea Way, Simpsonville, SC 29681.

28. Elizabeth Anderson is an individual with an address of 213 Loudoun Street SE, Leesburg VA 20175.

29. Ty Shatzer is an individual with an address of 134 Barrens Valley Road, Dillsburg PA 17323.

30. Brad Harley is an individual with an address of 18 Campus Boulevard, Suite 100, Newtown Square, PA 19073.

31. Kenneth Cote is an individual with an address of 57 Gaudet Street, North Providence, RI 02911.

32. ClearCapital.Com, LLC FKA Clear Capital.Com, Inc. ("ClearCapital" or "CDA Company"), is a Delaware limited liability company. ClearCapital.com, LLC has one member, ClearCapital Holdings, LLC, which is a Delaware limited liability company. ClearCapital Holdings, LLC has one member, Momentum, Inc. Momentum, Inc. is a corporation incorporated under the laws of Nevada with

its principal place of business in Nevada, at 300 East Second Street, Suite 1405, Reno, Nevada 89501.

33. Rextar Title Services, LLC is a Maryland company, with its principal place of business at 1004 Dulaney Valley Road, Towson, MD 21204.

34. Intentionally left blank.

35. Commerce Title Company, Inc. is a Maryland corporation, with its principal place of business at 1777 Reisterstown Rd., Suite 200 W, Baltimore, MD 21208.

36. Marvel Title & Escrow LLC is a Maryland company, with its principal place of business at 1004 Dulaney Valley Road, Towson, MD 21204.

37. Marco V. Rodriguez is an individual with an address of 1004 Dulaney Valley Road, Towson, MD 21204.

38. Herbert Godinez is an individual with an address of 2516 Hudson Street, Baltimore, MD 21224.

39. David Kramer is an individual with an address of 5 Harrow Court, Pikesville, MD 21208.

40. Eli J. Newman, Esq. is an individual with an address of 6104 Benhurst Road, Baltimore, MD 21209.

41. Eluzer Gold is an individual who resides at 6 Mannan Place, Spring Valley, NY 10977.

42. Shraga Lerner is an individual who resides at 3205 Northbrook Road, Baltimore MD 21208.

43. Benjamin Eidlisz is an individual who resides at 10 Brookside Drive, Pomona, NY 10970.

44. Kesef Ventures LLC is a Maryland company with a principal office located at 2611 Garrison Boulevard, Baltimore MD 21216.

45. Levy Ventures L.L.C. is a Maryland company with a principal office located at 2718 Orleans Street, Baltimore MD 21224.

46. Zahav Ventures, LLC is a Maryland company with a principal office located at 500 Thayer Center, Suite C, Oakland MD 21550.

47. SLDL Properties LLC is a Maryland company with a principal office located at 3205 Northbrook Road, Baltimore, MD 21208.

48. 1258 Glyndon LLC is a Maryland company with a principal office located at 3205 Northbrook Road, Baltimore MD 21208.

49. Sunray Management LLC is a Maryland company with a principal office located at 3500 Boston Street, Suite C, Baltimore MD 21224.

50. Springwood Partners LLC is a Maryland company with a principal office located at 3500 Boston Street, Suite C, Baltimore MD 21224

51. Greenbay One LLC is a Maryland company with a principal office located at 3500 Boston Street, Suite C, Baltimore MD 21224.

52. Diamond Properties LLC is a Maryland company with a principal office located at 3500 Boston Street, Suite C, Baltimore MD 21224.

53. Oakwood Capital LLC is a Maryland company with a principal office located at 3500 Boston Street, Suite C, Baltimore, MD 21224.

54. Beltway Lending, LLC is a Maryland company with a principal office located at 7400 Bradshaw Road, Kingsville, MD 21087.

55. Menorah Realty LLC dba Brookwood Capital regularly does business in Maryland and is a New York company with a principal office located at 19 Balmoral Drive, Spring Valley, NY 10977.

56. Miriam Gluck is an individual with an address of 35 Forest Road, Unit 304, Monroe, NY 10950. Miriam Gluck brokered the loans regarding Maryland properties.

## STATEMENT OF FACTS RELEVANT TO ALL COUNTS

### A. LENDERS

57. Commercial Lender LLC is a wholesale asset-based mortgage lender ("ABML") who finances and/or refinances debt secured by real estate through third-party correspondent lenders and/or brokers and whose activities affect interstate or foreign commerce.

58. Commercial Lender LLC relies upon correspondent lenders and/or brokers to deal with the borrowers face-to-face, collect pertinent documents and submit the application.

59. RCN Capital, LLC is an ABML who finances and/or refinances debt secured by real estate through brokers and direct-to-borrower loans whose activities affect interstate or foreign commerce.

60. ABMLs, including the Lenders, rely on appraisers to value loan collateral in an industry-compliant manner so that the ABML can protect its investments and properly underwrite the loans.

61. ABMLs, including the Lenders, also rely on leases and/or rental value to service the debt; information regarding estimated monthly market rent is often part of the income approach to value within the appraisals on which Lenders rely, called Debt Service Coverage Ratio ("DSCR").

62. When a loan is underwritten based on an inflated appraised value and/or inflated lease and/or rental value, the ABML is under-secured from the date the loan is made. The lender's injury—collateral worth materially less than the value on which the loan was underwritten—exists on the date the loan is funded, and the lender need not await a default to sustain a concrete and complete injury. That the injury exists on the funding date does not mean the lender is aware of it. The inflation is disclosed only when the collateral is independently valued, which ordinarily occurs after the loan defaults.

63. The Lenders made the Loans to entities wholly owned by Eluzer Gold.

64. Lenders had certain underwriting requirements as conditions precedent to making the Loans.

65. The Lenders' underwriting requirements included, without limitation, the following requirements:

i) Cash at closing ("CAC") should be brought to the closing by the borrower of the Loan funds ("Borrower")[1] ("CAC Requirement");

ii) The real property securing each Loan must meet the loan to value ("LTV") ratio requirements ("LTV Requirement"); the value or "V" is based on a Uniform Standards of Professional Appraisal Practice ("USPAP") compliant appraisal;

iii) The Loan had to meet a DSCR ("DSCR Requirement") which is based on the cashflow/income capitalization approach set forth in the appraisal utilizing the rental value of the property securing the Loan;

iv) The underlying transaction must have been arms-length, unless the relationship is disclosed with the initial submission of the application and certain conditions are met;

v) The minimum property value for single-asset DSCR loans was One Hundred Thousand and 00/100 ($100,000.00) Dollars;

vi) There must have been a property condition rating of C-1 to C-4 as reflected in the valuation;

vii) A secondary desk review must have produced a variance of less than ten percent (10%); and

viii) Information on the Settlement Statement (under acknowledgements like *[w]e/I have carefully reviewed the Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements made on my account or by me in this*

---

1 The term "Borrower" shall mean the borrower under each Loan Note, either Kesef Ventures LLC, Levy Ventures L.L.C. or Zahav Ventures, LLC. Eluzer Gold was the sole member of the borrowing entity and guarantor of each Loan.

*transaction and further certify that I have received a copy of the Settlement Statement)* must have been accurate, including without limitation, the CAC identified as being paid by the Borrower was actually the Borrower's funds and was paid at closing.

(collectively, the "Underwriting Requirements").

## B. TRANSACTIONS

66. These claims arise out of a series of loan transactions, each differing some in execution but not materially and undertaken by the same Fraudsters, brought to Lenders by Broker or Correspondent Lender and all funded by the Lenders to each Borrower, identified below, and secured by improved real estate. The Loans. Including the current outstanding unpaid principal balance (UPB) and payoff amount are more fully described as follows:

## LOANS

| | Property Securing Loan & Borrower | Loan Date/Broker or Correspondent Lender | Loan Amount | Current UPB | Payoff Amount |
|---|---|---|---|---|---|
| 1 | 2529 Woodbrook Ave, Baltimore, MD 21217 Levy Ventures, LLC | 8/7/2023 | $180,000.00 | $178,746.61 | $334,715.06 |
| 2 | 418 N. Milton Ave, Baltimore, MD 21224 | 1/5/2024 | $220,000.00 | $219,269.17 | $286,214.10* |
| 3 | Kesef Ventures, LLC<br><br>505 N. Collington Ave, | 12/7/2023 | $140,000.00 | $139,467.64 | $259,353.23 |

| | | | | | |
|---|---|---|---|---|---|
| | Baltimore, MD 21205 | | | | |
| 4 | Levy Ventures, LLC<br><br>1108 N. Dukeland St, Baltimore, MD 21216 | 6/23/2023 | $162,400.00 | $160,978.80 | $307,516.88 |
| 5 | Levy Ventures, LLC<br><br>1942 Mosher St, Baltimore, MD 21217 | 6/13/2023 | $177,600.00 | $175,910.78 | $335,005.04 |
| 6 | Levy Ventures, LLC<br><br>2840 Woodbrook Ave, Baltimore, MD 21217 | 7/21/2023 | $160,000.00 | $158,818.40 | $290,930.33 |
| 7 | Levy Ventures, LLC<br><br>1687 Darley Ave, Baltimore, MD 21213 | 7/7/2023 | $191,200.00 | $189,526.83 | $342,388.14 |
| 8 | Levy Ventures, LLC<br><br>3117 Lawnview Ave, Baltimore, MD 21213 | 7/28/2023 | $160,000.00 | $158,770.41 | $301,311.69 |
| 9 | Zahav Ventures, LLC<br><br>2601 Jefferson St, Baltimore, MD 21205 | 7/28/2023 | $168,000.00 | $166,586.80 | $302,953.37 |
| 10 | Zahav Ventures, LLC<br><br>1607 Race St, Baltimore, MD 21230 | 7/28/2023 | $360,000.00 | $360,000.00 | $645,501.47 |
| 11 | Levy Ventures, LLC<br><br>1411 Ramsay St, Baltimore, MD 21223 | 8/23/2023 | $151,200.00 | $150,030.20 | $275,936.44 |
| 12 | Levy Ventures, LLC<br><br>1731 McHenry St Baltimore, MD 21223 | 8/23/2023 | $153,600.00 | $152,530.45 | $281,996.93 |
| 13 | Levy Ventures, LLC<br><br>2801 Presbury St, Baltimore, MD 21216 | 8/23/2023 | $168,000.00 | $166,830.19 | $244,006.56* |
| 14 | Levy Ventures, LLC<br><br>2625 Garrett Ave, Baltimore, MD 21218 | 8/23/2023 | $183,200.00 | $181,872.67 | $332,109.96 |

| | | | | | |
|---|---|---|---|---|---|
| 15 | Levy Ventures, LLC<br><br>2110 W. Saratoga St<br>Baltimore, MD 21223 | 8/25/2023 | $156,000.00 | $154,913.74 | $277,671.79 |
| 16 | Levy Ventures, LLC<br><br>1822 Wilkens Ave,<br>Baltimore, MD 21223 | 9/14/2023 | $168,000.00 | $166,996.87 | $313,733.52 |
| 17 | Levy Ventures, LLC<br><br>1123 McKean Ave,<br>Baltimore, MD 21217 | 9/19/2023 | $144,000.00 | $143,140.16 | $274,026.15 |
| 18 | Levy Ventures, LLC<br><br>1652 Darley Ave,<br>Baltimore, MD 21213 | 10/16/2023 | $172,000.00 | $171,194.46 | $257,187.48* |
| 19 | Levy Ventures, LLC<br><br>3217 Brighton St,<br>Baltimore, MD 21216 | 10/16/2023 | $164,000.00 | $163,231.87 | $303,678.32 |
| 20 | Levy Ventures, LLC<br><br>2952 Presstman St,<br>Baltimore, MD 21216<br>Levy Ventures, LLC | 10/20/2023 | $180,000.00 | $179,152.65 | $275,121.25* |
| 21 | 1625 N. Rosedale St,<br>Baltimore, MD 21216 | 10/16/2023 | $150,400.00 | $149,695.58 | $245,178.22* |
| 22 | Levy Ventures, LLC<br><br>1809 Rayner Ave,<br>Baltimore, MD 21213 | 11/13/2023 | $148,000.00 | $147,481.31 | $257,777.37 |
| 23 | Levy Ventures, LLC<br><br>3617 Kenyon Ave,<br>Baltimore, MD 21213 | 11/13/2023 | $152,000.00 | $151,376.23 | $279,335.06 |
| 24 | Levy Ventures, LLC<br><br>3323 Kenyon Ave,<br>Baltimore, MD 21213 | 11/13/2023 | $148,000.00 | $147,404.97 | $277,125.37 |
| 25 | Levy Ventures, LLC<br><br>3214 Kenyon Ave,<br>Baltimore, MD 21213 | 11/13/2023 | $148,000.00 | $147,404.97 | $274,338.65 |
| 26 | Levy Ventures, LLC | 12/7/2023 | $144,000.00 | $143,452.39 | $174,244.04* |

| | | | | | |
|---|---|---|---|---|---|
| | 4235 Seidel Ave, Baltimore, MD 21206 | | | | |
| 27 | Levy Ventures, LLC<br><br>736 N. Linwood Ave, Baltimore, MD 21205 | 12/7/2023 | $148,000.00 | $147,437.21 | $269,946.48 |
| 28 | Levy Ventures, LLC<br><br>1518 Elrino St, Baltimore, MD 21224 | 12/7/2023 | $152,000.00 | $151,414.12 | $164,012.23* |
| 29 | Levy Ventures, LLC<br><br>3834 Elmora Ave, Baltimore, MD 21213 | 12/7/2023 | $148,000.00 | $147,437.21 | $269,691.31 |
| 30 | Levy Ventures, LLC<br><br>3514 Dudley Ave Baltimore, MD 21213 | 12/7/2023 | $152,000.00 | $151,421.97 | $169,724.24* |
| 31 | Levy Ventures, LLC<br><br>3131 Chesterfield Ave, Baltimore, MD 21213 | 12/14/2023 | $152,000.00 | $151,421.97 | $206,110.89* |
| 32 | Levy Ventures, LLC<br><br>4926 Schaub Ave, Baltimore, MD 21206 | 12/14/2023 | $148,000.00 | $147,341.11 | $267,894.19 |
| 33 | Levy Ventures, LLC<br><br>3032 Fleetwood Ave Baltimore, MD 21214 | 12/14/2023 | $224,000.00 | $223,002.75 | $400,257.73 |
| 34 | Levy Ventures, LLC<br><br>3113 Chesterfield Ave, Baltimore, MD 21213 | 12/14/2023 | $144,000.00 | $143,358.88 | $258,642.67 |
| 35 | Levy Ventures, LLC<br><br>3122 Brendan Ave, Baltimore, MD 21213 | 12/14/2023 | $160,000.00 | $159,287.64 | $286,982.07 |
| 36 | Levy Ventures, LLC<br><br>2007 W. Saratoga St, Baltimore, MD 21223 | 12/14/2023 | $148,000.00 | $147,341.11 | $268,305.02 |
| 37 | Levy Ventures, LLC | 12/28/2023 | $184,000.00 | $183,263.99 | $258,823.95* |

| | | | | | |
|---|---|---|---|---|---|
| | 1083 Ellicott Driveway Baltimore, MD 21216 | | | | |
| 38 | Levy Ventures, LLC<br><br>700 N. Belnord Ave, Baltimore, MD 21205 | 12/28/2023 | $160,000.00 | $159,359.99 | $290,107.34 |
| 39 | Kesef Ventures, LLC<br><br>3117 Mareco Ave, Baltimore, MD 21213 | 12/28/2023 | $164,000.00 | $163,343.99 | $307,389.32 |
| 40 | Kesef Ventures, LLC<br><br>1709 Poplar Grove St, Baltimore, MD 21216 | 12/28/2023 | $152,000.00 | $151,392.04 | $289,056.43 |
| 41 | Kesef Ventures, LLC<br><br>2612 E. Preston St, Baltimore, MD 21213 | 12/28/2023 | $160,000.00 | $159,359.99 | $237,754.62* |
| 42 | Kesef Ventures, LLC<br><br>1518 E. 28th St, Baltimore, MD 21218 | 12/28/2023 | $155,200.00 | $154,579.20 | $302,922.19 |
| 43 | Kesef Ventures, LLC<br><br>2606 Beryl Ave, Baltimore, MD 21205 | 1/5/2024 | $184,000.00 | $183,263.99 | $262,987.05* |
| 44 | Kesef Ventures, LLC<br><br>2822 Kennedy Ave, Baltimore, MD 21218 | 1/31/2024 | $143,200.00 | $142,724.32 | $219,790.57* |
| 45 | Kesef Ventures, LLC<br><br>2842 Mayfield Ave, Baltimore, MD 21213 | 1/5/2024 | $180,000.00 | $179,402.07 | $226,303.83* |
| 46 | Kesef Ventures, LLC<br><br>5014 Belair Rd, Baltimore, MD 21206 | 1/31/2024 | $184,000.00 | $183,410.01 | $347,138.30 |
| 47 | Kesef Ventures, LLC<br><br>2430 Etting St, Baltimore, MD 21217 | 1/17/2024 / ǂ | $140,000.00 | $139,534.90 | $247,428.26 |
| 48 | Kesef Ventures, LLC | 1/17/2024 / ǂ | $140,000.00 | $139,534.90 | $252,913.32 |

| | | | | | |
|---|---|---|---|---|---|
| | 2434 Etting St, Baltimore, MD 21217 | | | | |
| | Kesef Ventures, LLC<br><br>2436 Etting St, Baltimore, MD 21217 | 1/18/2024 / ǂ | $140,000.00 | $139,534.90 | $253,630.90 |
| 50 | Kesef Ventures, LLC<br><br>2428 Etting St, Baltimore, MD 21217 | 1/17/2024 / ǂ | $140,000.00 | $139,534.90 | $269,377.34 |
| 51 | Kesef Ventures, LLC<br><br>2442 Etting St, Baltimore, MD 21217 | 1/17/2024 / ǂ | $140,000.00 | $139,534.90 | $254,232.07 |
| 52 | Kesef Ventures, LLC<br><br>2446 Etting St, Baltimore, MD 21217 | 1/17/2024 / ǂ | $140,000.00 | $139,534.90 | $248,977.21 |
| 53 | Kesef Ventures, LLC<br><br>2422 Etting St, Baltimore, MD 21217 | 1/17/2024 / ǂ | $140,000.00 | $139,534.90 | $263,747.02 |
| 54 | Kesef Ventures, LLC<br><br>1706 Lemmon St, Baltimore, MD 21223 | 1/31/2024 | $180,000.00 | $179,402.07 | $291,456.90* |
| 55 | Kesef Ventures, LLC<br><br>2642 Wilkens Ave, Baltimore, MD 21223 | 2/12/2024 / ǂ | $142,500.00 | $142,088.87 | $214,643.78* |
| 56 | Kesef Ventures, LLC<br><br>33 N. Kresson St, Baltimore, MD 21224 | 11/13/2023 | $152,000.00 | $151,478.10 | $193,990.03* |
| 57 | Levy Ventures, LLC<br><br>2703 Ellicott Dr, Baltimore, MD 21216 | 11/13/2023 | $184,000.00 | $183,338.38 | $327,958.12 |
| 58 | Levy Ventures, LLC<br><br>2002 Boone St, Baltimore, MD 21218 | 1/5/2024 | $180,000.00 | $179,523.27 | $346,817.89* |
| 59 | Kesef Ventures, LLC<br><br>2006 Walbrook Ave, | 1/5/2024 | $159,200.00 | $158,778.34 | $283,502.57 |

| | | | | | |
|---|---|---|---|---|---|
| | Baltimore, MD 21217<br>Kesef Ventures, LLC | | | | |
| | Total | | | $9,625,701.04 | $12,227,504.63 |

67. Unless otherwise indicated, the Loan was brokered as a correspondent loan by Beltway Lending LLC (hereinafter, "Beltway" or "Correspondent Lender") and the Loan was made by Plaintiff Commercial Lender LLC. In the above Loans chart, ǂ indicates that the Loan was brokered by the Broker rather than Beltway, and the Loan was made by Plaintiff RCN Capital, LLC, instead of Plaintiff Commercial Lender LLC.

68. In the Loans, the Lenders relied on the value of the related real property as stated in the related appraisal in assessing the LTV for each loan.

69. The Lenders would not have made any of the Loans identified in the Appraiser Chart as materially overvalued had they received an industry-compliant appraisal valuing the real property because each such Appraisal materially overvalued the property and caused the Lenders' LTV underwriting standard to be breached.

70. All of the Loans are in material default.

71. Each of the Borrowers went to a settlement and executed a note payable to the order of the applicable Lender documenting the Loan.

72. Each of the Borrowers went to a settlement and executed a deed of trust securing the Loan based on the appraised real property.

73. Each Loan had a guaranty by the principal of the Borrower – Eluzer Gold.

74. Loan documents were transmitted by FedEx, Loan proceeds were wired into the Title Companies, and funds were thereafter wired from Title Companies to the sellers.

75. Closing Instructions were sent regarding each Loan from the Lenders in Connecticut.

76. The Loans were either foreclosed and are now either real estate owned, or in the process of becoming real estate owned ("REO"), by Plaintiffs, deeded-in-lieu of foreclosure to Plaintiffs, or have been disposed by Plaintiffs through a third-party sale.

## C. CORRESPONDENT LENDER
(BELTWAY LENDING LLC)

77. Defendant Beltway Lending LLC ("Beltway" or "Correspondent Lender") entered into a Correspondent Lender Agreement ("CL Agreement") with Plaintiff Commercial Lender LLC on or about January 4, 2023.

78. All of the Beltway loans were done through Commercial Lender.

79. Under the CL Agreement, Correspondent Lender was required to perform certain duties and functions ("CL Duties") diligently and truthfully, including, but not limited to:

a) Maintaining open and diligent lines of communications with the Borrowers and with Commercial Lender's loan officer(s);

b) Completing and submitting Loan Applications from applicants generally eligible to obtain a loan under a Commercial Lender's loan program using such forms provided under and in accordance with the applicable loan program.

c) Being aware of the terms and conditions of Commercial Lender's loan programs and making best efforts to submit loan applications that comply with the terms thereof;

d) Providing credit and background check information for all applicants and their respective authorization documents as required by Commercial Lender aka assist with the processing of the Loan applications;

e) Working diligently with the Commercial Lender loan officer to negotiate final pricing and terms of the mortgage loan;

f) Submitting to Commercial Lender all items and information required to evaluate the application, including, but not limited to those listed in Commercial Lender's processing checklist;

g) Working with applicants to fulfill the underwriting or clear-to-close conditions related to each Mortgage Loan for which Commercial Lender has granted underwriting approval in a timely manner;

h) Ensuring compliance with Appraisal Laws and Regulations. All appraisals and appraisal forms shall comply with (1) all state and federal appraisal criteria; (2) Standards and requirements applicable to Commercial Lender, and (3) The appraisal rules and regulations contained or incorporated in and adopted pursuant to the federal Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") and that all appraisers meet state and federal certification. Licensing and other criteria, standards and requirements, including but not limited to those require or adopted pursuant to FIRREA.

80. Under the CL Agreement, Correspondent Lender also covenanted, represented and warranted ("CL R&W 1") to Commercial Lender that the following were true:

a) All applications and documents submitted with respect to a loan application comply with Commercial Lender guidelines, standards and policies in existence on such date;

b) All documentation submitted by Correspondent Lender in connection with such application and approved loan are true and correct in all

material respects and Correspondent Lender will not fail to disclose any facts which could be material or which would make such documentation or application misleading;

c) All activities in connection with the loan application comply with all applicable laws; and

d) All material facts relating to the loan application which are known or required to be known to Correspondent Lender are disclosed in writing to Commercial Lender.

81. Under the CL Agreement, Correspondent Lender also made representations and warranties to Commercial Lender ("CL R&W 2") with respect to each Loan as of the closing date, including, but not limited to the following:

a) Compliance with Applicable Law;

b) No fraud;

c) Appraisals in compliance;

d) No property damage;

e) Compliance with OFAC;

f) No illegal activities; and

g) Use of funds or proceeds are to be used exclusively to acquire, refinance or construct improvements on the related mortgaged property.

82. Correspondent Lender, by and through its agents, provided many documents to Plaintiff, often including title company or attorney information for title, Borrower Authorization/Application, Operating, Shareholder or Entity Agreements, Articles of Organization, EIN, LOX for credit or background, Leases, Photo ID, Bank Statements, ACH Form and Voided Check, Homeowners Insurance and Paid Receipts, and/or Credit Report and Background Report (collectively, "Borrower Documents").

83. Plaintiff's guidelines, policies and procedures in place at the time the Loans were made did not include a loan product available to Correspondent Lender to allow funding of one hundred (100%) percent or more of the purchase price of real property.

## D. BROKER
### (MENORAH REALTY LLC DBA BROOKWOOD CAPITAL AND MIRIAM GLUCK)

84. Defendant Menorah Realty LLC dba Brookwood Capital, by and through its duly authorized agent Miriam Gluck came to RCN Capital, LLC as a broker on or about June 30, 2023.

85. All of the Broker Loans were done through RCN Capital.

86. As a broker, the Broker made certain representations and warranties ("BC R&W") in submitting loans to RCN Capital, LLC in exchange for payment, including, but not limited to:

a) Broker has obtained all licenses, if any, required to carry on the Potential Transactions;

b) Broker has not, and will not, omit or misrepresent any of the information pertaining to the potential borrowers or any collateral that may secure a loan;

c) There are no undisclosed third parties entitled to the payment of any fee in connection with the loan; and

d) All documents submitted by the Broker on behalf of a borrower are valid and genuine in every respect to the best of Broker's knowledge.

87. Broker provided documents to Plaintiff supporting a series of loans.

## E. FLIPPER LOANS

88. The following Seller/Flipper Chart sets forth Loans that were flips of real property - that is - A sold the property to B, who sold the property to C, often occurring simultaneously, but sometimes as much as six months apart ("FLIP" or "Flip").

89. This type of FLIP occurred so quickly that B could not have (and did not) renovated the property as represented and, in fact, often never took physical possession of the property or possessed it only briefly.

90. Upon information and belief, the following sellers (collectively, "Flippers") sold the real properties that secured the following Loans to Borrowers on the following dates for the following amounts generating the following profits:

<u>Seller/Flipper Chart</u>

| Property Securing Loan | Seller/Principal | # Days Between Sales based on Deed Dates / Flip Profit | Purchase Price & Date | Sales Price & Date |
|---|---|---|---|---|
| 2529 Woodbrook Ave | SLDL Properties LLC/ Shraga Lerner | 72/ $152,000 | $48,000/ 5/10/2023 | $200,000/ 7/21/2023 |
| 1809 Rayner Ave | 1258 Glyndon LLC/ Shraga Lerner | 46/ $127,500 | $57,500/ 9/28/2023 | $185,000/ 11/13/2023 |
| 1942 Mosher St | SLDL Properties LLC/ Shraga Lerner | 46/ $146,500 | $75,500/ 4/28/2023 | $222,000/ 6/13/2023 |
| 1123 McKean Ave | Lee Holdings International LLC/ Ariel M. Lee | 34/ $132,000 | $48,000/ 8/16/2023 | $180,000/ 9/19/2023 |
| 3217 Brighton St | SLDL Properties LLC/ Shraga Lerner | 66/ $143,000 | $62,000/ 8/11/2023 | $205,000/ 10/16/2023 |
| 3617 Kenyon Ave | 1258 Glyndon LLC/ Shraga Lerner | 46/ $125,000 | $65,000/ 9/28/2023 | $190,000/ 11/13/2023 |
| 3323 Kenyon Ave | 1258 Glyndon LLC/ Shraga Lerner | 28/ $106,540.75 | $65,000.00/ 10/16/23 | $185,000/ 11/13/2023 |
| 2703 Ellicott Dr | 1258 Glyndon LLC/ Shraga Lerner | $230,000 | Never In Title | $230,000/ 11/13/2023 |
| 4235 Seidel Ave | Sunray Mgmt LLC/ Shraga Lerner | 28/ $81,727 | $98,273/ 11/9/2023 | $180,000/ 12/7/2023 |
| 736 N. Linwood Ave | Springwood Partners LLC/Shraga Lerner | 28/ $86,727 | $98,273/ 11/9/2023 | $185,000/ 12/7/2023 |
| 1518 Elrino St | Cardinal Mgmt LLC/ Shraga Lerner | 28/ $91,727 | $98,273/ 11/9/2023 | $190,000/ 12/7/2023 |
| 3834 Elmora Ave | Greenbay One LLC/ Shraga Lerner | 28/ $86,727 | $98,273/ 11/9/2023 | $185,000/ 12/7/2023 |
| 3514 Dudley Ave | Diamond Props LLC/ Shraga Lerner | 28/ $91,727 | $98,273/ 11/9/2023 | $190,000/ 12/7/2023 |
| 505 N. Collington Ave | Sunray Mgmt LLC/ | 28/ | $98,273/ | $175,000/ |

| | | | | |
|---|---|---|---|---|
| | Shraga Lerner | $76,727 | 11/9/2023 | 12/7/2023 |
| 3131 Chesterfield Ave | Diamond Props LLC/ Shraga Lerner | 35/ $91,727 | $98,273/ 11/9/2023 | $190,000/ 12/14/2023 |
| 4926 Schaub Ave | Sunray Mgmt LLC/ Shraga Lerner | 35/ $86,727 | $98,273/ 11/9/2023 | $185,000/ 12/14/2023 |
| 3032 Fleetwood Ave | Oakwood Cap LLC/ Shraga Lerner | $280,000 | Never in Title | $280,000/ 12/14/2023 |
| 3113 Chesterfield Ave | Oakwood Cap LLC/ Shraga Lerner | 35/ $81,727 | $98,273/ 11/9/2023 | $180,000/ 12/14/2023 |
| 3122 Brendan Ave | Diamond Props LLC/ Shraga Lerner | $200,000 | Never In Title | $200,000/ 12/14/2023 |
| 2007 W. Saratoga St | 1258 Glyndon LLC/ Shraga Lerner | 52/ $140,000 | $42,000/ 10/23/2023 | $185,000/ 12/14/2023 |
| 418 N. Milton Ave | Greenbay One LLC/ Shraga Lerner | 57/ $176,727 | $98,273/ 11/9/2023 | $275,000/ 1/5/2024 |

91. The Flip Profits identified in the Seller/Flipper Chart, of which all except $132,000.00 was received by Shraga Lerner through entities he controls.

92. Each Flipper's ability to resell property at an amount in excess of the property's true market value was the result of the fraud and misrepresentations alleged herein, regardless of whether the Lenders had knowledge of the fraud or misrepresentations that inflated the sale price.

93. Each Flipper profited at the Lenders' expense.

## F. FRAUDULENT BORROWER LOANS

94. The actual Borrowers for each Loan were Limited Liability Companies ("LLCs"), i.e., Levy Ventures, L.L.C., Kesef Ventures LLC and Zahav Ventures, LLC (collectively, "Borrowers"), but each had the same sole member - Eluzer Gold.

95. The Borrowers, Title Companies, and Escrow Agents, knew that the Lenders required the CAC *by the Borrowers* for certain Loans.

96. Each Loan had a settlement statement.

97. Each settlement statement was prepared by the Title Company and Escrow Agents.

98. The CAC was required to be properly identified on each settlement statement.

99. Upon information and belief, the Borrowers did not provide the CAC for a series of Loans.

## G. FLIPPERS

100. Benjamin Eidlisz was related to the Flippers who profited from flipping the properties as part of the mortgage fraud scheme.

101. Benjamin Eidlisz and Shraga Lerner conspired with Eluzer Gold to defraud the Lenders of Loan proceeds; this is seen, inter alia by:

i) The email used by Eluzer Gold on his credit applications is beneidlisz@gmail.com;

ii) Signer Benjamin Eidlisz (beneidlisz@gmail.com) entered name at signing as Eluzer Gold 2023-06-05 - 3:08:09 PM GMT on at least one

credit application (the Loan secured by 2529 Woodbrook) by Eluzer Gold.

102. Shraga Lerner was also a Flipper (Flippers are sellers identified in the Title Company Chart below regarding Loans identified as FILRPS) who profited from flipping properties as part of the mortgage fraud scheme, by and through his various entities, including SLDL Properties LLC, PP Baltimore 6 LLC, 1258 Glyndon LLC, Sunray Mgmt LLC, Springwood Partners LLC, Greenbay One LLC, Diamond Props LLC, and Oakwood Cap LLC (collectively, "Lerner Entities"). The Flipper frequently held the Properties for only short periods before reselling them to the Borrowers at materially higher prices, and the short holding periods were insufficient to account for the substantial increases in resale prices through bona fide renovations of the magnitude represented in connection with the Loans.

## H. Title Companies and Escrow Agents

103. Title Companies, acting through their respective Escrow Agents, are the gatekeepers of the Loans, entrusted to handle the Lenders' funds and documents in a classic fiduciary manner.

104. Closing instructions were issued to the Title Companies regarding the Loan closings, inter alia, setting forth some of the requirements necessary to close each Loan.

105. Most of the transactions identified as FILRPS were not simultaneous closings. Rather, the relevant transactions involved an A-to-B acquisition closely followed by a B-to-C sale to a Borrower financed by Plaintiffs after a short holding period. The number of days between the A-to-B acquisition and the B-to-C Loan closing is reflected in the underlying chain-of-title and closing records.

106. Of the fifty-nine (59) Loans, thirty-nine (39) involved a B-to-C closing occurring less than ninety (90) days after the seller's A-to-B acquisition.

107. In thirty-eight (38) of those thirty-nine (39) rapid-sale transactions, the same title company handled both the seller's A-to-B acquisition and the subsequent B-to-C sale financed by the Lenders.

108. Commerce Title Company, Inc. handled thirty-three (33) of the related A-to-B acquisitions and thirty-five (35) of the B-to-C Loan closings. Thirty (30) of Commerce's B-to-C Loan closings occurred less than ninety (90) days after the seller's acquisition, and in twenty-nine (29) of those transactions Commerce handled both the A-to-B acquisition and the B-to-C Loan closing.

In three (3) Commerce Title Company, Inc. closings, the seller never even had title.

109. Rextar Title Services, LLC handled eight (8) of the related A-to-B acquisitions and fourteen (14) of the B-to-C Loan closings. Seven (7) of Rextar's B-to-C Loan closings occurred less than ninety (90) days after the seller's acquisition, and in each of those seven (7) transactions Rextar handled both the A-to-B acquisition and the B-to-C Loan closing.

110. The repeated same Title Company A-to-B and B-to-C closings meant that Commerce and Rextar did not merely have constructive notice that a prior sale might have occurred. Those Title Companies had participated in the immediately preceding acquisitions and therefore possessed actual knowledge, through their own transactions and records, of the seller's recent acquisition, the identity of the seller, the timing of the acquisition, and the economic terms reflected in their own closing files.

111. In performing each B-to-C Loan closing, the respective Escrow Agent acted for the Title Company, received the Lenders' Closing Instructions, handled the Lenders' Loan documents and Loan proceeds, performed or directed title and settlement functions, and had access to and control over the title and closing records used to conduct the B-to-C closing. Where the same Title Company had handled the immediately preceding A-to-B

acquisition, the prior closing records were records of that same Title Company and contained facts material to the B-to-C transaction.

112. Of the thirty (30) Commerce FLIP B-to-C Loan closings, every purchaser/borrower was one of only two entities: Levy Ventures L.L.C. in twenty-five (25) transactions and Kesef Ventures LLC in five (5) transactions. As alleged above, both entities were wholly owned by Eluzer Gold.

113. The seller side of those same thirty (30) Commerce FLIP transactions likewise repeatedly involved the same small group of entities. The chain-of-title records identify SLDL Properties LLC as seller in seven (7) transactions; 1258 Glyndon LLC in seven (7); Sunray Mgmt LLC in four (4); Cardinal Mgmt LLC in three (3); Diamond Props LLC in three (3); Oakwood Cap LLC in three (3); Greenbay One LLC in two (2); and Springwood Partners LLC in one (1). Many of these entities are Lerner Entities used by Shraga Lerner in the flip transactions to defraud lenders, including the Lenders.

114. Commerce therefore did not encounter thirty unrelated rapid resales involving different market participants. It repeatedly closed substantially the same transaction pattern: one of the same Gold-owned purchaser/borrower entities acquired property from the same recurring

group of seller-side entities shortly after the seller-side entity had acquired the property at a materially lower price.

115. In twenty-nine (29) of the thirty (30) Commerce FLIP transactions, Commerce itself had also handled the immediately preceding A-to-B acquisition. Commerce therefore possessed direct transaction-specific knowledge from its own prior closing files of the seller-side entity, the seller-side entity's recent acquisition of the property, the timing of that acquisition, acquisition purchase price, sales price, and the economic terms reflected in Commerce's own records. When Commerce thereafter received the B-to-C closing involving the same recurring purchaser-side and seller-side participants, those facts were not isolated or incidental facts appearing for the first time.

116. Commerce's repeated dealings with the same purchaser-side and seller-side participants gave Commerce additional actual knowledge of the recurring nature of the transactions. By the later Commerce FLIP closings, Commerce had repeatedly seen the same Gold-owned Borrowers purchasing properties from the same seller-side entities after short holding periods and at materially increased prices.

117. That recurring pattern was material to the Lenders' decision whether to authorize the B-to-C closings and release their Loan proceeds because it

showed that the rapid prior sale was not an isolated property-specific event, but part of a repeated course of transactions involving the same participants, the same settlement company, short holding periods, and materially increased resale prices.

118. Commerce nevertheless closed the applicable B-to-C Loans, accepted and disbursed the Lenders' Loan proceeds, and failed to disclose to the Lenders the combination of material facts known to Commerce: the recent A-to-B acquisition, the short holding period, the materially increased B-to-C price, and the repeated use of the same purchaser-side and seller-side participants in substantially the same transaction structure.

119. These allegations do not impose upon Commerce a generalized duty to investigate whether the participants were committing mortgage fraud. Rather, they concern material facts Commerce actually knew from the transactions it repeatedly handled and from the title and closing records entrusted to it while acting as the Lenders' title, settlement, closing, and escrow agent.

120. The rapid resale of the same property within less than ninety (90) days, particularly when coupled with a material increase in the B-to-C sales price over the recent A-to-B acquisition price and repeated use of the same sellers, Borrowers, guarantors, seller owners, buyer owner, Title Companies, and

settlement professionals, was material information concerning the transaction being financed by the Lenders. These facts created an obvious risk that the B-to-C sales price and resulting collateral value did not reflect an arm's-length market transaction or bona fide appreciation in the property, whose purchase was being funded by the Lenders' Loan proceeds.

121. The materiality of those facts was heightened because the Lenders' underwriting requirements included Loan-to-Value requirements based upon the value of the collateral, required disclosure of non-arm's-length transactions unless disclosed and approved, required accurate settlement information, and required satisfaction of the Lenders' Closing Instructions before the Loan proceeds could be disbursed.

122. Commerce and Rextar, and the respective Escrow Agents acting for them in the B-to-C closings, knew that the Lenders were supplying substantial Loan proceeds for the B-to-C acquisitions, securing the Loans with the properties (by having security documents, including Deeds of Trust, executed at closing), and that the Lenders were relying upon the Title Companies and Escrow Agents to conduct the settlements, protect and accurately account for those funds and documents, comply with the Closing Instructions, and disclose material information concerning the transactions entrusted to them.

123. The duty alleged from the rapid prior sales is not a generalized duty to investigate or detect mortgage fraud. It arises from the Title Companies' and Escrow Agents' agency and fiduciary undertakings in the particular A-to-B and B-to-C closings and from their possession of material facts concerning those transactions while controlling whether the Lenders' entrusted funds would be disbursed.

124. Before disbursing the Lenders' Loan proceeds in the applicable FILRPS transactions, Commerce and Rextar, and the respective Escrow Agents failed to disclose to the Lenders the known material facts concerning the recent A-to-B acquisition, including the short interval between acquisition and resale and, where reflected in the closing records, the substantial increase between the A-to-B acquisition price and the B-to-C sales price, upon information and belief because the Escrow Agents knew that if the Lender knew these material facts, the Lenders would not have authorized the closings causing the Escrow Agents and Title Companies to lose profits.

125. Had those material facts been disclosed before the respective B-to-C closings, the Lenders would not have authorized the affected Loans to close or their Loan proceeds to be disbursed under the circumstances alleged herein. The failure to disclose therefore caused the Lenders to fund Loans

they otherwise would not have funded and exposed the Lenders to the losses alleged in this Complaint.

126. Marvel Title & Escrow LLC handled seven (7) B-to-C Loan closings identified in the transaction records, but the same rapid-prior-sale pattern alleged above is not asserted against Marvel: those transactions did not involve a less-than-ninety-day A-to-B acquisition followed by a Marvel B-to-C closing in which Marvel also handled the A-to-B acquisition. Marvel is therefore not included in Counts VI or VII on the FILRPS theory alleged above.

127. As referenced in the Title Company Chart below, the Escrow Agents employed by the Title Companies performed real estate settlements and closings regarding the listed Loans, each of which caused losses to the Lenders, by category, these include:

i) "Failure to Inform Lenders of Rapid Prior Sale" or "FILRPS" means a B-to-C Loan transaction in which the seller had acquired the property in a prior A-to-B transaction less than ninety (90) days before the B-to-C closing at a materially lower price, and the respective Title Company and/or Escrow Agent knew, or had within the title and closing records under their control, the material facts concerning that recent acquisition and failed to disclose those facts to the Lenders

before closing and disbursing the Lenders' Loan proceeds. For the same-Title-Company transactions alleged below, the Title Company's knowledge was direct because that Title Company had itself handled both the A-to-B acquisition and the subsequent B-to-C Loan closing; and

ii) "Failure to Disclose Recurring Participant Pattern" or "RPP" means failure, in a FLIP transaction, to disclose to the Lenders that the transaction was part of a recurring pattern known to the related title company – Commerce or REXTAR - and related Escrow Agent - in which the same Gold-owned purchaser/borrower entities repeatedly acquired properties from the same recurring group of seller-side entities after short holding periods and at materially increased resale prices. RPP includes the related title company – Commerce or REXTAR - and related Escrow Agent's knowledge derived from its repeated handling of those transactions; and, as to Commerce and related Escrow Agent(s) in twenty-nine (29) FLIP transactions, and, upon information and belief, from Commerce's own handling of the immediately preceding A-to-B acquisition; and, as to REXTAR and related Escrow Agent(s) in seven (7) FLIP transactions, and, upon information and belief, from REXTAR own handling of the

immediately preceding A-to-B acquisition; and, upon information and belief, Commerce, REXTAR, and related Escrow Agents handled other loans not funded by either Plaintiff involving the same FLIP transaction structure, the same Conspirators and Fraudsters, and the same or related Escrow Agents who handled the immediately preceding A-to-B acquisition.

these are collectively referred to as "Title Bad Acts."

## TITLE COMPANY CHART

| | Property Securing Loan | Title Company & Escrow Agent | Borrower's CAC | Basis of Liability |
|---|---|---|---|---|
| 1 | 2529 Woodbrook Ave | Herbert Godinez/ Rextar Title Services LLC | $63,959.27 | FILRPS; RPP |
| 2 | 1108 N. Dukeland St | David Kramer/ Castle Title | $60,127.31 | FILRPS |
| 3 | 1942 Mosher St | David Kramer/ Castle Title | $64,972.31 | FILRPS |
| 4 | 2840 Woodbrook Ave | Eli Newman/ Commerce Title Company, Inc | $57,530.75 | FILRPS; RPP |
| 5 | 1687 Darley Ave | Herbert Godinez/ Rextar Title Services, LLC | $67,710.24 | FILRPS; RPP |
| 6 | 1411 Ramsay St | Herbert Godinez/ Rextar Title Services LLC | $56,438.52 | FILRPS; RPP |
| 7 | 1731 McHenry St | Herbert Godinez/ Rextar Title Services LLC | $52,690.87 | FILRPS; RPP |
| 8 | 2801 Presbury St | Eli Newman/ Commerce Title Company Inc. | $59,562.10 | FILRPS; RPP |
| 9 | 2110 W. Saratoga St | Herbert Godinez/ Rextar Title Services LLC | $54,108.98 | FILRPS; RPP |
| 10 | 1822 Wilkens Ave | Eli Newman/ Commerce Title Company Inc | $58,442.38 | FILRPS; RPP |
| 11 | 1123 McKean Ave | Eli Newman/ Commerce Title Company Inc. | $49,551.49 | FILRPS; RPP |
| 12 | 1652 Darley Ave | Eli Newman/ Commerce Title Company Inc. | $59,727.30 | FILRPS; RPP |
| 13 | 3217 Brighton St | Eli Newman/ | $57,188.27 | FILRPS; RPP |

| | | | | |
|---|---|---|---|---|
| | | Commerce Title Company Inc. | | |
| 14 | 2952 Presstman St | Eli Newman/ Commerce Title Company Inc | $62,042.43 | FILRPS; RPP |
| 15 | 3617 Kenyon Ave | Eli Newman/ Commerce Title Company Inc. | $55,489.23 | FILRPS; RPP |
| 16 | 3323 Kenyon Ave | Eli Newman/ Commerce Title Company Inc. | $53,766.96 | FILRPS; RPP |
| 17 | 3214 Kenyon Ave | Eli Newman/ Commerce Title Company Inc | $53,946.96 | FILRPS; RPP |
| 18 | 4235 Seidel Ave | Eli Newman/ Commerce Title Company Inc. | $53,580.80 | FILRPS; RPP |
| 19 | 736 N. Linwood Ave | Eli Newman/ Commerce Title Company Inc | $54,865.63 | FILRPS; RPP |
| 20 | 1518 Elrino St | Eli Newman/ Commerce Title Company Inc | $56,433.32 | FILRPS; RPP |
| 21 | 3834 Elmora Ave | Eli Newman/ Commerce Title Company Inc | $54,872.78 | FILRPS; RPP |
| 22 | 3514 Dudley Ave | Eli Newman/ Commerce Title Company Inc | $55,119.22 | FILRPS; RPP |
| 23 | 505 N. Collington Ave | Eli Newman/ Commerce Title Company Inc. | $51,973.55 | FILRPS; RPP |
| 24 | 3131 Chesterfield Ave | Eli Newman/ Commerce Title Company Inc | $55,369.93 | FILRPS; RPP |
| 25 | 4926 Schaub Ave | Eli Newman/ Commerce Title Company Inc | $54,315.73 | FILRPS; RPP |
| 26 | 3032 Fleetwood Ave | Eli Newman/ Commerce Title Company Inc | $79,689.90 | FILRPS; RPP |
| 27 | 3113 Chesterfield Ave | Eli Newman/ Commerce Title Company Inc | $53,163.54 | FILRPS; RPP |
| 28 | 3122 Brendan Ave | Eli Newman/ Commerce Title Company Inc | $58,065.36 | FILRPS; RPP |
| 29 | 2007 W. Saratoga St | Eli Newman/ Commerce Title Company Inc | $52,135.95 | FILRPS; RPP |
| 30 | 418 N. Milton Ave | Eli Newman/ Commerce Title Company Inc | $77,966.90 | FILRPS; RPP |
| 31 | 2606 Beryl Ave | Eli Newman/ Commerce Title Company Inc | $64,132.04 | FILRPS; RPP |
| 32 | 2822 Kennedy Ave | Marco V. Rodriguez/ Rextar Title Services LLC | $50,479.77 | FILRPS; RPP |
| 33 | 2842 Mayfield Ave | Eli Newman/ Commerce Title Company Inc | $65,374.08 | FILRPS; RPP |
| 34 | 5014 Belair Rd | Eli Newman/ Commerce Title Company Inc | $65,407.52 | FILRPS; RPP |
| 35 | 1809 Rayner Ave | Eli Newman/ Commerce Title Company Inc. | $53,026.55 | FILRPS; RPP |

| | | | | |
|---|---|---|---|---|
| 36 | 33 N. Kresson St | Eli Newman/ Commerce Title Company Inc | $55,116.16 | FILRPS; RPP |
| 37 | 2703 Ellicott Dr | Eli Newman/ Commerce Title Company Inc | $64,054.37 | FILRPS; RPP |
| 38 | 2002 Boone St | Eli Newman/ Commerce Title Company Inc. | $64,792.90 | FILRPS; RPP |
| 39 | 2006 Walbrook Ave | Herbert Godinez/ Rextar Title Services LLC | $56,481.33 | FILRPS; RPP |

128. Each Escrow Agent is and was at all times relevant hereto, an agent, servant, employee, officer and/or director of the Title Company.

129. Each Escrow Agent acted on behalf of the Title Company as the closing agent for the Loans.

130. Upon information and belief, each Escrow Agent acted on behalf of the Title Company and notarized certain documents, created and directed execution of a Settlement Statement, received Closing Instructions, prepared, signed and printed certain checks, and otherwise handled the Lenders' documents and funds in connection with each Loan.

131. As title company/closing agent for the Loans, each Escrow Agent was responsible for, *inter alia*:

iii) Directing the preparation and recording of the Lenders' loan documents, deeds and/or assignments;

iv) Directing the preparation and recording of the Seller’s sale documents, deeds and/or assignments;

v) Title abstracting, examination, and title insurance issuance;

vi) Preparing the Settlement Statement;

vii) Conducting the Loan settlement;

viii) Collecting and documenting in ledgers all funds coming into the transaction, including payments from the Lenders, buyer, and seller;

ix) Collecting and documenting in ledgers disbursements of all Funds to the buyer, prior mortgage holders, and seller; and

x) Performing escrow services including distributing the Lenders' purchase money or refinance proceeds.

(collectively, "Title Contract Terms").

132. Prior to the closing of each Loan, the Lenders provided written Closing Instructions to each Title Company, which was acknowledged by the Escrow Agent.

133. The Closing Instructions prescribed that the Title Company and Escrow Agent were only authorized to close the Loans subject to certain conditions set forth in the Closing Instructions, including, but not limited to the disbursement of funds.

134. Settlement statements must be accurate and have acknowledgements using substantially similar language as: *I have carefully reviewed the Settlement Statement and find it to be a true and accurate statement of all*

*receipts and payments made on my account or by me in this transaction and further certify that I have received a copy of this Settlement Statement.*

135. The Title Companies were paid the following fees to close the following loans:

## Title Company Fee Chart

| | Property Securing Loan | Title Company & Escrow Agent | Borrower's CAC |
|---|---|---|---|
| 1 | 2529 Woodbrook Ave | Herbert Godinez/ Rextar Title Services LLC | $1,798.80 |
| 2 | 1108 N. Dukeland St | David Kramer/ Castle Title | $2,390.00 |
| 3 | 1942 Mosher St | David Kramer/ Castle Title | $2,395.00 |
| 4 | 2840 Woodbrook Ave | Eli Newman/ Commerce Title Company, Inc | $1,290.00 |
| 5 | 1687 Darley Ave | Herbert Godinez/ Rextar Title Services, LLC | $1,780.12 |
| 6 | 3117 Lawnview Ave | Jennifer Alter/ Eagle Premier Title Company | $1,302.00 |
| 7 | 2601 Jefferson St | Eli Newman/ Commerce Title Company Inc. | $1,485.00 |
| 8 | 1607 Race St | Herbert Godinez/ Rextar Title Services LLC | $2,426.50 |
| 9 | 1411 Ramsay St | Herbert Godinez/ Rextar Title Services LLC | $1,704.72 |
| 10 | 1731 McHenry St | Herbert Godinez/ Rextar Title Services LLC | $1,711.44 |
| 11 | 2801 Presbury St | Eli Newman/ Commerce Title Company Inc. | $1,280.00 |
| 12 | 2625 Garrett Ave | Eli Newman/ Commerce Title Company Inc. | $1,430.00 |
| 13 | 2110 W. Saratoga St | Herbert Godinez/ Rextar Title Services LLC | $1,661.16 |
| 14 | 1822 Wilkens Ave | Eli Newman/ Commerce Title Company Inc | $1,335.00 |
| 15 | 1123 McKean Ave | Eli Newman/ Commerce Title Company Inc. | $1,430.00 |
| 16 | 1652 Darley Ave | Eli Newman/ Commerce Title Company Inc. | $1,335.00 |

| | | | |
|---|---|---|---|
| 17 | 3217 Brighton St | Eli Newman/<br>Commerce Title Company Inc. | $1,335.00 |
| 18 | 2952 Presstman St | Eli Newman/<br>Commerce Title Company Inc | $1,390.00 |
| 19 | 1625 N. Rosedale St | Eli Newman/<br>Commerce Title Company Inc. | $1,316.00 |
| 20 | 3617 Kenyon Ave | Eli Newman/<br>Commerce Title Company Inc. | $1,335.00 |
| 21 | 3323 Kenyon Ave | Eli Newman/<br>Commerce Title Company Inc. | $1,335.00 |
| 22 | 3214 Kenyon Ave | Eli Newman/<br>Commerce Title Company Inc | $1,335.00 |
| 23 | 4235 Seidel Ave | Eli Newman/<br>Commerce Title Company Inc. | $1,546.00 |
| 24 | 736 N. Linwood Ave | Eli Newman/<br>Commerce Title Company Inc | $1,546.00 |
| 25 | 1518 Elrino St | Eli Newman/<br>Commerce Title Company Inc | $1,546.00 |
| 26 | 3834 Elmora Ave | Eli Newman/<br>Commerce Title Company Inc | $1,546.00 |
| 27 | 3514 Dudley Ave | Eli Newman/<br>Commerce Title Company Inc | $1,546.00 |
| 28 | 505 N. Collington Ave | Eli Newman/<br>Commerce Title Company Inc. | $1,546.00 |
| 29 | 3131 Chesterfield Ave | Eli Newman/<br>Commerce Title Company Inc | $1,448.00 |
| 30 | 4926 Schaub Ave | Eli Newman/<br>Commerce Title Company Inc | $1,448.00 |
| 31 | 3032 Fleetwood Ave | Eli Newman/<br>Commerce Title Company Inc | $1,448.00 |
| 32 | 3113 Chesterfield Ave | Eli Newman/<br>Commerce Title Company Inc | $1,448.00 |
| 33 | 3122 Brendan Ave | Eli Newman/<br>Commerce Title Company Inc | $1,448.00 |
| 34 | 2007 W. Saratoga St | Eli Newman/<br>Commerce Title Company Inc | $1,448.00 |
| 35 | 1083 Ellicott Drwy | Eli Newman/<br>Commerce Title Company Inc | $1,448.00 |
| 36 | 700 N. Belnord Ave | Marco V. Rodriguez/<br>Rextar Title Services LLC | $1,674.60 |
| 37 | 3117 Mareco Ave | Marco V. Rodriguez/<br>Rextar Title Services LLC | $1,688.04 |
| 38 | 1709 Poplar Grove St | Marco V. Rodriguez/<br>Rextar Title Services LLC | $1,647.72 |
| 39 | 2612 E. Preston St | Marco V. Rodriguez/ | $1,674.60 |

| | | | |
|---|---|---|---|
| | | Rextar Title Services LLC | |
| 40 | 1518 E. 28th St | Marco V. Rodriguez/ Rextar Title Services LLC | $1,661.16 |
| 41 | 418 N. Milton Ave | Eli Newman/ Commerce Title Company Inc | $1,448.00 |
| 42 | 2606 Beryl Ave | Eli Newman/ Commerce Title Company Inc | $1,448.00 |
| 43 | 2822 Kennedy Ave | Marco V. Rodriguez/ Rextar Title Services LLC | $1,618.84 |
| 44 | 2842 Mayfield Ave | Eli Newman/ Commerce Title Company Inc | $1,430.00 |
| 45 | 5014 Belair Rd | Eli Newman/ Commerce Title Company Inc | $1,448.00 |
| 46 | 2430 Etting St | Tonita Williams/ Marvel Title & Escrow LLC | $1,607.40 |
| 47 | 2434 Etting St | Herbert Godinez/ Marvel Title & Escrow LLC | $1,607.40 |
| 48 | 2436 Etting St | Herbert Godinez/ Marvel Title & Escrow LLC | $1,607.40 |
| 49 | 2428 Etting St | Herbert Godinez/ Marvel Title & Escrow LLC | $1,607.40 |
| 50 | 2442 Etting St | Herbert Godinez/ Marvel Title & Escrow LLC | $1,607.40 |
| 51 | 2446 Etting St | Herbert Godinez/ Marvel Title & Escrow LLC | $1,607.40 |
| 52 | 2422 Etting St | Herbert Godinez/ Marvel Title & Escrow LLC | $1,607.40 |
| 53 | 1706 Lemmon St | Eli Newman/ Commerce Title Company Inc. | $1,403.00 |
| 54 | 2642 Wilkens Ave | Marco V. Rodriguez/ Rextar Title Services LLC | $1,617.48 |
| 55 | 1809 Rayner Ave | Eli Newman/ Commerce Title Company Inc. | $1,335.00 |
| 56 | 33 N. Kresson St | Eli Newman/ Commerce Title Company Inc | $1,335.00 |
| 57 | 2703 Ellicott Dr | Eli Newman/ Commerce Title Company Inc | $1,335.00 |
| 58 | 2002 Boone St | Eli Newman/ Commerce Title Company Inc. | $1,430.00 |
| 59 | 2006 Walbrook Ave | Herbert Godinez/ Rextar Title Services LLC | $1,674.60 |

## I. APPRAISERS

136. Appraisers, AMC, CDA Appraiser, and/or CDA Company, performed appraisals and/or appraisal reviews of real property, at the Lenders' request, securing the Loans.

137. The prospect of a Loan default is "in the reasonable contemplation" of the appraiser in making an appraisal; accordingly, the appraiser bears the risk that the misappraised collateral, if and when sold, will be less than contemplated by the ABML; to be clear, the risk is not that a loan may default, rather that if the loan defaults, then the collateral (as valued by the appraiser) is insufficient to prevent a loss to the ABML.

138. To satisfy the LTV Requirement, the AMC was hired to and did prepare appraisals ("Appraisals") as referenced in the Appraiser Chart below; the AMC retained the Appraisers to assist in performing the actual Appraisals. The Appraisers and AMCs performed certain actions regarding the Appraisals, breaching USPAP and causing liability to the Lenders by category, these include:

i) "Subject Errors" or "SE" herein refers to the fact that the analyses, opinions and conclusions in the Subject section of the Uniform Residential Appraisal Report ("URAR") are not credible, i.e. contain inaccurate listing information and/or inaccurate sale information;

This missing and/or incomplete analysis reflects non-compliance with USPAP SR 1-1(a); 1-2(e)(i); and/or 2-1(b).

ii) “Incorrect Owner” or “IO” herein refers to the appraiser naming the incorrect party as owner of the real property; these errors and omissions are inconsistent with USPAP SR 1-1(b) and/or 1-2(e)(ii);

iii) “Contract Section Errors” or “CSE” herein refers to the appraiser failing to analyze the disparity between the prior sales/transfers of the subject property and appraised value, reflects non-compliance with USPAP SR 1-1(b), 2-1(b), and/or 2-2(a)(x)(5).

iv) "Neighborhood Errors" or "NE" herein refers to the fact that the analyses, opinions and conclusions in the neighborhood section of the URAR are not credible, i.e., the neighborhood section inaccurately defines the subject's market area, the boundaries reported are not consistent with the correct neighborhood, reflects non-compliance with USPAP SR 1-1(b); 1-2(e)(i), SR 2-1(a), 2-1(b), and/or 2-2(a)(x)(5)..

v) "Improvement Errors" or "IE" herein refers to the fact that the analyses, opinions and conclusions in the improvement section of the URAR are not credible, i.e. the conclusion as to subject property's condition were incorrect, the photographs do not adequately support the rating, there is insufficient explanation or analysis supporting the

condition classification, reflects non-compliance with USPAP SR 1-2(e)(i), 2-1(a), and/or 2-1(b).

vi) "Sales Comparison Approach Errors" or “SCAE" herein refers to the fact that the analyses, opinions and conclusions in the sales comparison approach section of the URAR are not credible, i.e., the appraiser did not accurately report or analyze the condition of the comparables relative to the subject property, sales use no reflective of the most comparable sales available as of the effective valuation date, inadequate analysis of comparability or support for adjustments made, use of identical comparables on multiple appraisals for adjacent properties, etc., reflects non-compliance with USPAP SR 1-1(b), 1-4(a), 2-1(a), 2-1(b), and/or 2-2(a)(x)(5).

vii) “Prior Sale Omitted” or “PSO” herein refers to the Appraiser failing to disclose the prior sale of the real property as required; reflects non-compliance with USPAP SR 1-1(b), 1-5 (b), 2-1(b), and/or 2-2(a)(x)(5).;

viii) "Cost Approach Errors" or "CAE" herein refers to the fact that the analyses, opinions and conclusions in the cost approach section of the URAR are not credible, i.e. failure to properly identify the cost source, utilization of inadequate condition, etc.; reflects an example of non-compliance with USAP SR 2-1(b);

ix) "Income Approach Errors" or "IAE" herein refers to the fact that the analyses, opinions and conclusions in the income approach section of the URAR are not credible, i.e. the comparable rent schedule does not support the estimated rent, use of superior condition rental comparisons, no support for the gross rent multiplier, etc.; reflects non-compliance with USPAP SR 1-1(b), 2-1(a), 2-1(b), and/or 2-2(a)(x)(5).

x) "Exhibit Errors" or "EE" herein refers to the fact that the exhibits to the URAR are not credible, i.e. the photographs only show certain portions of the property, the photographs do not adequately depict the property, the photographs provide only limited reviews, the photographs restrict the ability to verify the reported condition and quality of the improvements, etc.; reflects non-compliance with USPAP SR 1-1(b) and/or 1-2(e)(i).

collectively, called "Appraisal Bad Acts."

139. The following Maryland licensed appraisers performed the following Appraisals identified in the Appraiser Chart below.

i) Christopher Actie ("CA");

ii) Jason Taylor, referred to as ("JT"); and

iii) Lynda Zink referred as ("LZ").

140. The above referenced Maryland licensed appraisers performed the Appraisals through the following AMCs.

i) Incenter Appraisal Management LLC, herein referred to ats "IAM;"

ii) Appraisal Nation herein referred to as "AN;" or

iii) BNL Appraisal Management Company, herein referred to as "BNL;" or

iv) Tamarisk Appraisals, herein referred to as "TA."

<u>APPRAISER CHART</u>

| | Property Securing Loan | Error | Appraisal Valuation | Total Approx. Overvaluation | Appraiser |
|---|---|---|---|---|---|
| 1 | 2529 Woodbrook Ave | SE, NE, IE, SCAE, CAE, IAE, EE | $225,000.00 | $113,000.00 | CA / AN |
| 2 | 1108 N. Dukeland St | SE, NE, IE, SCAE,PSO, CAE, IAE | $203,000.00 | $109,000.00 | LZ / IAM |
| 3 | 1942 Mosher St | SE, CSE, NE, IE, SCAE, PSO, CAE, IAE | $222,000.00 | $77,000.00 | JT / IAM |
| 4 | 2840 Woodbrook Ave | SE, SCAE, NE, CAE, IAE | $200,000.00 | $92,000.00 | CA / IAM |
| 5 | 1687 Darley Ave | SE, SCAE, CAE | $240,000.00 | $0 | CA / IAM |
| 6 | 3117 Lawnview Ave | SE, IE, SCAE, CAE, IAE | $200,000.00 | $95,000.00 | CA / IAM |
| 7 | 2601 Jefferson St | SCAE, PSO, CAE, IAE, EE | $210,000.00 | $70,000.00 | CA / IAM |
| 8 | 1607 Race St | SE, NE, IE, SCAE, CAE, IAE | $450,000.00 | $125,000.00 | CA / IAM |
| 9 | 1411 Ramsay St | SE, NE, SCAE, PSO, CAE, IAE, EE | $190,000.00 | $74,000.00 | CA / AN |
| 10 | 1731 McHenry St | SE, IO, NE, IE, SCAE, CAE, IAE | $200,000.00 | $87,000.00 | CA / AN |
| 11 | 2801 Presbury St | SE, NE, IE, SCAE, CAE, IAE | $210,000.00 | $110,000.00 | CA / AN |
| 12 | 2625 Garrett Ave | SE, NE, SCAE, PSO, CAE, IAE | $230,000.00 | $130,000.00 | CA / AN |
| 13 | 2110 W. Saratoga St | SE, NE, IE, SCAE, CAE, IAE | $195,000.00 | $50,000.00 | CA / AN |
| 14 | 1822 Wilkens Ave | SE, IO, NE, IE, SCAE, CAE, IAE | $210,000.00 | $120,000.00 | CA / AN |

| | | | | | |
|---|---|---|---|---|---|
| 15 | 1123 McKean Ave | SE, IE, SCAE, CAE, IAE | $180,000.00 | $58,000.00 | CA / AN |
| 16 | 1652 Darley Ave | SE, NE, IE, SCAE, CAE, IAE | $215,000.00 | $91,000.00 | JT / AN |
| 17 | 3217 Brighton St | SE, NE, IE, SCAE, PSO, CAE, IAE | $205,000.00 | $90,000.00 | JT / AN |
| 18 | 2952 Presstman St | SE, NE, IE, SCAE, PSO, CAE, IAE | $225,000.00 | $109,000.00 | JT / AN |
| 19 | 1625 N. Rosedale St | NE, IE, SCAE, CAE, IAE, EE | $188,000.00 | Value indeterminable due to incorrect subject photos | CA / AN |
| 20 | 3617 Kenyon Ave | SE, IE, SCAE, PSO, CAE, IAE | $190,000.00 | $75,000.00 | CA / AN |
| 21 | 3323 Kenyon Ave | SE, IE, SCAE, CAE, IAE | $185,000.00 | $45,000.00 | CA / AN |
| 22 | 3214 Kenyon Ave | SE, SCAE, CAE, IAE | $185,000.00 | $45,000.00 | CA / AN |
| 23 | 4235 Seidel Ave | SE, NE, IE, SCAE, CAE, IAE | $185,000.00 | $65,000.00 | CA / AN |
| 24 | 736 N. Linwood Ave | SE, NE, IE, SCAE, PSO, CAE, IAE | $185,000.00 | $80,000.00 | CA / AN |
| 25 | 1518 Elrino St | SE, NE, IE, SCAE, CAE, IAE | $190,000.00 | $44,000.00 | CA / AN |
| 26 | 3834 Elmora Ave | SE, IE, SCAE, CAE, IAE | $185,000.00 | $35,000.00 | CA / AN |
| 27 | 3514 Dudley Ave | SE, SCAE, CAE, IAE | $190,000.00 | $65,000.00 | CA / AN |
| 28 | 505 N. Collington Ave | SE, NE, IE, SCAE, PSO, CAE, IAE | $185,000.00 | $95,000.00 | CA / AN |
| 29 | 3131 Chesterfield Ave | SE, SCAE, CAE, IAE | $190,000.00 | $35,000.00 | CA / AN |
| 30 | 4926 Schaub Ave | SE, NE, IE, SCAE, CAE, IAE, EE | $185,000.00 | $5,000.00 | CA / AN |
| 31 | 3032 Fleetwood Ave | SE, IE, SCAE, PSO, CAE, IAE, EE | $280,000.00 | $70,000.00 | CA / AN |
| 32 | 3113 Chesterfield Ave | SE, SCAE, CAE, IAE | $187,000.00 | $32,000.00 | CA / AN |
| 33 | 3122 Brendan Ave | SE, IE, SCAE, CAE, IAE | $205,000.00 | $68,000.00 | CA / AN |
| 34 | 2007 W. Saratoga St | SE, NE, IO, IE, SCAE, CAE, IAE | $185,000.00 | $80,000.00 | CA / AN |
| 35 | 1083 Ellott Drwy | NE, IE, SCAE, CAE, IAE | $230,000.00 | $80,000.00 | CA / AN |
| 36 | 700 N. Belnord Ave | SE, IE, SCAE, CAE, IAE | $200,000.00 | $98,000.00 | CA / AN |
| 37 | 3117 Mareco Ave | SE, SCAE, CAE, IAE | $205,000.00 | $98,000.00 | CA / AN |
| 38 | 1709 Poplar Grove St | SE, NE, SCAE, CAE, IAE | $190,000.00 | $81,000.00 | CA / AN |
| 39 | 2612 E. Preston St | SE, NE, IE, SCAE, CAE, IAE | $200,000.00 | $105,000.00 | CA / AN |
| 40 | 1518 E. 28th St | SE, NE, IE, CAE, IAE, EE | $194,000.00 | $94,000.00 | CA / AN |
| 41 | 418 N. Milton Ave | SE, NE, IE, SCAE, CAE, IAE, EE | $280,000.00 | $170,000.00 | JT / AN |

| | | | | | |
|---|---|---|---|---|---|
| 42 | 2606 Beryl Ave | SE, IE, NE, SCAE, PSO, CAE, IAE | $230,000.00 | $115,000.00 | JT / AN |
| 43 | 2822 Kennedy Ave | SE, NE, IE, SCAE, PSO, CAE, IAE, EE | $180,000.00 | $95,000.00 | CA / AN |
| 44 | 2842 Mayfield Ave | SE, NE, IE, SCAE, CAE, IAE | $225,000.00 | $115,000.00 | JT / AN |
| 45 | 5014 Belair Rd | SE, NE, SCAE, CAE, IAE | $230,000.00 | $0 | CA / AN |
| 46 | 2430 Etting St | SE, NE, IE, SCAE, CAE, IAE, EE | $175,000.00 | $98,000.00 | JT /BNL |
| 47 | 2434 Etting St | SE, NE, IE, SCAE, CAE, IAE | $175,000.00 | $97,000.00 | JT / BNL |
| 48 | 2436 Etting St | SE, NE, IE, SCAE, CAE, IAE | $175,000.00 | $97,000.00 | JT / BNL |
| 49 | 2428 Etting St | SE, NE, IE, SCAE, CAE, IAE, EE | $175,000.00 | $95,000.00 | JT / BNL |
| 50 | 2442 Etting St | SE, NE, IE, SCAE, CAE, IAE | $175,000.00 | $97,000.00 | JT / BNL |
| 51 | 2446 Etting St | SE, NE, IE, SCAE, CAE, IAE | $175,000.00 | $97,000.00 | JT / BNL |
| 52 | 2422 Etting St | SE, NE. IE, SCAE, CAE, IAE | $175,000.00 | $97,000.00 | JT / BNL |
| 53 | 1706 Lemmon St | SE, NE, IE, SCAE, CAE, IAE | $225,000.00 | $45,000.00 | CA / AN |
| 54 | 2642 Wilkens Ave | SE, SCAE, CAE, IAE, EE | $200,000.00 | $93,000.00 | CA/ BNL |
| 55 | 1809 Rayner Ave | SE, NE, IE, SCAE, CAE, IAE, EE | $185,000.00 | $10,000.00 | CA / AN |
| 56 | 33 N. Kresson St | SE, NE, SCAE, CAE, IAE | $190,000.00 | $75,000.00 | CA / AN |
| 57 | 2703 Ellicott Dr | SE, NE, IE, SCAE, CAE, IAE | $230,000.00 | $115,000.00 | JT / TA |
| 58 | 2002 Boone St | SE, NE, SCAE, IE, CAE, IAE | $225,000.00 | $65,000.00 | JT / AN |
| 59 | 2006 Walbrook Ave | SE, NE, IE, SCAE, CAE, IAE, EE, IRC | $199,000.00 | $92,000.00 | JT / AN |

141. Appraisal Nation, LLC is an appraisal management company whose primary focus is delivery of accurate, independent, unbiased appraisals

142. Appraisal Nation, LLC is responsible for the following:

i) Performs an internal review of each appraisal it produces, intended, inter alia, to identify potential USPAP violations ("USPAP Requirement");[2]

ii) Manages the Lenders' appraisal procuring process and conducts quality controls of those reports; in addition to an automated software based review (MARS) that evaluates up to 1,400 points of compliance for valuation products, individual appraisals will then undergo a line-by-line compliance screening by in-house appraisers – per its website - ***We are the appraisal QC experts:*** *Appraisals are reviewed by an automated review software that evaluates up to 1,400 points of compliance, then will undergo a line-by-line review by one of our in-house appraisers*; Appraisal Nation will provide appropriate reporting of appraisal quality to ensure the lenders' compliance with the Dodd-Frank ("ASB Review Requirement");

iii) Quality Control - Every appraisal report that Appraisal Nation delivers goes through an automated review process (RealView) that checks the report against UAD, UCDP and USPAP guidelines; a

---

2 Per AN's website *[w]e are the appraisal QC experts. Appraisals are reviewed by an automated review software, then will undergo a review by one of our in-house real estate experts.*

secondary manual review by trained industry professionals is then performed to ensure that all *Dodd-Frank Act in accordance with Appraisal Independence Requirements (AIR), Fannie Mae, Freddie Mac, TILA-RESPA, and the Interagency Appraisal and Evaluation Guidelines* are met; the manual review also ensures that the report is technically correct and that all lender requirements have been completed; Appraisal Nation's quality control staff regularly attends training sessions to improve its processes and procedures ("QC Requirement");[3] and

iv) Ensures that all reports must be USPAP compliant ("USPAP Compliance Requirement");

collectively, the "AN Duties."

143. Lenders employed the AMC who then employed each Appraiser for the limited and express purpose of obtaining the Appraisal, upon information and belief, per the Financial Industry Reform, Recovery and Enforcement Act of 1989 12 U.S.C. § 3338 ("FIRREA"), 12 CFR 225.65(b), 12 CFR

3 Per the AN's website [t]*he delivery of accurate, independent, unbiased appraisals is our primary focus. Our appraisal process is completed in compliance with the Dodd-Frank Act in accordance with Appraisal Independence Requirements (AIR), Fannie Mae, Freddie Mac, TILA-RESPA, and the Interagency Appraisal and Evaluation Guidelines.*

323.5(b), 12 CFR 722.5(b), 12 CFR 34.45(b), and 12 CFR 564.5(b), Dodd-Frank Act in accordance with Appraisal Independence Requirements (AIR), Fannie Mae, Freddie Mac, TILA-RESPA, and the Interagency Appraisal and Evaluation Guidelines. and USPAP.

144. The Lenders stand in contractual privity, or in a relationship equivalent to privity, with each AMC and each Appraiser. Each AMC and each Appraiser knew that the Appraisal was to be used for a particular purpose: the underwriting of the specific mortgage Loan for which it was ordered. Each AMC and each Appraiser knew that a known party—the identified Lender—was intended to rely upon the Appraisal for that purpose. And each AMC and each Appraiser engaged in conduct linking it to that Lender: each accepted an engagement identifying the Lender as the client, each identified that Lender as the intended user on the face of the Appraisal, each certified the Appraisal, and each delivered the Appraisal to that Lender for use in the identified transaction. That relationship supplies the intimate nexus Maryland requires before a duty of care will support recovery for purely economic loss.

145. Upon completion of each Appraisal, the Appraiser certified that the Appraisal complied with USPAP.

146. Upon completion of each Appraisal, the Appraiser certified that the Appraisal was performed under his or her Maryland Appraiser's license.

## J. COLLATERAL DESKTOP REVIEW COMPANY

147. To confirm the accuracy of each appraisal, the Lenders contemporaneously retained the CDA Company to perform a limited USPAP complying appraisal review of each appraisal ("CDA Review").

148. The CDA Company hired a series of professional appraisers duly licensed in Maryland to perform the CDA Reviews.

149. The Lenders stand in contractual privity with the CDA Company and in a relationship equivalent to privity with each CDA Appraiser. Each CDA Review was ordered by and for the identified Lender, identified that Lender as the client and intended user, was prepared for the express purpose of confirming whether the underlying Appraisal was adequately supported before that Lender funded the specific Loan, and was certified and delivered to that Lender before funding.

150. Each CDA Appraiser knew that the CDA Review he or she signed would be delivered to and relied upon by the identified Lender in deciding whether to fund the identified Loan, and each certified the CDA Review to that effect.

151. Intentionally left blank.

152. The following Maryland licensed appraisers with Clear Capital performed the following CDA Reviews of the following Appraisals:

i) Debbie Griffin ( “DG”);

ii) Ty Shatzer (“TS”);

iii) Elizabeth Anderson (“EA”);

iv) Karen Wilson (“KW”):

v) Brad Harley (“BH”);

vi) Kenneth Cote (“KC”)

vii) Jonathan Spaich (“JS”); and

viii) Robert Goldt (“RG”).

153. The CDA Companies and CDA Appraisers performed certain actions regarding the CDA Reviews, breaching USPAP and causing loss to the Lenders; by category, these include:

i) The CDA's stated scope of work invokes an extraordinary assumption that the original appraisal report (“OAR”) contains credible factual information, which is a permissible starting point under USPAP. However, a reviewer is not relieved of the obligation to identify errors that are plainly visible within the data the reviewer has already assembled. The CDA's own supplemental data, including MLS

records, public records, and the additional comparable sales presented in its Sections VII contain information that directly contradicts conclusions drawn in the OAR. The CDA's failure to connect these contradictions to a credibility finding represents a fundamental scope of work deficiency ("Failure to Identify Errors Correctly" or "FIEC"); reflects non-compliance with SR 3-1(a); SR 3-1(b); and/or SR 4-1(b);

ii) The CDA's failure to identify, take into consideration and/or conduct additional investigation or due diligence review with regard to flip transaction pattern, non-arms-length transaction and/or intra party transfer in endorsing the appreciation of the property in a short period of time. ("Failure to Identify Transfer History" or "FITH"); not adequately addressing the circumstances of the prior transaction, the lack of market exposure, or whether the sale reflected market value, inconsistent with USPAP SR 1-5(a), SR 2-1(b), and SR 2-2(a)(x)(5) and unexposed contract price cannot be reconciled to a market value definition requiring a reasonable time for exposure in the open market without analysis, and the CDA accepted the OAR's treatment as adequate reflects non-compliance with USPAP SR 3-1(a); SR 3-1(b); SR 4-1(b);

iii) The CDA's acceptance of the condition rating despite finding no support for the condition rating and/or even flagging the condition as a subject level risk indicator ("Inaccurate Condition Rating" or "IRC"); reflects non-compliance with the analytical obligation imposed by SR 3-1(a);

iv) The CDA's failure to address and/or reconcile issues regarding the prior sale and transfer history, i.e. subject transfer history, comparable verification and/or date inconsistencies, etc. ("Improper Review of Prior Sale" and Transfer History" or "IRPSTH"); reflects non-compliance with USPAP SR 3-1(b) and/or SR 4-1(b);

v) The CDA's improper review of the sales comparison approach, i.e. physical mismatches accepted without scrutiny, no adjustment or reconciliation for superior properties from different market area(s), contradictions between risk indicator section and the record, etc. ("Improper Review of Sales Comparison Approach" or "IRSCA"); reflects missing and incomplete reporting and analysis reflects non-compliance with the 2023 Edition of USPAP as follows: SR 3-1(a); SR 3-1(b); SR 3-1(c); SR 4-1(b);

vi) The CDA's improper review of supplemental sales data, i.e. no analysis of gap or reconciliation between appraiser's data and

reviewer's own assembled data, failure to apply no arm's length filter, reconciliation of nearest and most conventional sales, etc. ("Improper Review of Supplemental Sales Data" or "IRSSD"); reflects inadequate market conditions analysis under SR 4-1(b);

vii) The CDA's lack of review of the income approach, i.e. failure to review the comparable rent schedule ("No Review of Income Approach" or "NRIA"); this missing or incomplete analysis reflects non-compliance with SR 3-1(a); SR 3-1(b); SR 4-1(b); and/or

viii) The CDA's risk rating of low-risk designation found not to be credible ("Risk Rating Inaccurate" or "RRI") does not reflect the application of professional judgment appropriate to a USPAP-compliant appraisal review;

collectively, called "CDA Bad Acts."

## CDA APPRAISAL REVIEW CHART

| | Property Securing Loan | Error | CDA Appraisal Valuation | Total Approx. Overvaluation | CDA Appraiser |
|---|---|---|---|---|---|
| 1 | 529 Woodbrook Ave | FIEC, IRC, IRSCA, IRSSD, IRPSTH, NRIA, RRI | $225,000.00 | $113,000.00 | DG |
| 2 | 108 N. Dukeland St | FIEC, FITH, IRC, IRPSTH, IRSCA, IRSSD, NRIA, RRI | $203,000.00 | $109,000.00 | DG |
| 3 | 1942 Mosher Ave | EC, FITH, IRPSTH, IRSCA NRIA, RRI | $200,000.00 | $77,000.00 | TS |
| 4 | 840 Woodbrook Ave | EC, FITH, IRC, IRSCA, RRI, IRSSD, NRIA | $200,000.00 | $92,000.00 | EA |

| | | | | | |
|---|---|---|---|---|---|
| 5 | 1687 Darley Ave | FIEC, FITH, RRI, IRPSTH, IRSSD, IRSCA, NRIA, IRC | $240,000.00 | 0.00 | DG |
| 6 | 3117 Lawnview Ave | FIEC, FITH, IRPSTH, IRSCA, RRI, IRSSD, NRIA, IRC | $200,000.00 | $95,000.00 | DG |
| 7 | 2601 Jefferson St | FIEC, FITH, IRPSTH, IRSCA, IRC, IRSSD, NRIA, RRI, IRC | $210,000.00 | $70,000.00 | EA |
| 8 | 1607 Race St | FIEC, FITH, IRSCA, IRC, IRPSTH, NRIA, RRI | $450,000.00 | $125,000.00 | EA |
| 9 | 1411 Ramsay St | IEC, FITH, IRPSTH, IRSCA, IRSSD, NRIA, RRI, IRC | $190,000.00 | $74,000.00 | DG |
| 10 | 1731 McHenry St | FIEC, FITH, IRC, IRPSTH, IRSCA, IRSSD, NRIA, RRI | $200,000.00 | $87,000.00 | KW |
| 11 | 2801 Presbury St | FIEC, FITH, IRC, IRPSTH, IRSCA, IRSSD, NRIA, RRI | $210,000.00 | $110,000.00 | KW |
| 12 | 2625 Garrett Ave | FIEC, FITH, IRC, IRPSTH, IRSCA, IRSSD, NRIA, RRI, | $215,000.00 | $115,000.00 | KW |
| 13 | 2110 W. Saratoga St | EC, FITH, RRI, IRC, IRPSTH, IRSSD, NRIA, IRC | $195,000.00 | $50,000.00 | DG |
| 14 | 1822 Wilkens Ave | FIEC, FITH, IRC, IRPSTH, IRSCA, NRIA, RRI, IRSSD | $210,000.00 | $120,000.00 | BH |
| 15 | 1123 McKean Ave | FIEC, FITH, IRC, IRPSTH, IRSCA, IRSSD, NRIA, RRI | $180,000.00 | $58,000.00 | EA |
| 16 | 1652 Darley Ave | IEC, FITH, IRPSTH, IRSCA, IRSSD, NRIA, RRI, IRC | $215,000.00 | $91,000.00 | EA |
| 17 | 3217 Brighton St | FIEC, FITH, IRC, IRPSTH, IRSCA, IRSSD, NRIA, RRI | $205,000.00 | $90,000.00 | KC |
| 18 | 2952 Presstman St | FIEC, FITH, IRC, IRPSTH, IRSCA, IRSSD, NRIA, RRI | $225,000.00 | $109,000.00 | KW |
| 19 | 1625 N. Rosedale St | FIEC, FITH, IRC, IRPSTH, IRSCA, IRSSD, NRIA, RRI | $188,000.00 | Value indeterminable due to incorrect subject photos | DG |
| 20 | 3617 Kenyon Ave | FIEC, FITH, IRC, IRPSTH, IRSCA, IRSSD, NRIA, RRI | $190,000.00 | $75,000.00 | JS |
| 21 | 3323 Kenyon Ave | EC, RRI, IRC, FITH, IRPSTH, IRSCA, IRSSD, NRIA | $185,000.00 | $45,000.00 | DG |
| 22 | 3214 Kenyon Ave | EC, RRI, IRSSD, FITH, IRPSTH, IRC, IRSCA, NRIA | $185,000.00 | $45,000.00 | EA |
| 23 | 4235 Seidel Ave | EC, RRI, IRC, FITH, IRPSTH, IRSCA, IRSSD, NRIA | $185,000.00 | $65,000.00 | JS |
| 24 | 736 N. Linwood Ave | EC, RRI, FITH, IRC, IRSCA, IRPSTH, IRSSD, NRIA, | $185,000.00 | $80,000.00 | JS |
| 25 | 1518 Elrino St | EC, RRI, FITH, IRC, IRPSTH, IRSCA, IRSSD, NRIA | $190,000.00 | $44,000.00 | JS |
| 26 | 3834 Elmora Ave | EC, RRI, IRSSD, IRC, IRSCA, FITH, | $190,000.00 | $53,000.00 | RG |

| | | | | | |
|---|---|---|---|---|---|
| | | IRPSTH, NRIA | | | |
| 27 | 3514 Dudley Ave | EC, RRI, IRSCA, FITH, IRC, IRPSTH, IRSSD, NRIA | $190,000.00 | $65,000.00 | RG |
| 28 | 05 N. Collington Ave | FIEC, FITH, IRC, IRPSTH, IRSCA, IRSSD, NRIA, RRI | $185,000.00 | $95,000.00 | RG |
| 29 | 131 Chesterfield Ave | EC, RRI, IRC, FITH, IRPSTH, IRSCA, IRSSD, NRIA | $190,000.00 | $35,000.00 | JS |
| 30 | 4926 Schaub Ave | EC, RRI, IRC, FITH, IRPSTH, IRSCA, IRSSD, NRIA | $185,000.00 | $15,000.00 | DG |
| 31 | 032 Fleetwood Ave | FIEC, FITH, IRPSTH, NRIA, IRC, IRSCA, IRSSD, RRI | $280,000.00 | $70,000.00 | KW |
| 32 | 113 Chesterfield Ave | FIEC, IRC, FITH, IRPSTH, IRSCA, IRSSD, NRIA, RRI | $187,000.00 | $32,000.00 | JS |
| 33 | 3122 Brendan Ave | IEC, RRI, NRIA, FITH, IRC, IRSCA, IRPSTH, IRSSD | $205,000.00 | $68,000.00 | JS |
| 34 | 007 W. Saratoga St | FIEC, FITH, IRPSTH, NRIA, IRC, IRSCA, IRSSD, RRI | $185,000.00 | $80,000.00 | KW |
| 35 | 1083 Ellicott Drwy | FIEC, FITH, NRIA, IRC, IRSCA, IRPSTH, IRSSD, RRI | $230,000.00 | $80,000.00 | JS |
| 36 | 700 N. Belnord Ave | EC, RRI, IRSSD, FITH, IRC, IRPSTH, IRSCA, NRIA | $200,000.00 | $98,000.00 | JS |
| 37 | 3117 Mareco Ave | EC, RRI, IRSSD, FITH, IRC, IRPSTH, IRSCA, NRIA | $205,000.00 | $98,000.00 | JS |
| 38 | 709 Poplar Grove St | IEC, RRI, FITH, IRSSD, NRIA, IRC, IRPSTH, IRSCA | $190,000.00 | $81,000.00 | JS |
| 39 | 2612 E Preston St | C, RRI, FITH, IRPSTH, NRIA, IRSCA, IRC, IRSSD | $200,000.00 | $105,000.00 | JS |
| 40 | 1518 E 28th St | IEC, RRI, IRPSTH, NRIA, FITH, IRC, IRSCA, IRSSD | $194,000.00 | $94,000.00 | JS |
| 41 | 418 N. Milton Ave | IEC, RRI, IRSSD, NRIA, FITH, IRC, IRPSTH, IRSCA | $280,000.00 | $170,000.00 | DG |
| 42 | 2606 Beryl Ave | IEC, FITH, RRI, NRIA, IRC, IRPSTH, IRSCA, IRSSD | $230,000.00 | $115,000.00 | EA |
| 43 | 2822 Kennedy Ave | C, FITH, IRSSD, NRIA, IRC, IRPSTH, IRSCA, RRI | $180,000.00 | $95,000.00 | JS |
| 44 | 2842 Mayfield Ave | EC, RRI, IRPSTH, FITH, IRC, IRSCA, IRSSD, NRIA | $225,000.00 | $115,000.00 | DG |
| 45 | 5014 Belair Rd | | $230,000.00 | | KW |
| 46 | 2430 Etting St | IEC, RRI, NRIA, FITH, IRSCA, IRC, IRPSTH, IRSSD | $175,000.00 | $98,000.00 | JS |
| 47 | 2434 Etting St | EC, RRI, IRSSD, FITH, IRC, IRPSTH, IRSCA, NRIA | $175,000.00 | $97,000.00 | JS |
| 48 | 2436 Etting St | FIEC, IRC, FITH, NRIA, IRSCA, IRPSTH, IRSSD | $135,000.00 | $57,000.00 | KW |
| 49 | 2428 Etting St | FIEC, CMM, RRI, NRIA, FITH, IRC, | $175,000.00 | $95,000.00 | JS |

| | | | | | |
|---|---|---|---|---|---|
| | | IRSCA, IRPSTH, IRSSD | | | |
| 50 | 2442 Etting St | EC, RRI, FITH, IRC, IRPSTH, IRSCA, IRSSD, NRIA | $175,000.00 | $97,000.00 | JS |
| 51 | 2446 Etting St | EC, RRI, IRSSD, IRC, IRPSTH, FITH, IRSCA, NRIA | $175,000.00 | $97,000.00 | JS |
| 52 | 2422 Etting St | EC, RRI, IRSSD, FITH, IRC IRPSTH, IRSCA, NRIA | $175,000.00 | $97,000.00 | JS |
| 53 | 1706 Lemmon St | IEC, RRI, FITH, NRIA, IRC, IRPSTH, IRSCA, IRSSD | $225,000.00 | $45,000.00 | JS |
| 54 | 2642 Wilkens Ave | IEC, RRI, FITH, IRSCA, IRSSD, IRC IRPSTH, NRIA | $200,000.00 | $93,000.00 | EA |
| 55 | 1809 Rayner Ave | EC, RRI, FITH, IRC, IRPSTH, IRSCA, IRSSD, NRIA | $185,000.00 | $10,000.00 | KW |
| 56 | 33 N. Kresson St | C, RRI, FITH, NRIA, IRSCA, IRPSTH, IRSSD | $190,000.00 | $75,000.00 | EA |
| 57 | 2703 Ellicott Dr | EC, RRI, IRSSD, IRC, IRSCA, FITH, IRPSTH | $230,000.00 | $115,000.00 | JS |
| 58 | 2002 Boone St | EC, FITH, IRC, IRSCA, IRSSD, NRIA, RRI, IRPSTH | $225,000.00 | $65,000.00 | DG |
| 59 | 2006 Walbrook Ave | IEC, RRI, FITH, IRSSD, NRIA, IRC, IRPSTH, IRSCA | $199,000.00 | $92,000.00 | DG |

## STATEMENT OF FACTS RELEVANT TO COUNTS XIII - XVI

154. Certain Appraisers committed fraudulent acts in appraising certain properties, described as follows:

i) "Fake Renovations" or "FR" herein means renovations that did not apply to the subject property but were described in the Appraisal;

ii) "Fake Photos" or "FP" herein means photos allegedly of the interior or exterior of the subject Property which were, in reality from a different property; and

iii) "Fake Physical Description" or "FPD" herein means that the physical description of the subject Property is fake.

155. These Appraiser fraudulent acts relate to the following Appraisers and Appraisals for the following Properties:

APPRAISER FRAUD CHART

| Property Securing Loan | Error | Appraiser |
|---|---|---|
| 2529 Woodbrook Ave | FP | CA |
| 2601 Jefferson St | FP | CA |
| 2110 W. Saratoga St | FP | CA |
| 1123 McKean Ave | FR | CA |
| 1625 N. Rosedale St | FP | CA |
| 3617 Kenyon Ave | FP | CA |
| 3214 Kenyon Ave | FP | CA |
| 4926 Schaub Ave | FP | CA |
| 3122 Brendan Ave | FP | CA |
| 418 N. Milton Ave | FP | JT |
| 2822 Kennedy Ave | FR | CA |
| 2430 Etting St | FPD | JT |
| 2428 Etting St | FP | JT |
| 2703 Ellicott Dr | FR | JT |
| 2006 Walbrook Ave | FR | JT |

156. On or about the closing date of each Loan, the respective Lender transmitted the Loan proceeds by interstate wire from Connecticut to the respective Title Company and/or its escrow account in Maryland.

157. The incoming interstate wire of Loan proceeds was necessary to consummate each transaction and was caused by the participants'

submission, adoption, use, or approval of the Loan and settlement information presented to the Lenders.

158. After receiving the Lenders' Loan proceeds, the respective Title Company and Escrow Agent caused the Loan proceeds to be distributed by wire or other electronic transfer on or about the settlement date to the seller/Flipper and/or other recipients identified in the Settlement Statement or otherwise participating in the transaction.

159. The outgoing wire transfers distributed and monetized the proceeds obtained from the Lenders and constituted an integral part of completing the respective transactions.

160. The participating Flipper, Fraudster, and/or Conspirator received or obtained the benefit of Loan-funded sale proceeds through these disbursements.

161. The respective Title Company and Escrow Agent received compensation and fees, expressly identified in the respective settlement statement, for conducting the settlement and closing the transaction.

162. The incoming and outgoing wire transfers were not incidental to the transactions. They were the means by which the Lenders' money was obtained and thereafter distributed to the participants in the transactions.

163. In each such transaction, the participants knew or reasonably contemplated that interstate electronic communications and interstate wire transfers would be used because the Lenders were located in Connecticut, the Properties and Title Companies were located in Maryland, Closing Instructions and Loan-related information were transmitted electronically between the Lenders and the Title Companies, and the Loan proceeds were funded and distributed electronically.

164. In addition to the interstate wires, the respective Title Company and Escrow Agent caused the Borrower to execute the Loan documents and caused the seller to execute a deed and other documents required to complete the sale and conveyance of the Property.

165. After settlement, originals of the executed Loan and closing documents were transmitted by Federal Express from the respective Title Company in Maryland to the Lender in Connecticut.

166. The interstate shipment of the executed Loan and closing documents was a contemplated and necessary part of completing and documenting each Loan transaction and was undertaken in furtherance of the transaction through which the participants obtained and distributed the Lenders' Loan proceeds.

167. Accordingly, each affected closing involved multiple interstate communications and transmissions in furtherance of the transaction, including: (a) electronic transmission of the Closing Instructions from the Lender in Connecticut to the Title Company in Maryland; (b) acknowledgement or countersignature of the Closing Instructions by the Title Company and/or Escrow Agent; (c) interstate wire transmission of the Loan proceeds from the Lender to the Title Company or escrow account; (d) electronic disbursement of those Loan proceeds to the seller/Flipper and/or other recipients, including in New York; and (e) interstate shipment by Federal Express of the executed Loan and closing documents from Maryland to Connecticut.

168. As to each Loan, the Flipper, Fraudster, and/or Borrower did not merely perform independent acts occurring coincidentally in the same transaction. Their coordinated acts were necessary to complete the closing, obtain the Lenders' Loan proceeds, and distribute those proceeds to themselves.

169. The repeated use of the same settlement process—including materially inaccurate or deceptive settlement information, execution and adoption of the Settlement Statement, receipt of the Lenders' Closing Instructions, interstate funding of the Loan proceeds, disbursement of those proceeds, and interstate transmission of the executed closing documents—supports

the inference that the participating Defendants knowingly joined, facilitated, or furthered the common endeavor to obtain the Lenders' funds through transactions made to appear to satisfy the Lenders' underwriting and closing requirements.

170. As to the respective Defendants as participating in Loans, the foregoing conduct also establishes multiple uses of interstate wires, electronic communications, and/or interstate commercial carriers in furtherance of each affected transaction.

171. In at least one loan—1942 Mosher—Benjamin Eidlisz and Shraga Lerner conspired to flip the property. On April 28, 2023, at 11:36:12 CT, Benjamin Eidlisz, through his entity BetterWay LLC, transferred $80,408.77 from its bank account at JP Morgan Chase to fund 100% of Shraga Lerner's $65,000.00 purchase of 1942 Mosher through his entity, SLDL Properties, LLC. The transfer was identified as TRANSACTION NUMBER 202304280079581 and REFERENCE 3462173118ES. Less than two months later, on June 13, 2023, 1942 Mosher was sold to Eluzer Gold's entity, Levy Ventures L.L.C., for $222,000.00. This resulted in a 241.5% gross profit percentage, and the resale price was 341.5% of the purchase price.

## COUNT I - PROFESSIONAL MALPRACTICE/NEGLIGENCE
(APPRAISERS & AMCS)

172. Plaintiffs adopt and incorporate by reference the allegations contained in paragraphs 1- 171, excluding the allegations contained in paragraphs 154 – 171, of this Complaint.

173. This Count is limited to the claims regarding each Loan in which the AMC - IAM, TA, AN, BNL, and/or each Appraiser was involved with an Appraisal securing a Loan as identified in the Appraiser Chart.

174. An appraiser is a professional person who is licensed as an appraiser in Maryland.

175. In connection with the Loans, the Lenders retained a series of Appraisers via the AMC to prepare the Appraisals as identified in Appraiser Chart.

176. Appraisal Nation, LLC was one of the four AMCs retained by the Lenders to procure Appraisals. Each respective AMC delegated appraisal preparation to the Appraiser it retained and acted as principal with respect to the appraisal services performed on its behalf.

177. The AMC reviewed, approved, and presented each Appraisal to the Lenders.

178. The AMC assisted each Appraiser in drafting each Appraisal, inter alia, by performing quality control, inter alia, based on the AN website, inter

alia, stating that, inter alia *[w]e are appraisal QC experts. Appraisals are reviewed by an automated review software, then will undergo a review by one of our in-house real estate experts. ....*

179. The AMC had its own duty to perform quality control for each appraisal, inter alia, as identified in its website.

180. Upon information and belief, the AMC had the right to control the appraiser.

181. As such, each Appraiser and the AMC owed the Lenders a duty to prepare the Appraisal using that degree of care and skill which a reasonably competent Appraiser acting in similar circumstances would use in preparing an appraisal of the property.

182. This duty included, but was not limited to, complying with USPAP.

183. Upon completion of each Appraisal, the Appraiser certified that the Appraisal complied with USPAP.

184. Appraisers and the AMC breached this duty, failed to exercise reasonable and/or due care, diligence and/or judgment in the performance of their duties, in part, as identified in Appraiser Chart, and overstating the value of the respective property by performing the Appraisal Bad Acts.

185. The Lenders reasonably and materially relied on each Appraisal to determine the value of the respective property so it could limit its risks in

making the Loan by having a secondary source of repayment if the primary source, the respective Borrower, defaulted and failed to pay the respective Loan.

186. The Lenders reasonably relied on each Appraisal to determine the value of the respective property so it could determine and meet the LTV Requirement.

187. Appraiser and AMC knew or should have known that the Lenders would reasonably and materially rely on the Appraisal's valuation of the collateral in determining whether to make each Loan – a mortgage finance transaction - and even noted this in the appraisal reports, as required by USPAP, in the *Intended Use* section using language substantially similar to *[t]he intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction*.

188. Plaintiffs reasonably and materially relied on the Appraisals' valuation of the Collateral in determining to make the Loan.

189. But for the AMC and Appraisers' violations of their professional obligations, the Lenders would not have approved or funded the Loan and would not have been damaged as set forth above.

190. Plaintiffs would not have made the Loans if the correlating Appraisal had been USPAP compliant and reasonably accurate.

191. The Lenders' damages were proximately caused by the AMC and Appraiser's failure to use that degree of care and skill that a reasonably competent Appraiser would have used in preparing an Appraisal of the subject property.

192. As a direct, consequent and proximate result of the aforementioned negligent acts and omissions of Appraisers and AMCs, without any negligence contributing thereto, the Plaintiffs have been damaged.

193. Plaintiffs are damaged by the Loan funds and have been unable to recover as identified in the Payoff Amounts in the Loan Chart.

WHEREFORE, Plaintiffs demand judgment against AMCs - IAM, TA, AN, BNL, and/or each Appraiser in the amount of each Loan balance of every Loan in which AMC - IAM, TA, AN, BNL, and/or each Appraiser performed an Appraisal, as identified in the Appraiser Chart, jointly and severally, in compensatory damages, plus interest, costs, and any and all other relief to which this Court finds it entitled.

## COUNT II – NEGLIGENT MISREPRESENTATION
(APPRAISERS, IAM, TA, AN, & BNL)

194. Plaintiffs adopt and incorporate by reference the allegations contained in paragraphs 1- 193, excluding the allegations contained in paragraphs 154 – 171, of this Complaint.

195. This Count is limited to the claims regarding each Loan in which the AMC – IAM, TA, AN, BNL, and/or each Appraiser was involved with an Appraisal securing a Loan as identified in the Appraiser Chart.

196. Appraisers and AMC drafted each Appraisal.

197. The Appraisals were presented to Lenders and the representations contained therein utilized by Lenders in deciding whether to make the Loan.

198. AMC – IAM, TA, AN, BNL, and each Appraiser owed Lenders a duty to ensure that the Appraisals accurately reflected the subject properties they appraised.

199. The following Appraisal Bad Acts identified above negligently represented information regarding the subject properties: IO, NE, IE, PSO, IAE, EE, and/or FR (collectively, "Misrepresentations").

200. The AMC - IAM, AN, TA, BNL, and Appraisers were negligent in allowing the Misrepresentations inflating the subject properties' values as opined in the Appraisals.

201. The value of each subject property was a material fact in Lenders' decision to make each Loan, including without limitation, due to the LTV Requirement.

202. The AMC – IAM, TA, AN, BNL, and Appraisers intended for Lenders to rely on subject properties' values as opined in the Appraisals in underwriting and determining to fund each Loan.

203. The AMC – IAM, TA, AN, BNL, and Appraisers knew or should have known Lenders would rely on subject properties' values as opined in the Appraisals in underwriting and determining to fund each Loan.

204. The AMC – IAM, TA, AN, BNL, and Appraisers knew that Lenders would rely on the subject properties' values as opined in the Appraisals in determining whether to make each Loan, and that an inflated value would cause loss to the Plaintiffs by having undersecured Loans.

205. Lenders justifiably relied on the representations made in the Appraisals, including, inter alia, the value of the subject properties, in determining whether to make the Loan, inter alia, by applying the LTVs.

206. Lenders would not have made the Loan if the Appraisals had accurately stated the value of the subject properties in the Appraisals.

207. Each Loan is in default, and Plaintiffs are damaged in the amount of the Loan funds and have been unable to recover.

WHEREFORE, Plaintiffs demand judgment against the AMC – IAM, TA, AN, BNL, and/or each Appraiser in the amount of each Loan balance of every Loan in which the AMC – IAM, TA, AN, BNL, and/or each Appraiser performed an Appraisal, as identified in the Appraiser Chart, jointly and severally, in compensatory damages, plus interest, costs, and any and all other relief to which this Court finds it entitled.

## COUNT III - PROFESSIONAL MALPRACTICE/NEGLIGENCE
(CDA COMPANY AND CDA APPRAISERS)

208. Plaintiffs adopt and incorporate by reference the allegations contained in paragraphs 1- 207, excluding the allegations contained in paragraphs 154 – 171, of this Complaint.

209. This Count is also limited as to the CDA Appraiser as to the claims regarding all Loans in which said CDA Appraiser made a CDA, as identified in the CDA Appraisal Review Chart – all of the Loans.

210. This Count is limited to the CDA Company to the claims regarding all Loans in which a CDA was made, as identified in the CDA Appraisal Review Chart – all of the Loans.

211. An appraiser is a professional person who, in the instant action, is or was at all relevant times licensed as an appraiser in Maryland.

212. In connection with the Loans, the Lenders retained from the CDA Company a series of appraisal reviews known as Collateral Desktop Analyses or CDAs, as identified in the CDA Appraisal Review Chart, for the purposes of, inter alia, providing an efficient and cost-effective means of determining whether the appraisals under review were adequately supported, supplying data for pre-funding due diligence, validating whether the comparables used were representative of the subject properties and their markets, conducting internal quality-assurance review as part of post-funding due diligence for lenders and investors, reducing uncertainty before funding, and independently re-evaluating the appraisals so that the Lenders could promptly assemble comprehensive loan files.

213. The CDA Company partnered with agents who performed the CDA Reviews, upon information and belief, using CDA Company systems for information to produce CDA Reports.

214. The CDA Company controlled and/or had the right to control how the CDA Appraisers performed the CDA Reports.

215. The CDA was supposed to, and owed the Lenders a duty to, review each original appraisal as follows:

i) Complete a review of the appraisal presented for completeness, relevance, appraisal methodology, and reasonableness;

ii) Consult and consider supplemental market data from available data sources;

iii) Determine if the value conclusion of the appraisal under review is reasonable and is adequately supported;

iv) If the value conclusion of the appraisal under review is deemed adequately supported, the review appraiser must;

   a. Provide detailed commentary regarding the facts of the original value conclusion,

   b. Comment and provide adequate detail of the supplemental data considered that supports the original value conclusion;

v) If the value conclusion of the appraisal under review is deemed inadequately supported, the review appraiser must:

   a. Develop an opinion and disclose the detailed reasoning that supports the disagreement in value;

   b. Develop an opinion and support the alternate value in accordance with USPAP;

   c. Should there be insufficient data to derive or support an alternate value, adequate supporting commentary should be provided along with a recommendation for a follow-up action.

216. The CDA Company reviewed each appraisal for, inter alia, USPAP compliance and quality control, approved, and presented each CDA Review to the Lenders, for which it was paid.

217. The CDA Company assisted each CDA Appraiser in drafting each CDA Review, including a CDA platform and access to the CDA Company's extensive databases.

218. The CDA Company owed the Lenders a duty to perform its appraisal-review functions with reasonable care, including quality-control review, review for USPAP compliance, determining whether the comparables were representative of the subject property and market, and determining whether the appraisal under review was adequately supported.

219. As such, each CDA Appraiser and the CDA Company owed the Lenders a duty to prepare each CDA Review using that degree of care and skill which a reasonably competent Appraiser acting in similar circumstances would use in preparing an appraisal review.

220. This duty included, but was not limited to, complying with USPAP.

221. Upon completion of each CDA Review, the CDA Appraiser certified that the CDA Review complied with USPAP.

222. Each CDA Review relied upon was obtained, completed, and delivered to the Lender before the corresponding Loan was funded.

223. CDA Appraisers and the CDA Company breached this duty, failed to exercise reasonable and/or due care, diligence and/or judgment in the performance of their duties, in part, as identified in CDA Appraisal Review Chart, and confirmed the overstated value of the respective property in the original appraisal by performing the CDA Bad Acts.

224. The Lenders reasonably and materially relied on each CDA Review to confirm the accuracy of each OAR, so it could limit its risks in making the Loan by having a secondary source of repayment if the primary source, the respective Borrower, defaulted and failed to pay the respective Loan.

225. The Lenders reasonably relied on each CDA Review to confirm the accuracy of each OAR, so it could determine and meet the LTV Requirement. CDA Appraiser and CDA Company knew or should have known that the Lenders would reasonably and materially rely on the CDA Review to confirm the accuracy of each OAR in determining whether to make each Loan, inter alia, noting on its website *CDA re-evaluates an appraisal so you can deliver a comprehensive, investor-compliant loan file quickly.*

226. Plaintiffs reasonably and materially relied on the CDA Review to confirm the accuracy of each OAR in determining to make the Loan.

227. But for the CDA Appraiser and CDA Company's violations of their professional obligations, the Lenders would not have approved or funded the Loan and would not have been damaged as set forth above.

228. Plaintiffs would not have made the Loan if the CDA Review Appraisal had complied with USPAP and been reasonably accurate.

229. The Lenders' damages were proximately caused by the CDA Appraiser and CDA Company's failure to use that degree of care and skill that a reasonably competent Appraiser would have used in preparing a CDA Review of the OAR.

230. As a direct, consequent and proximate result of the aforementioned negligent acts and omissions of CDA Appraiser and CDA Company, without any negligence contributing thereto, the Plaintiffs have been damaged.

231. Plaintiffs are damaged by the Loan funds and have been unable to recover.

WHEREFORE, Plaintiffs demand judgment against the respective CDA Company and CDA Appraiser for the Loan balance of each Loan for which that respective CDA Company and CDA Appraiser procured, reviewed, approved, and provided the related CDA Review, as identified in the respective CDA Appraisal Review Chart, in compensatory damages, together with interest, costs, and such other and further relief as the Court deems just and proper.

## COUNT IV – BREACH OF CONTRACTAPPRAISAL MANAGEMENT COMPANIES
(AMCS - IAM, TA, AN, & BNL)

232. Plaintiffs adopt and incorporate by reference the allegations contained in paragraphs 1- 231, excluding the allegations contained in paragraphs 154 – 171, of this Complaint.

233. This Count is limited to the claims regarding all Loans in which the AMC – IAM, TA, AN, or BNL was involved with an Appraisal securing a Loan as identified in the Appraiser Chart.

234. In connection with each Loan identified in the Appraiser Chart, the Lenders retained the respective AMC identified in the Appraiser Chart to procure and provide an appraisal of the real property securing the Loan ("Appraisal"). The respective AMC retained the Appraiser identified in the Appraiser Chart to perform the Appraisal on the AMC's behalf.

235. The purpose of each Appraisal was to provide the Lenders with an appraisal of the collateral for use in underwriting the related mortgage Loan, including determining whether the Loan satisfied the Lenders' LTV Requirement.

236. Each AMC knew that the Appraisal it procured and provided would be used by the Lenders in evaluating the subject property for a mortgage

finance transaction and in determining whether to approve and fund the related Loan. The Appraisals themselves identified the lender/client's evaluation of the subject property for a mortgage finance transaction as their intended use.

237. As part of its undertaking, each AMC retained the Appraiser, reviewed and approved the completed Appraisal, and presented the Appraisal to the Lenders.

238. The Lenders caused the respective AMC to be paid for procuring, reviewing, approving, and providing the Appraisal relating to the Loan identified in the Appraiser Chart.

239. Each AMC was required to provide an Appraisal that complied with USPAP and accurately and reasonably valued the collateral securing the related Loan so that the Lenders could determine whether the Loan satisfied the LTV Requirement.

240. As to Appraisal Nation, LLC, its undertaking further included the AN Duties alleged above, including performing quality-control review of each Appraisal, reviewing Appraisals for potential USPAP violations, conducting automated and manual compliance review, ensuring that lender requirements were completed, and ensuring that the reports delivered to the Lenders were USPAP compliant.

241. The Appraisals procured, reviewed, approved, and presented by the respective AMCs contained the Appraisal Bad Acts identified for each Loan in the Appraiser Chart and materially overstated the value of the respective properties securing the Loans.

242. By procuring, reviewing, approving, and providing Appraisals containing the Appraisal Bad Acts and materially overstated property values, the respective AMCs failed to provide the appraisal services for which they were retained and materially breached their contractual obligations to the Lenders.

243. Appraisal Nation, LLC further materially breached its contractual obligations by failing to perform the AN Duties with respect to the Appraisals identified in the Appraiser Chart for which Appraisal Nation was the AMC.

244. The Lenders relied upon the Appraisals provided by the respective AMCs in determining the value of the collateral, applying the LTV Requirement, and deciding whether to approve and fund the related Loans.

245. The Lenders would not have approved or funded the respective Loans had the AMCs provided USPAP-compliant and reasonably accurate Appraisals reflecting the actual value of the collateral.

246. As a direct and proximate result of each AMC's material breach, the Lenders funded Loans secured by materially overvalued and insufficient collateral and suffered the losses alleged herein relating to the Loans for which that AMC was responsible, as identified in the Appraiser Chart.

247. Plaintiffs are damaged by the Loan funds and have been unable to recover.

WHEREFORE, Plaintiffs demand judgment against AMC – IAM, TA, AN, or BNL for the Loan balance for each Loan AMC – IAM, TA, AN, or BNL was involved with, as identified in the Appraiser Chart, in compensatory damages, plus interest, costs, and any and all other relief to which this Court finds it entitled.

## COUNT V – BREACH OF CONTRACT
(CDA COMPANY)

248. Plaintiffs adopt and incorporate by reference the allegations contained in paragraphs 1- 247, excluding the allegations contained in paragraphs 154 – 171, of this Complaint.

249. This Count is limited to the Loans for which the CDA Company prepared and provided a CDA Review, as identified in the CDA Appraisal Review Chart.

250. In connection with the Loans, the Lenders retained the CDA Company to prepare and provide appraisal reviews known as Collateral Desktop Analyses - CDA Reviews - as identified in the CDA Appraisal Review Chart.

251. The purpose of each CDA Review included determining whether the appraisal under review was adequately supported, supplying data for pre-funding due diligence, validating whether the comparables used were representative of the subject property and market, reducing uncertainty before funding, and independently re-evaluating the appraisal for use in the Lenders' mortgage underwriting process.

252. The CDA Company accepted the Lenders' engagement, caused the CDA Reviews to be performed through CDA Appraisers using the CDA Company's systems, reviewed and approved the CDA Reviews, and presented the completed CDA Reviews to the Lenders.

253. The Lenders caused the CDA Company to be paid for preparing, reviewing, approving, and providing the CDA Reviews.

254. As part of its contractual undertaking, the CDA Company agreed to provide CDA Reviews that evaluated the underlying appraisals for completeness, relevance, appraisal methodology, reasonableness, adequate support for the value conclusion, and appropriate supplemental market data.

255. The CDA Company's contractual undertaking further included reviewing for USPAP compliance and quality control, determining whether the comparables used in the underlying appraisal were representative of the subject property and market, and determining whether the appraisal being reviewed was adequately supported.

256. The CDA Company knew that the Lenders would use the CDA Reviews in determining whether to approve and fund the related Loans and in determining whether the underlying appraisals accurately supported the collateral values necessary to satisfy the Lenders' LTV Requirement or substantially similar underwriting requirement(s).

257. The CDA Reviews identified in the CDA Appraisal Review Chart contained the CDA Bad Acts and improperly confirmed or "blessed" materially overstated values contained in the underlying appraisals instead of identifying the appraisal deficiencies and USPAP-violative value inflation.

258. By providing CDA Reviews containing the CDA Bad Acts and confirming materially overstated collateral values, the CDA Company failed to perform the appraisal-review services for which it was retained and materially breached its contractual obligations to the Lenders.

259. Had the CDA Company performed its contractual obligations and provided USPAP-compliant and reasonably accurate CDA Reviews identifying the deficiencies and unsupported valuations in the underlying appraisals, the Lenders would not have approved or funded the related Loans.

260. As a direct and proximate result of the CDA Company's material breach, the Lenders funded Loans they otherwise would not have funded, secured by materially overvalued and insufficient collateral, and suffered damages consisting of the amounts of the related Loan balances that the Lenders have been unable to recover.

WHEREFORE, Plaintiffs demand judgment against the CDA Company for compensatory damages relating to the Loans for which the CDA Company provided CDA Reviews, as identified in the CDA Appraisal Review Chart, together with interest, costs, and such other and further relief as the Court deems just and proper.

## COUNT VI - BREACH OF CONTRACT
(TITLE COMPANIES – COMMERCE AND REXTAR)

261. Plaintiffs adopt and incorporate by reference the allegations contained in paragraphs 1- 260, excluding the allegations contained in paragraphs 154 – 171, of this Complaint.

262. This Count is asserted against Commerce Title Company, Inc. and Rextar Title Services, LLC (collectively for purposes of this Count, the "Contract Title Companies") as to the respective Loans they closed on behalf of the Lenders and for which the Title Company Chart identifies a Title Bad Act, including the applicable FILRPS transactions. This Count is not asserted against Marvel Title & Escrow LLC.

263. In connection with each such Loan, the Lenders retained the respective Contract Title Company to perform the real estate settlement and closing and to handle the Lenders' Loan funds and Loan documents in accordance with the Closing Instructions and Title Contract Terms alleged above.

264. The respective Contract Title Company accepted the Lenders' engagement and, acting through its Escrow Agent, undertook to perform the Loan closing and comply with the Title Contract Terms and Closing Instructions.

265. The Title Contract Terms included, without limitation, preparing and recording Loan and sale documents; performing title examination and issuing title insurance; preparing an accurate Settlement Statement; conducting the Loan settlement; collecting and accurately documenting all funds received and disbursed; safeguarding the Lenders' Loan documents and proceeds; and properly distributing the Lenders' Loan proceeds.

266. Before each Loan closing, the Lenders provided written Closing Instructions to the respective Contract Title Company, which were received and acknowledged by the Escrow Agent acting on behalf of that Title Company.

267. The Closing Instructions constituted terms of the Contract Title Company's undertaking and authorized the Contract Title Company to close and disburse the Loan proceeds only upon satisfaction of the conditions contained in the Closing Instructions and the actual transaction presented to the Lenders.

268. In the applicable FILRPS and/or RPP transactions, the respective Contract Title Company had actual knowledge of material facts concerning the seller's rapid prior acquisition and parties involved because that same Title Company had handled both the A-to-B acquisition and the subsequent B-to-C Loan closing, as alleged above.

269. Those material facts included the seller's recent acquisition of the same property less than ninety (90) days earlier by the same persons and, where reflected in the Title Company's own closing records, the materially lower acquisition price compared with the B-to-C sales price being financed by the Lenders.

270. The respective Contract Title Company knew that these FILRPS and RPP facts were material to the Lenders' authorization to close and disburse the Loan proceeds because they bore directly on the nature and economics of the transaction, the Lenders' arm's-length and LTV underwriting requirements, the accuracy of the settlement and title information, and whether the transaction satisfied the conditions upon which the Contract Title Company was authorized to release the Lenders' funds.

271. As to Commerce and Rextar, the contractual breach alleged in the applicable FLIP and/or RPP transactions includes closing and disbursement of the Lenders' Loan proceeds without disclosing the recurring transaction facts known from Commerce and Rextar's own course of dealings: the same Gold-owned purchaser/borrower entities repeatedly purchased properties from the same small group of seller-side entities after short holding periods and at materially increased prices, and Commerce itself had handled the immediately preceding A-to-B acquisition in twenty-nine (29) of the thirty

(30) Commerce FLIP transactions and, as to Rextar, as to those closings alleged in that lawsuit captioned *AmeriTrust Mortgage Corporation v FirstLoans, Inc.*, et al. filed in the United States District Court for the District of Maryland, Case Number 1:26-cv-03574-ELH ("AmeriTrust Lawsuit").

272. Those known facts concerned the ownership history, prior sale, economic terms, and recurring structure of the very transactions Commerce and Rextar were retained to close and were material to whether the Lenders' Closing Instructions and conditions for disbursement had been satisfied. Commerce's failure to disclose them before closing and disbursing the Lenders' funds therefore constituted an additional material breach of the Title Contract Terms and Closing Instructions alleged above.

273. The respective Contract Title Companies materially breached their contractual obligations by committing the Title Bad Acts identified for their respective Loans in the Title Company Chart and, as to the applicable FILRPS and/or RPP transactions, by failing to disclose the known rapid prior acquisition and related material transaction facts before closing and disbursing the Lenders' Loan proceeds.

274. The respective Contract Title Companies further materially breached their contractual obligations by closing and disbursing the affected Loans

notwithstanding their actual knowledge of material transaction information that had not been disclosed to the Lenders and notwithstanding circumstances inconsistent with the transactions and conditions upon which the Lenders authorized closing.

275. The Lenders relied upon each Contract Title Company to comply with the Closing Instructions and Title Contract Terms, disclose material transaction information known to it in performing the closing, and accurately account for and protect the Lenders' Loan funds and Loan documents.

276. Had the respective Contract Title Company performed its contractual obligations and disclosed the material facts known to it concerning the applicable FILRPS and/or RPP transaction, the Lenders would not have authorized the related Loan to close or their Loan proceeds to be disbursed under the circumstances alleged herein.

277. As a direct and proximate result of the respective Contract Title Company's material breaches, the Lenders funded Loans they otherwise would not have funded and suffered damages consisting of the amounts of the related Loan balances that the Lenders have been unable to recover.

WHEREFORE, Plaintiffs demand judgment against each respective Contract Title Company for the Loan balance and other compensable damages

proximately caused by the Loans that the Contract Title Company closed in material breach of its contractual obligations, as identified in the Title Company Chart, together with interest, costs, and such other and further relief as the Court deems just and proper.

## COUNT VII – NEGLIGENCE & FIDUCIARY DUTY

(TITLE COMPANIES AND ESCROW AGENTS – EXCLUDING MARVEL AS TO THIS COUNT)

278. Plaintiffs adopt and incorporate by reference the allegations contained in paragraphs 1- 277, excluding the allegations contained in paragraphs 154 – 171, of this Complaint.

279. This Count is asserted against Commerce Title Company, Inc. and Rextar Title Services, LLC, and the respective Escrow Agents who handled the Loans for those Title Companies, as identified in the Title Company Chart. This Count is not asserted against Marvel Title & Escrow LLC and is not asserted against an Escrow Agent solely by reason of that agent's participation in a Marvel closing.

280. The respective Title Companies were directly retained by the Lenders to perform the respective Loan closings, and the respective Escrow Agents acted on behalf of the Title Companies in conducting those closings and handling the Lenders' Loan proceeds and Loan documents.

281. In connection with each Loan, the respective Title Company and Escrow Agent received and exercised control over the Lenders' Loan proceeds for the limited purpose of conducting the Loan closing and disbursing those funds in accordance with the Lenders' Closing Instructions and the actual terms of the transaction.

282. The respective Title Companies and Escrow Agents also received and exercised control over the Lenders' Loan documents and were responsible for, inter alia, preparing the Settlement Statement, conducting the settlement, documenting all funds received and disbursed, performing or directing title examination and title-insurance functions, and distributing the Lenders' purchase-money or refinance proceeds.

283. Under Maryland law, an agent ordinarily owes fiduciary duties to its principal. The fiduciary relationship alleged here arises from the Title Companies' and Escrow Agents' status as agents entrusted with the Lenders' funds and Loan documents and from their undertaking to receive, safeguard, account for, and disburse the Lenders' funds for the limited purposes authorized by the Lenders.

284. A title company or settlement agent acting as an escrow agent occupies a recognized fiduciary relationship with respect to funds entrusted to it. An escrow agent owes the depositor a fiduciary duty to disburse entrusted

funds in accordance with the terms and instructions governing the escrow. *Roman v. Sage Title Group, LLC*, 229 Md. App. 601, 613 (2016), aff'd, 455 Md. 188 (2017).

285. Independently of the fiduciary relationship, a title company that undertakes for compensation to conduct a settlement owes its customer a duty to exercise reasonable care in that undertaking. The duty alleged in this Count is a duty to exercise reasonable care in the particular undertaking each Title Company accepted—conducting these closings, preparing these Settlement Statements, complying with these Closing Instructions, and disbursing these Loan proceeds—and to disclose material facts each Title Company actually knew from its own closing files. It is not a duty to discover a title defect that a reasonable title search would not reveal.

286. Accordingly, with respect to the Lenders' Loan proceeds and Loan documents entrusted to them, the respective Title Companies and Escrow Agents owed fiduciary duties to the Lenders, including duties:

(i) to act in good faith and with loyalty concerning the matters entrusted to them;

(ii) to safeguard the Lenders' Loan proceeds;

(iii) to use the Loan proceeds only for the authorized purpose;

(iv) to disburse the Loan proceeds only in accordance with the Closing Instructions and the actual terms of the Loan transaction;

(v) to accurately account for all funds received and disbursed;

(vi) to make full disclosure of material information concerning the closing that was known to them or contained in the title and closing records under their control and that was necessary for the Lenders' protection or guidance, including the material facts known to it concerning the applicable FILRPS and/or RPP transaction;

(vii) not to conceal, omit, disguise, or mischaracterize material information concerning receipts, disbursements, title, ownership, the material facts known to it concerning the applicable FILRPS and/or RPP transaction or the transaction being funded;

(viii) not to close a Loan when conditions imposed by the Lenders for closing and disbursement had not been satisfied; and

(ix) to return or refrain from disbursing the Lenders' Loan proceeds when the conditions authorizing disbursement were not satisfied.

287. Independently, the respective Title Companies and Escrow Agents owed the Lenders a duty to exercise ordinary and reasonable care in performing the Loan closings and in handling the Lenders' Loan funds, Loan

documents, title matters, Settlement Statements, disclosures, and disbursements.

288. Those duties included exercising reasonable care in conducting the settlement; disclosing to the Lender the FILRPS and/or RPP material information; preparing accurate Settlement Statements and title documents; collecting, safeguarding, documenting, and disbursing Loan proceeds; complying with the Closing Instructions; and handling the Loan funds and documents with the degree of care and skill reasonably expected of competent title and escrow professionals acting under similar circumstances.

289. Prior to each closing, the Lenders provided written Closing Instructions to the respective Title Company, which were received and acknowledged by the Escrow Agent acting on behalf of the Title Company. The Title Companies and Escrow Agents knew that the Lenders entrusted substantial Loan proceeds to them in reliance upon their undertaking to protect those funds, accurately document the closing, disclose material information, and disburse the proceeds only as authorized.

290. In the applicable FILRPS and/or RPP transactions, Commerce and Rextar had direct knowledge of the immediate prior A-to-B acquisitions because the same Title Company had handled both the A-to-B acquisition

and the B-to-C Loan closing. Their own title and closing records therefore reflected the seller's recent acquisition and the timing and economics of that acquisition before the Lenders' B-to-C Loan proceeds were disbursed.

291. The respective Escrow Agents conducting the B-to-C closings acted for those Title Companies, were responsible for the B-to-C title and settlement functions, received the Lenders' Closing Instructions, and had access to and control over the records used to establish title, ownership, settlement figures, and the propriety of disbursement. The facts concerning the immediate prior acquisition were therefore known to the Title Company and were contained in the title and closing records used by or available to its Escrow Agent in conducting the B-to-C closing.

292. The respective Title Companies and Escrow Agents knew that a seller's acquisition of the same property less than ninety (90) days earlier, followed by a materially higher B-to-C sales price, was material to the transaction they were closing for the Lenders because it bore directly on the true nature and economics of the transaction, the seller's title and ownership history, the Lenders' arm's-length and LTV requirements, and whether the Lenders should authorize release of the Loan proceeds.

293. Commerce and Rextar's knowledge was further heightened by the identity and repetition of the transaction participants. All thirty (30)

Commerce FLIP B-to-C closings involved only Levy Ventures L.L.C. or Kesef Ventures LLC as purchaser/borrower, both wholly owned by Eluzer Gold, and the seller side repeatedly consisted of the same small group of entities identified above. And as to Rextar, those transactions identified in the AmeriTrust Lawsuit. Commerce and Rextar therefore had actual knowledge that it was repeatedly receiving substantially the same rapid-resale transaction structure involving the same purchaser-side and seller-side participants.

294. As Commerce and Rextar continued to act as the Lenders' title, settlement, closing, and escrow agent in those recurring transactions, its fiduciary and reasonable-care duties required it to disclose material transaction facts actually known to it and necessary for the Lenders' protection and guidance before Commerce and Rextar exercised control over and disbursed the Lenders' entrusted funds. The repeated participant pattern made the rapid prior sales and materially increased resale prices more—not less—material to that decision.

295. Commerce and Rextar breached those duties by failing to disclose the recurring participant pattern together with the rapid prior acquisitions and materially increased resale prices known from the transactions and records it handled, and by proceeding to close and disburse the Lenders' funds

without giving the Lenders the opportunity to refuse funding or impose additional conditions.

296. The repeated nature of these transactions further placed Commerce and Rextar, and the respective Escrow Agents on notice of the materiality of the rapid prior sales. The pattern was not an isolated prior conveyance: Commerce handled twenty-nine (29) and Rextar seven (7) less-than-ninety-day transactions in which the same Title Company handled both the A-to-B acquisition and the B-to-C Loan closing.

297. The respective Title Companies and Escrow Agents breached their fiduciary duties and duties of reasonable care by committing the Title Bad Acts identified for the respective Loans in the Title Company Chart and, as to the applicable FILRPS transactions, by failing to disclose the known rapid prior acquisition and related material transaction facts before disbursing the Lenders' Loan proceeds.

298. These breaches did not arise from a generalized duty to investigate mortgage fraud. They arose from Defendants' possession and control of material transaction information while acting as the Lenders' title, settlement, closing, and escrow agents and while exercising control over whether the Lenders' entrusted funds would be released.

299. By disbursing the Lenders' Loan proceeds without disclosing those material facts, the respective Title Companies and Escrow Agents exercised control over entrusted funds in a manner inconsistent with the purposes for which the funds were entrusted and deprived the Lenders of the opportunity to refuse funding or impose additional closing conditions.

300. Had the respective Title Companies and Escrow Agents fulfilled their fiduciary duties and exercised reasonable care by disclosing the material facts known to them concerning the applicable FILRPS and/or RPP transactions, the Lenders would not have authorized those Loans to close or their Loan proceeds to be disbursed under the circumstances alleged herein.

301. As a direct and proximate result of those breaches, the Lenders' Loan proceeds were disbursed in transactions that the Lenders otherwise would not have funded, leaving the Lenders with Loans and collateral that did not satisfy the Lenders' underwriting and closing requirements.

302. Plaintiffs consequently suffered monetary harm consisting of the amounts of the related Loan balances that they have been unable to recover.

303. Maryland recognizes an independent claim for breach of fiduciary duty where the plaintiff establishes the existence of a fiduciary relationship, breach, and resulting harm. *Plank v. Cherneski*, 469 Md. 548, 598, 231 A.3d

436 (2020). The remedy depends upon the particular fiduciary relationship, the nature of the breach, and the remedies historically available for that breach. Id. at 625-26.

304. Monetary damages are an appropriate remedy for this particular fiduciary breach because the breach directly concerns the handling and disbursement of money entrusted to the Title Companies and Escrow Agents.

305. The monetary remedy should place the Lenders in the position they would have occupied had the Title Companies and Escrow Agents complied with their fiduciary obligations, disclosed the material transaction facts known to them, and refrained from disbursing the Loan proceeds in transactions the Lenders would not have authorized.

306. Accordingly, Plaintiffs are entitled to recover the monetary loss proximately resulting from the breach, including the amounts of the Loan balances attributable to the Loans improperly closed and funded by the respective Title Company and Escrow Agent, less any amounts recovered by Plaintiffs with respect to those Loans.

WHEREFORE, Plaintiffs demand judgment against the respective Title Companies and Escrow Agents liable under this Count for the monetary damages proximately caused by their negligence and breaches of fiduciary

duty, including the unrecovered Loan balances associated with the Loans improperly closed and funded by them, as identified in the Title Company Chart, together with prejudgment interest, costs, and such other and further relief as the Court deems just and proper.

## COUNT VIII – UNJUST ENRICHMENT
(DEFENDANT FLIPPERS)

307. Plaintiffs adopt and incorporate by reference the allegations contained in paragraphs 1- 306, excluding the allegations contained in paragraphs 154 – 171, of this Complaint.

308. This Count is limited to each named Defendant Flipper as to the properties sold by that Flipper and the related Loans identified in the Seller/Flipper Chart.

309. The Flippers acquired properties and then resold those properties to the Borrowers at substantially higher prices, often within a very short period of time, and, in some instances, in transactions in which the resale funded the Flipper's acquisition of the property. These transactions sometimes occurred before the Flipper had acquired title and the Flippers often did not possess the properties long enough to perform the renovations represented in connection with the resale.

310. The Lenders funded the related Loans used by the Borrowers to purchase the properties from the respective Flippers.

311. The Lenders' Loan proceeds were disbursed at the respective closings and were used to pay the purchase prices owed to the Flippers for the properties.

312. As a result, each respective Flipper directly received a portion of the Lenders' Loan proceeds from the sale of the property identified in the Seller/Flipper Chart.

313. The difference between the respective Flipper's acquisition price and its subsequent sales price to the Borrower generated the profit identified for that transaction in the Seller/Flipper Chart ("Flip Profit"). The Seller/Flipper Chart identifies the Flipper, property, acquisition price and date, resale price and date, number of days between the transactions, and resulting Flip Profit.

314. The Flip Profits alleged in the Seller/Flipper Chart total $2,283,078.50. All but $132,000 of those profits were obtained by Shraga Lerner through the Flippers associated with him.

315. Each Flipper therefore received a direct and quantifiable monetary benefit derived from the Lenders' Loan proceeds in the amount of the respective Flip Profit identified in the Seller/Flipper Chart.

316. Each Flipper had knowledge and appreciation of that benefit because the Flipper was the seller in the transaction, received the sales proceeds, and realized the Flip Profit from the resale of the property.

317. The Lenders would not have funded the related Loans under the circumstances alleged herein had they known the true facts concerning the transactions, including the facts underlying the inflated sales prices, rapid or simultaneous flips, and other misrepresentations alleged in this Complaint.

318. The Lenders suffered losses on the Loans through which the respective Flip Profits were funded.

319. Each Flipper's ability to resell the property at an amount exceeding its true market value resulted from fraud or misrepresentation that inflated the resale price and that each Flipper was thereby unjustly enriched at the Lenders' expense.

320. Under the circumstances alleged herein, it would be inequitable and unjust for the respective Flipper to retain the Flip Profit derived from the Lenders' Loan proceeds.

321. The measure of restitution sought under this Count is the benefit received and retained by each respective Flipper, namely, the Flip Profit attributable to that Flipper as identified in the Seller/Flipper Chart.

WHEREFORE, Plaintiffs demand judgment against each respective Flipper in the amount of the Flip Profit received by that Flipper from the related Loan proceeds, as identified in the Seller/Flipper Chart, together with prejudgment interest, costs, and such other and further relief as the Court deems just and proper.

## COUNT IX – UNJUST ENRICHMENT
(TITLE COMPANIES & ESCROW AGENTS)

322. Plaintiffs adopt and incorporate by reference the allegations contained in paragraphs 1- 321, excluding the allegations contained in paragraphs 154 – 171, of this Complaint.

323. This Count is asserted in the alternative against each respective Title Company and Escrow Agent, including Marvel Title & Escrow LLC, only as to the Loans that the Title Company or Escrow Agent closed or handled and from which that Defendant received fees, compensation, commissions, distributions, or other financial benefits, as identified in the Title Company Chart and Title Company Fee Chart.

324. In connection with each such Loan, the Lenders supplied the Loan proceeds necessary to fund and complete the transaction. Without the Lenders' funding, the respective closing would not have occurred, and the

Title Company and Escrow Agent would not have received the closing-related benefit.

325. As part of each closing, the respective Title Company received fees and other compensation for performing title, settlement, escrow, and closing services. Those fees and compensation were paid from, or made possible by, the Lenders' funding of the respective Loan and are identified in the Settlement Statements and Title Company Fee Chart.

326. Upon information and belief, the respective Escrow Agents received a portion of the fees, compensation, commissions, distributions, or other financial benefits generated by the Loan closings they performed for the respective Title Companies.

327. The respective Title Companies and Escrow Agents had knowledge and appreciation of those benefits because they performed the closings, charged or received compensation for their services, prepared or participated in preparing the Settlement Statements reflecting the charges, and accepted the resulting financial benefit.

328. The benefits received by the respective Title Companies and Escrow Agents were directly attributable to the Loans funded by the Lenders. But for the Lenders' funding of the respective Loans, the closings would not have

occurred, and those Defendants would not have received the fees, compensation, or other financial benefits generated by the transactions.

329. That the Lenders' funds reached the Title Companies and Escrow Agents through the settlement rather than by direct payment from the Lenders does not defeat restitution. Maryland does not require that the benefit conferred come directly from the plaintiff's own resources.

330. As to Commerce, the inequity of retaining its closing-related fees and compensation is further supported by the repeated nature of the transactions from which those benefits were earned. Commerce received compensation from a series of rapid-resale closings involving the same two Gold-owned purchaser/borrower entities and the same recurring seller-side entities, while possessing the transaction-specific and cumulative knowledge alleged above and failing to disclose those material facts to the Lenders before accepting and disbursing their Loan proceeds.

331. Commerce thus did not receive the challenged benefits from a single isolated closing in which the rapid-prior-sale facts were unknown to it. It repeatedly received compensation from substantially the same transaction pattern after acquiring direct knowledge of that pattern through its own prior and contemporaneous closings. Under the circumstances alleged,

Plaintiffs contend that retention of those Commerce closing-related benefits would be inequitable.

332. As to Commerce and Rextar, and the respective Escrow Agents liable for the applicable Loans, the circumstances rendering retention inequitable include the Title Bad Acts and the failure to disclose the known rapid-prior-sale facts alleged above before accepting and disbursing the Lenders' funds and receiving compensation from the resulting closings.

333. As to Marvel Title & Escrow LLC and any Escrow Agent included under this Count solely by reason of a Marvel closing, Plaintiffs do not rely upon the less-than-ninety-day same-Title-Company FILRPS theory alleged against Commerce and Rextar. Plaintiffs plead restitution in the alternative based upon the financial benefits received from Loan closings that were made possible by the Lenders' Loan proceeds and that, as alleged elsewhere in this Complaint, would not have occurred had the Lenders known the true material facts concerning the fraudulent Loan transactions.

334. The Lenders suffered losses on the respective Loans while the Title Companies and Escrow Agents retained the fees, compensation, and other financial benefits generated by those same funded transactions.

335. Under the circumstances alleged herein, Plaintiffs contend that it would be inequitable and unjust to permit the respective Title Company or Escrow

Agent to retain a closing-related benefit derived from a Loan that the Lenders would not have funded had the true material facts been disclosed.

336. This Count is pleaded in the alternative to Plaintiffs' contractual and tort claims to the extent permitted by law, including to the extent the existence, enforceability, scope, or applicability of any express contractual remedy is disputed. Maryland permits a quasi-contract claim to proceed notwithstanding an express contract where the plaintiff pleads fraud or bad faith in the procurement or performance of the transaction, and where the express undertaking does not fully address the subject matter of the claim. Plaintiffs plead both circumstances here.

337. The measure of restitution for unjust enrichment, sought against each Defendant under this Count is limited to the value of the benefit actually received and unjustly retained by that Defendant in connection with the applicable Loan, including the fees, compensation, commissions, distributions, and other financial benefits identified in the Title Company Fee Chart or established through discovery.

WHEREFORE, Plaintiffs demand judgment against each respective Title Company and Escrow Agent liable under this Count in the amount of the fees, compensation, commissions, distributions, and other financial benefits received and unjustly retained by that Defendant in connection with the

applicable Loans identified in the Title Company Chart and Title Company Fee Chart, together with prejudgment interest, costs, and such other and further relief as the Court deems just and proper.

## COUNT X - BREACH OF CONTRACT
(CORRESPONDENT LENDER)

338. Plaintiffs adopt and incorporate by reference the allegations contained in paragraphs 1- 337, excluding the allegations contained in paragraphs 154 – 171, of this Complaint.

339. This Count is asserted solely by Plaintiff Commercial Lender LLC against Defendant Beltway Lending LLC ("Beltway" or "Correspondent Lender") and is limited to the Loans originated and submitted by Beltway to Commercial Lender pursuant to the Correspondent Lender Agreement and identified as Beltway correspondent Loans in the Loan Chart.

340. On or about January 4, 2023, Commercial Lender and Beltway entered into the Correspondent Lender Agreement. All Loans originated by Beltway that are the subject of this Count were submitted to and funded by Commercial Lender pursuant to the CL Agreement.

341. Under the CL Agreement, Beltway agreed to perform the CL Duties diligently and truthfully, including communicating diligently with Borrowers and Commercial Lender; completing and submitting

applications from applicants generally eligible for Commercial Lender's loan programs; being familiar with Commercial Lender's loan programs and using best efforts to submit applications complying with those programs; providing required credit and background information; submitting the information required to evaluate each application; working with applicants to satisfy underwriting and clear-to-close conditions; and complying with applicable appraisal laws, regulations, standards, and FIRREA requirements.

342. Under the CL Agreement, Beltway also covenanted, represented, and warranted to Commercial Lender that all applications and documents submitted concerning each Loan complied with Commercial Lender's applicable guidelines, standards, and policies; all documentation submitted concerning each application and approved Loan was true and correct in all material respects; Beltway would not omit facts that were material or that would render the application or supporting documentation misleading; all activities concerning each Loan application complied with applicable law; and all material facts known, or required to be known, by Beltway concerning each application would be disclosed in writing to Commercial Lender.

343. Beltway further represented and warranted, as of the closing date of each Loan, compliance with applicable law, the absence of fraud and illegal activity, compliance of the appraisals, and that the Loan proceeds would be used exclusively to acquire, refinance, or construct improvements upon the related mortgaged property.

344. In performing its obligations under the CL Agreement, Beltway and its agents provided Commercial Lender with documents and information used by Commercial Lender to evaluate, underwrite, approve, and fund the Beltway Loans, including borrower applications, organizational documents, credit and background information, leases, bank statements, insurance information, and other Borrower Documents.

345. Commercial Lender performed its obligations under the CL Agreement and, in reliance upon Beltway's performance of the CL Duties, representations, warranties, and submission of the Loan files, approved and funded the Beltway Loans identified in the Loan Chart.

346. The Beltway Loans did not satisfy the contractual representations, warranties, and obligations undertaken by Beltway under the CL Agreement.

347. The Beltway Loans failed to comply with Commercial Lender's applicable guidelines, standards, policies, and underwriting requirements,

including the requirement that Commercial Lender did not offer a loan product permitting funding of one hundred percent or more of a property's purchase price.

348. The documentation and information submitted in connection with the Beltway Loans contained materially false, inaccurate, incomplete, and/or misleading information, including the misrepresentations, omissions, appraisal deficiencies, false or misleading transaction information, and other Loan-related misconduct alleged throughout this Complaint.

349. The Beltway Loans included transactions that were not arm's-length transactions; were grossly undersecured from the inception; had purchase and sale agreements and/or information concerning those transactions that were false or misleading; had materially inflated appraisals; had material facts that were not disclosed to Commercial Lender; had conduct that did not comply with applicable law; contained material fraud and/or illegal activity in connection with the acquisition of the properties or origination of the Loans; and allowed uses of Loan proceeds inconsistent with the representations and warranties made under the CL Agreement. Each of these is a material breach of Beltway's contractual warranties.

350. These acts and omissions materially breached Beltway's CL Duties and its covenants, representations, and warranties under the CL Agreement.

351. Commercial Lender relied upon Beltway to perform the CL Duties diligently and truthfully and upon the accuracy and completeness of Beltway's contractual representations, warranties, documents, and disclosures in determining whether the Beltway Loans satisfied Commercial Lender's underwriting requirements and whether to approve and fund those Loans.

352. Had Beltway performed its obligations under the CL Agreement and accurately disclosed the facts concerning the Beltway Loans, Commercial Lender would not have approved or funded the Beltway Loans under the circumstances alleged herein.

353. The Beltway Loans are in material default, and Commercial Lender has suffered losses on those grossly undersecured Loans. The Loans have been foreclosed, transferred by deed in lieu, become REO, and/or been disposed of through third-party sales, with unrecovered balances remaining.

354. As a direct and proximate result of Beltway's material breaches of the CL Agreement, Commercial Lender funded Loans that it otherwise would not have funded and suffered monetary damages, including the amounts of the Beltway Loan balances that Commercial Lender has been unable to recover.

355. The CL Agreement further provides that Beltway shall reimburse Commercial Lender for losses, liabilities, claims, damages, costs, reasonable attorneys' fees, and expenses arising out of, resulting from, or relating to Beltway's breach of any covenant, condition, term, obligation, representation, or warranty under the CL Agreement; false or misleading information that Beltway knew or should have known was false or misleading through reasonable due diligence; Beltway's fraud or gross negligence in originating or processing applications or approved Loans; and material acts or omissions of Beltway or its employees or agents that adversely affect an application or approved Loan.

356. Accordingly, Beltway is contractually liable to Commercial Lender for the losses and other recoverable amounts resulting from the Beltway Loans identified in the revised Loan Chart.

WHEREFORE, Plaintiff Commercial Lender LLC demands judgment against Defendant Beltway Lending LLC for the unrecovered balances and other losses relating to each Beltway Loan identified in the Loan Chart, together with contractual reimbursement of recoverable liabilities, damages, costs, reasonable attorneys' fees, interest, and such other and further relief as the Court deems just and proper.

## COUNT XI - BREACH OF CONTRACT
(BROKER)

357. Plaintiffs adopt and incorporate by reference the allegations contained in paragraphs 1- 356, excluding the allegations contained in paragraphs 154 – 171, of this Complaint.

358. This Count is asserted solely by Plaintiff RCN Capital, LLC ("RCN") against Defendant Menorah Realty LLC d/b/a Brookwood Capital, and is limited to the Loans brokered or submitted by the Broker to RCN, as identified in the Loan Chart.

359. Broker entered into a broker relationship with RCN and submitted prospective mortgage Loans to RCN for underwriting and funding. All Broker Loans were made through RCN.

360. Pursuant to the parties' broker agreement ("Broker Agreement"), Broker made contractual representations and warranties to RCN concerning each potential transaction submitted to RCN Capital ("BC R&W").

361. Among other things, Broker represented and warranted that it had obtained all licenses required to conduct the potential transactions; it had not omitted or misrepresented information concerning the prospective Borrowers or the collateral securing the Loans; there were no undisclosed third parties entitled to receive fees in connection with the Loans; and the

documents submitted by Broker on behalf of the Borrowers were valid and genuine in all material respects to the best of Broker's knowledge.

362. Broker provided RCN with documents and information supporting the Loans submitted through Broker.

363. RCN performed its obligations under the Broker Agreement and, in reliance upon Broker's performance of its contractual obligations, representations, warranties, and submission of the Loan files, approved and funded the Broker Loans identified in the Loan Chart.

364. The Broker Loans did not comply with Broker's representations, warranties, and contractual obligations under the Broker Agreement.

365. The Loans submitted by Broker included materially false, inaccurate, incomplete, and/or misleading information concerning the Borrowers, collateral, property transactions, appraisals, and other matters material to RCN's underwriting and funding decisions.

366. The Broker Loans also included, as applicable, transactions that did not satisfy RCN's applicable guidelines, standards, policies, and underwriting requirements; transactions that were not arm's-length; false or misleading purchase and sale information; materially inflated appraisals; material facts that were not disclosed to RCN; fraud and/or illegal activities in connection with the acquisition of the properties or procurement of the

Loans; and uses of Loan proceeds inconsistent with the transaction presented to RCN; inter alia, these matters are material breaches of Broker's contractual representations and warranties.

367. By submitting Loan applications and supporting documents containing materially false, incomplete, or misleading information, and by failing to disclose material facts concerning the Borrowers, collateral, transactions, and other matters material to RCN's underwriting decisions, Broker materially breached the Broker Agreement and the BC R&W.

368. RCN relied upon Broker to comply with its contractual obligations and upon the accuracy and completeness of Broker's representations, warranties, documents, and disclosures in determining whether the Broker Loans satisfied RCN's underwriting requirements and whether to approve and fund those Loans.

369. Had Broker performed its obligations under the Broker Agreement and accurately disclosed the material facts concerning the Broker Loans, RCN would not have approved or funded the related Loans under the circumstances alleged herein.

370. As a direct and proximate result of Broker's material breaches of the Broker Agreement, RCN funded Loans it otherwise would not have funded and suffered monetary losses relating to those Loans.

371. The Broker Agreement further provides that, upon a material misrepresentation and/or breach of warranty, Broker is required to indemnify, defend, and hold harmless RCN, its members, agents, employees, affiliates, successors, and assigns from any and all losses, damages, causes of action, liabilities, lawsuits, costs, and expenses, including attorneys' fees, incurred by RCN.

372. Accordingly, Broker is contractually liable to RCN for the losses, damages, costs, expenses, and attorneys' fees arising from the Broker Loans identified in the Loan Chart.

WHEREFORE, Plaintiff RCN Capital, LLC demands judgment against Defendant Menorah Realty LLC d/b/a Brookwood Capital for the unrecovered Loan balances and other losses relating to each Broker Loan identified in the Loan Chart, together with contractual indemnification for recoverable damages, liabilities, costs, expenses, reasonable attorneys' fees, interest, and such other and further relief as the Court deems just and proper.

## COUNT XII – UNJUST ENRICHMENT

(CORRESPONDENT LENDER, BROKER & MIRIAM GLUCK)

373. Plaintiffs adopt and incorporate by reference the allegations contained in paragraphs 1- 372, excluding the allegations contained in paragraphs 154 – 171, of this Complaint.

374. This Count is asserted against Defendant Beltway only as to the Loans originated or submitted by Beltway and funded by Commercial Lender LLC, and against Defendant Broker, including Miriam Gluck, only as to the Loans brokered or submitted by Broker and funded by RCN Capital, LLC, as identified in the Loan Chart.

375. In connection with the respective Loans, Commercial Lender paid Beltway compensation pursuant to the Correspondent Lender Agreement, and RCN Capital paid the Broker compensation pursuant to the Broker Agreement.

376. The Broker paid Miriam Gluck with these proceeds.

377. Those payments constituted direct monetary benefits conferred by the respective Lender upon Beltway and the Broker in consideration of their participation in originating, submitting, processing, or brokering the related Loans.

378. Beltway and the Broker had knowledge and appreciation of those benefits because each knowingly accepted compensation arising from the respective Loans that it submitted or brokered.

379. As alleged throughout this Complaint, the respective Lender approved and funded the related Loans based, in material part, upon information and documentation submitted, transmitted, or facilitated by Beltway or Broker in connection with the Loan applications and underwriting process.

380. The information and documentation associated with the respective Loans included materially false, inaccurate, incomplete, and/or misleading information concerning matters material to the Lenders' underwriting and funding decisions, including, as applicable, the Borrowers, the collateral, the purchase and sale transactions, appraisals, use of Loan proceeds, and other matters alleged herein.

381. Had the respective Lender known the true facts concerning the related Loan and the deficiencies, omissions, misrepresentations, or misconduct alleged herein, the Lender would not have approved or funded that Loan under the circumstances alleged in this Complaint.

382. Because the respective Loans would not have been funded had the true facts been disclosed, Beltway and Broker would not have received the compensation and other monetary benefits generated by those Loans.

383. The respective Lenders suffered losses on the Loans, while Beltway and Broker retained the compensation and other financial benefits paid to them in connection with those same transactions.

384. Beltway and Broker therefore received and retained benefits at the expense of the respective Lender that funded the Loans giving rise to those benefits.

385. Under the circumstances alleged herein, it would be inequitable and unjust to permit Beltway or Broker to retain compensation obtained in connection with Loans that would not have been funded but for the materially improper information, documentation, omissions, or other conduct alleged in this Complaint.

386. This Count is pleaded in the alternative to Plaintiffs' breach-of-contract claims against Beltway and Broker to the extent permitted by law.

387. The measure of restitution sought under this Count is the value of the benefit actually received and unjustly retained by each respective Defendant in connection with the applicable Loans, including the compensation, fees, commissions, and other monetary benefits paid to Beltway or Broker and established by the Loan records or through discovery.

WHEREFORE, Plaintiff Commercial Lender LLC demands judgment against Defendant Beltway Lending LLC for restitution and disgorgement of the compensation, fees, commissions, and other monetary benefits received and unjustly retained by Beltway in connection with the Beltway Loans

identified in the Loan Chart, and Plaintiff RCN Capital, LLC demands judgment against Defendant Menorah Realty LLC d/b/a Brookwood Capital and Miriam Gluck for restitution and disgorgement of the compensation, fees, commissions, and other monetary benefits received and unjustly retained by Broker in connection with the Broker Loans identified in the Loan Chart, together with prejudgment interest, costs, and such other and further relief as the Court deems just and proper.

## COUNT XIII – FRAUD - APPRAISAL
(APPRAISERS)

388. Plaintiffs adopt and incorporate by reference the allegations contained in paragraphs 1- 387 of this Complaint.

389. This Count is asserted against each respective Appraiser only as to Appraisals for which the Appraiser Chart or the Appraiser Fraud Chart identifies Incorrect Owner (IO), Contract Section Errors (CSE), Prior Sale Omitted (PSO), Exhibit Errors (EE), Fake Renovations (FR), Fake Photos (FP), and/or Fake Physical Description (FPD) (collectively, "Appraiser Fraud Bad Acts") for the property securing the related Loan[.

390. Each respective Appraiser prepared and signed an Appraisal concerning the property securing the related Loan and represented to the Lenders that

the analyses, factual information, opinions, conclusions, and appraised value contained in that Appraisal were accurate and supported.

391. Each respective Appraiser further certified upon completion of the Appraisal that the Appraisal complied with USPAP. The Appraisers were retained to assist in preparing the Appraisals; the Appraisals were reviewed and presented to the Lenders, and each Appraiser certified USPAP compliance.

392. The Appraisals expressly identified their intended use as evaluation of the subject property by the lender/client in connection with a mortgage-finance transaction, or contained substantially similar language. Each Appraiser therefore knew that the Lenders would receive and use the Appraisal, including its valuation conclusions, in determining whether to make the related Loan.

393. The Appraisals prepared by the respective Appraisers contained materially false representations of existing fact identified in the Appraiser Chart and throughout this Complaint, including, as applicable Appraiser Fraud Bad Acts; these are the representations upon which the fraud claim is based.

394. Each Appraiser Fraud Bad Act was contained in the particular Appraisal prepared by the respective Appraiser for the property identified in the

Appraiser Chart and was communicated to the Lenders through that Appraisal in connection with the underwriting and funding of the related Loan.

395. The Appraiser Fraud Bad Acts were material because they concerned facts used by the Appraiser to analyze the collateral and support the Appraisal's valuation conclusion and, thereby, affected the value used by the Lenders in applying their Loan-to-Value requirements.

396. By way of example, Appraisers used photographs that were not photographs of the subject property but instead depicted a superior property and used those false photographs, in part, to support an inflated valuation of the subject property. In the Appraisal of 11625 N Rosedale, dated 09/29/2023, Actie reported the subject as C3, and included exterior and interior photographs. Those photographs are not of 2529 Woodbrook Avenue. The subject's front, rear and interior photographs presented in the appraisal report do not exhibit the same physical layout, orientation or structural characteristics as those shown in the current and prior Multiple Listing Service ("MLS")S listing photographs. For example, the front floor plan of the second floor in the appraisal report goes straight across. However, the same picture in the prior and current MLS listings show a bump-out on the second floor front floor plan. The staircase location in the

appraisal report is not in the same location in the current MLS listing photos. Looking at the OAR photos directly, the interior photo page shows radiators visible in multiple bedroom photographs, consistent with a hot water baseboard or radiant heating system. Yet the OAR's improvements section reports the heating system as forced warm air with central air conditioning. This is an internal contradiction within the OAR itself; the reported heating system type is inconsistent with the heating system visible in the OAR's own photographs. That contradiction exists independent of any MLS comparison. Actie used those photographs to support an appraised value of $188,000.00.

397. Appraisers represented nonexistent or false renovations, used false leases, omitted or misstated prior transactions, used inaccurate comparable information, and otherwise made the Appraiser Fraud Bad Acts identified for their respective Appraisals.

398. The respective Appraiser knew that each Appraiser Fraud Bad Act was false when made or made the representation with reckless indifference as to its truth.

399. The respective Appraiser also knew that the Appraiser Fraud Bad Acts materially affected the resulting appraised value and that the inflated

appraised value would be communicated to and used by the Lenders in determining the value of the collateral securing the related Loan.

400. Each respective Appraiser made the Appraiser Fraud Bad Acts with the intent that the Lenders rely upon the false information and resulting inflated valuation in determining whether to approve and fund the related Loan.

401. The Lenders did, in fact, reasonably rely upon the representations contained in each Appraisal, including the Appraisal's valuation of the collateral, in applying the Lenders' LTV Requirement and determining whether to make the related Loan.

402. Because the LTV Requirement limited the amount of each Loan to a required percentage of the value of the collateral, a materially inflated appraisal permitted a Loan to satisfy the stated LTV Requirement when an accurate valuation would not have permitted that Loan to be approved or funded.

403. Had the respective Appraiser accurately disclosed the facts concerning the subject property and prepared a reasonably accurate Appraisal without the Appraiser Fraud Bad Acts, the resulting appraisal would not have materially overstated the collateral value, and the Lenders would not have

approved or funded the related Loan under the circumstances alleged herein.

404. The Lenders' reliance was foreseeable and intended because the Appraisals themselves identified the lender/client and expressly stated that their intended use was evaluation of the property in connection with a mortgage-finance transaction.

405. The Appraiser Fraud Bad Acts and resulting inflated valuations directly induced the Lenders to fund Loans that they otherwise would not have funded.

406. The respective Appraisers acted knowingly, deliberately, and with the intent to deceive the Lenders by causing materially false information to be incorporated into many of the Appraisals and used to support inflated collateral values. Appraisers had actual knowledge, expressly intended to deceive, and deliberately committed wrongdoing in connection with these representations.

407. As a direct and proximate result of the respective Appraiser's fraudulent representations, the Lenders funded Loans they otherwise would not have funded, including Loans that were materially undersecured from inception because the value of the collateral was materially overstated.

408. The Lenders have suffered compensable monetary losses consisting of the amounts of the related Loan balances that they have been unable to recover.

WHEREFORE, Plaintiffs demand judgment against each respective Appraiser for the damages proximately caused by the fraudulent Appraisal prepared by that Appraiser, including the unrecovered balance of each related Loan identified in the Appraiser Chart, together with punitive damages where permitted by law, prejudgment interest, costs, and such other and further relief as the Court deems just and proper.

## COUNT XIV – FRAUD – SETTLEMENT STATEMENT INFORMATION (FLIPPERS AND BORROWERS)

409. Plaintiffs adopt and incorporate by reference the allegations contained in paragraphs 1- 408 of this Complaint.

410. This Count is asserted against each respective Borrower as to the Loans made to that Borrower, and against each respective Flipper as to the Loans and property transactions in which that Flipper participated, as identified in the Loan Chart, Seller/Flipper Chart, Title Company Chart, and allegations of this Complaint.

411. Each Loan was consummated through a settlement at which a Settlement Statement was prepared identifying material financial terms of the transaction, including the purchase price, the amount due from the Borrower, the Borrower's cash at closing, and the receipt and disbursement of the Lenders' Loan proceeds.

412. The Settlement Statements were prepared by the respective Title Companies and Escrow Agents. The fraud alleged in this Count against the Flippers and Borrowers is based upon their participation in, adoption of, and knowing use of materially false transaction information reflected in or communicated through those Settlement Statements, rather than upon an allegation that they themselves physically prepared the Settlement Statements. Every Loan had a Settlement Statement and that the Title Companies and Escrow Agents prepared those statements.

413. The respective Borrowers and Flippers knew the actual economic facts of the transactions in which they personally participated, including, as applicable, the actual purchase and resale prices, the amount of money actually contributed by the Borrower, the source of the purchase funds, the amounts received by the sellers, the identity of the persons or entities receiving Loan proceeds, and the purposes of material disbursements.

414. Because the Borrower and Flipper were participants in and recipients or intended beneficiaries of the respective transactions, they knew the actual recipients and purposes of unjustified profits by buying unrenovated properties, presenting them as renovated forming fake equity based on inflated appraisals, made in connection with those transactions.

415. The rapid-flip transactions also involved materially false or concealed information concerning the ownership, acquisition, resale, and actual economics of the properties in a coordinated fraud scheme to defraud the Lenders. The distressed properties were usually resold quickly without renovations.

416. The Flippers knew the actual acquisition price and date, resale price and date, ownership status, unrenovated property condition, and proceeds received in the transactions in which they participated.

417. The Seller/Flipper Chart identifies multiple transactions in which properties were resold at substantially increased prices reflecting fabricated value and equity within extremely short periods, including transactions in which the stated resale date preceded the stated acquisition date.

418. The Flippers' ability to resell properties for amounts exceeding their true market value resulted from fraud or misrepresentation that inflated the resale prices on contrived sales contracts.

419. Upon information and belief, in transactions involving FLIPS, the Borrower, conspiring with the Seller knowingly participated in the concealment or material omission of the immediate prior acquisition and materially lower acquisition price from the Lender.

420. The Title Bad Acts included undisclosed immediate prior sales, incorrect representations concerning ownership, RPP, FILRPS unrecorded deeds into sellers, and, upon information and belief, disguised disbursements.

421. The fraud was not limited to the entity that formally appeared as seller; individuals such as Lerner/Eidlisz participated in the fraudulent transactions through or with those entities.

422. In particular, Benjamin Eidlisz was related to the Flipper who profited from the flipping transactions. Eidlisz and Shraga Lerner conspired with Eluzer Gold to defraud the Lenders. Eidlisz's email address was used by Gold on credit applications and Eidlisz electronically signed at least one credit application in Gold's name.

423. Shraga Lerner participated as a Flipper through multiple entities and profited from the property-flipping transactions forming part of the alleged mortgage-fraud scheme.

424. Accordingly, the respective Flipper's alleged fraud is not limited to receipt of sales proceeds It includes their knowing participation in the

underlying transactions, their knowledge of the actual purchase and resale terms, and, where alleged, their participation in the preparation, transmission, execution, or use of materially false information supplied to induce the Lenders to make the related Loans.

425. Each respective Borrower and Flipper played a material role in perpetrating this fraud on the Lenders and knew that the material settlement information and/or omission of the FLIP nature of the sale, relating to the transaction in which that Defendant participated was false when made or acted with reckless indifference to its truth.

426. Upon information and belief, each respective Borrower and Flipper knowingly permitted, adopted, caused, or participated in the communication of the materially false settlement information and/or omission of the FLIP nature of the sale, with the intent that the Lenders rely upon it in determining that the applicable underwriting and closing conditions had been satisfied.

427. The false information and omission of the FLIP nature of the sale, was material to the Lenders' decision whether to approve, fund, and authorize the closing of the respective Loans, including compliance with the LTV Requirement and restrictions upon the disposition of Loan proceeds.

428. The respective Borrowers and Flippers intended that the Lenders act upon the materially false or misleading transaction information, including lack of knowledge of the FLIP nature, and A-to-B purchase price and recent purchase date, as well as FILRPS and/or RPP material information, by funding the related Loans.

429. The Lenders reasonably relied upon the materially false information communicated in connection with the respective closing transactions and, in reliance thereon, funded the related Loans.

430. Had the Lenders known the true facts concerning the actual purchase and resale transactions - FILRPS and/or RPP material information, undisclosed immediate prior sales, the Seller's actual title status, disguised or unauthorized disbursements, or other material false settlement information alleged herein, the Lenders would not have approved or funded the related Loans under the circumstances alleged.

431. The false, and undisclosed material settlement and transaction information therefore directly and proximately caused the Lenders to fund Loans that they otherwise would not have funded.

432. The respective Borrowers and Flippers acted knowingly, deliberately, and with the intent to obtain or facilitate the obtaining of the Lenders' Loan

proceeds through materially false representations, omissions, and settlement information.

433. The respective Borrowers and Flippers had actual knowledge that the settlement and transaction information identified in this Count was false when it was communicated to the Lenders, and communicated, adopted, or caused the communication of that information with the intent to deceive the Lenders into funding the related Loans.

434. As a direct and proximate result of the fraud committed by the respective Borrowers and Flippers, the Lenders funded Loans that they otherwise would not have funded and suffered compensable monetary losses, including the amounts of the related Loan balances that the Lenders have been unable to recover.

WHEREFORE, Plaintiffs demand judgment against each respective Borrower and Flipper for the damages proximately caused by that Defendant's fraudulent participation in the related Loan and property transaction, as identified in the Loan Chart, Seller/Flipper Chart, Title Company Chart, and allegations of this Complaint, together with compensatory damages, punitive damages where permitted by law, prejudgment interest, costs, and such other and further relief as the Court deems just and proper.

## COUNT XV – CIVIL RICO - 18 U.S.C. §§ 1962(c) and 1964(c)
(RICO DEFENDANTS)

435. Plaintiffs adopt and incorporate by reference the allegations contained in paragraphs 1 - 434 of this Complaint.

436. At all relevant times, Plaintiffs were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

437. This Count is asserted only against the Flippers, Fraudsters and Conspirators (collectively, the "RICO Defendants"). It is not asserted against a Defendant merely because that Defendant negligently performed professional, appraisal, title, settlement, or other services in connection with a Loan.

### The Association-in-Fact Enterprise

438. Beginning no later than 2023, and continuing thereafter, Defendants Eluzer Gold, Benjamin Eidlisz, Shraga Lerner, the Borrowers and Flippers and those other Defendants who knowingly participated in the conduct described herein associated together for the common purpose of obtaining substantial mortgage Loan proceeds from the Lenders through transactions made to appear to satisfy the Lenders' underwriting and closing requirements when, in fact, material information necessary to those

requirements was false, misleading, concealed, and/or fabricated due to inflated purchase property value.

439. The association constituted an association-in-fact enterprise ("Enterprise") within the meaning of 18 U.S.C. § 1961(4).

440. The Enterprise had a purpose, relationships among its associates, and sufficient longevity to permit its associates to pursue the Enterprise's purpose through numerous separate real-estate acquisitions, resales, Loan applications, appraisals, closings, disbursements, and related transactions.

441. The Enterprise was distinct from the individual RICO Defendants. The Enterprise consisted of the ongoing relationships among the participating persons and entities through which the fraudulent mortgage transactions were identified, structured, documented, valued, financed, closed, funded, and monetized, including hidden FILRPS and/or RPP information.

442. The Enterprise was not merely the sum of the RICO Defendants, nor a label for the pattern of racketeering activity itself. It had a structure and an existence separate from the predicate acts. Gold supplied the borrowing entities and the personal guaranty without which the Loans could not be made. Lerner supplied the properties and the seller-side entities. Eidlisz supplied the acquisition financing that enabled the seller-side entities to purchase the properties before reselling them, and obtained credit in Gold's

name. Those roles and relationships were fixed, recurring, and continued from transaction to transaction across dozens of separate Loans, and would have persisted had any individual Loan never closed.

443. The associates performed separate but complementary functions necessary to accomplish the Enterprise's common purpose.

444. Gold controlled the Borrower entities through which the Loans were obtained and participated in the submission and use of information required to obtain the Loans.

445. The actual Borrowers were Levy Ventures L.L.C., Kesef Ventures LLC, and Zahav Ventures LLC, each of which had Gold as its sole member.

446. Eidlisz participated in obtaining financing in Gold's name and through Gold's entities. Among other things, the email address beneidlisz@gmail.com was used as Gold's email address on credit applications, and Eidlisz, using that email address, electronically entered Gold's name on at least one credit application on June 5, 2023.

447. Lerner participated through the acquisition and flipping of properties and through multiple entities, including SLDL Properties LLC, PP Baltimore 6 LLC, 1258 Glyndon LLC, Sunray Management LLC, Springwood Partners LLC, Greenbay One LLC, Diamond Properties LLC,

and Oakwood Capital LLC. Those entities participated in repeated property flips from which Lerner profited.

448. The Flippers supplied properties to the transactions, participated in rapid or simultaneous acquisitions and resales, received Loan-funded sales proceeds, and, as alleged herein, participated in concealing or misrepresenting the true acquisition prices, ownership history, renovation history, and economics of the transactions.

449. The Borrowers applied for and obtained the Loans, supplied or adopted underwriting information, participated in the closings, and obtained the benefit of the Lenders' financing.

450. The respective Title Companies and Escrow Agents participated in the conduct of the Enterprise by knowingly exercising control over closings, Settlement Statements, title documents, Closing Instructions, receipt of the Lenders' Loan proceeds, hiding the FILRPS and/or RPP material information, and distribution of those proceeds in furtherance of the fraudulent transactions.

451. The Title Companies and the Escrow Agents are not named as Defendants in this Count. Their conduct is described here only to explain the mechanism through which the Enterprise obtained the Lenders' Loan proceeds and distributed them among its members[.

452. The Title Companies and Escrow Agents acted as the gatekeepers of the Loan closings, handled the Lenders' funds and documents, received Closing Instructions, and conducted the settlements through which the Loan proceeds were distributed.

453. The Enterprise's activities affected interstate commerce. Among other things, participants and entities were located in different states, Loan documentation and information were transmitted electronically and by interstate commercial carrier, and substantial Loan proceeds were transmitted by wire to and through the Title Companies and thereafter to sellers and other recipients. Loan documents were sent by FedEx to and from Connecticut, New York, and/or Maryland. Loan proceeds were wired into the Title Companies and thereafter wired from the Title Companies to sellers.

**Conduct of the Enterprise**

454. Each RICO Defendant against whom this substantive Count is asserted knowingly participated, directly or indirectly, in conducting or managing some part of the Enterprise's affairs.

455. Gold, Eidlisz, and Lerner participated in directing the core property-acquisition, financing, resale, Borrower, and proceeds-generating activities of the Enterprise.

456. The participating Flippers directed and controlled their respective acquisitions, sales, resale prices, property transfers, and receipt and disposition of proceeds and knowingly supplied or caused the use of materially false transaction information necessary to obtain the related Loans.

457. The participating Borrowers directed and controlled the Loan applications made in their names, adopted and used the information submitted to obtain financing, participated in the closings, and caused the Loan proceeds to be obtained for the transactions.

458. The participating Title Companies and Escrow Agents exercised control over whether the respective Loans would close, whether the Closing Instructions had purportedly been satisfied, what information appeared in the Settlement Statements and title documents, and how the Lenders' Loan proceeds were disbursed.

459. The Title Companies and Escrow Agents, who are not Defendants in this Count, controlled the mechanics of closing and disbursement described

above. The Enterprise's members used that process to obtain and distribute the Lenders' Loan proceeds.

460. The conduct alleged against these Defendants was therefore not merely the performance of services for the Enterprise. Each substantive RICO Defendant performed a function through which that Defendant exercised discretion or control over some part of the Enterprise's affairs and knowingly used that function to advance the Enterprise's fraudulent purpose.

**Scheme to Defraud the Lenders**

461. The object of the Enterprise was to cause the Lenders to approve and fund Loans by making the transactions appear to satisfy the Lenders' credit, collateral, LTV, CAC, title, underwriting, and closing requirements through materially false statements, documents, representations, and omissions including the FILRPS and/or RPP material information.

462. The fraudulent information included, as applicable to the particular Defendant and Loan:

i) FILRPS and/or RPP material information;

ii) false leases and rental information used to inflate DSCRs;

iii) false information used to procure or support materially inflated appraisals and thereby artificially satisfy LTV Requirements;

iv) fake renovations, fake renovation information, and fake renovators;

v) false or misleading property photographs and other appraisal information;

vi) false information concerning prior acquisitions, immediate prior sales, ownership, and title;

vii) false sales prices and other false purchase and sale information;

viii) false representations that the Borrower supplied the required CAC;

ix) false or misleading Settlement Statements;

x) Disguised Disbursements;

xi) undisclosed rapid or simultaneous flips;

xii) Seller Not In Title transactions;

xiii) other Title Bad Acts knowingly committed in furtherance of the scheme; and/or

xiv) other materially false information identified for the respective Loan in the Loan Chart, Appraiser Chart, Seller/Flipper Chart, and Title Company Chart;

these same recurring categories of fraudulent information were the means through which the Loan proceeds were obtained.

463. The false information was material because it was directed to matters upon which the Lenders relied in deciding whether to approve, fund, and close the respective Loans.

**Racketeering Activity — Mail and Wire Fraud**

464. The RICO Defendants knowingly devised and participated in a scheme to defraud the Lenders and to obtain the Lenders' money by means of materially false and fraudulent pretenses, representations, promises, and omissions.

465. For purposes of executing and furthering the scheme, the RICO Defendants used, caused the use of, and reasonably contemplated the use of interstate wires and interstate mail or commercial carriers within the meaning of 18 U.S.C. §§ 1341 and 1343.

466. The interstate wire communications made in furtherance of the scheme included the electronic transmission of Loan applications, credit applications, leases, appraisals, closing documents, Settlement Statements, title documents, Loan approvals, Closing Instructions, and other Loan-

related information between the participants, Lenders, brokers, correspondents, appraisers, and settlement agents often originating in Connecticut and going to New York or Maryland and vice versa.

467. A specific instance presently alleged is Eidlisz's electronic execution, using beneidlisz@gmail.com, of a credit application in Gold's name on June 5, 2023.

468. The wires used in execution of the scheme also included the transmission of the Lenders' Loan proceeds to the respective Title Companies and the subsequent electronic disbursement of those proceeds to sellers and other recipients.

469. The mails and interstate commercial carriers, including FedEx, were used in executing the scheme, including for shipment of original Loan documents and closing documents by interstate carriers as well as continuous email communications between the Lender in Connecticut and Gold, et al, in New York.

470. These communications included closing instructions sent by the Lender in Connecticut, regarding every Loan, to the relevant Title Company in Maryland.

471. The false documents and information transmitted or caused to be transmitted through the wires and mails included the fraudulent

information alleged above and identified for the respective Loans in the Complaint's charts.

472. Each such transmission or mailing was incident to an essential part of the scheme because it was used to obtain Loan approval, satisfy or appear to satisfy a condition of funding, close the respective Loan, obtain the Lenders' Loan proceeds, distribute those proceeds, or complete and conceal the fraudulent transaction.

473. A RICO Defendant need not personally perform every mailing or wire transmission. The use of the mails or wires was a reasonably foreseeable and integral consequence of carrying out a multistate mortgage-lending scheme requiring electronic submission of underwriting materials, transmission of closing documents, funding by wire, and distribution of Loan proceeds.

474. Each RICO Defendant against whom this Count is asserted committed, caused, or knowingly participated in at least two acts indictable under 18 U.S.C. § 1341 and/or § 1343 in furtherance of the scheme, as further identified by the transactions, communications, documents, and wire transfers relating to the Loans attributable to that Defendant.

**The Pigtown Scheme — Subsequent Related Fraudulent Conduct**

475. The continuing nature of the racketeering activity is further demonstrated by a subsequent alleged scheme involving Eidlisz and Gold.

476. On February 26, 2026, Pigtown Portfolio LLC and East Baltimore Investments II, LLC filed a Verified Complaint in the Circuit Court for Baltimore City against, among others, Eidlisz, Gold, and Gelt Ventures LLC.

477. That Verified Complaint alleges that Pigtown and East Baltimore owned eleven Baltimore City properties and that Eidlisz and Gold had no ownership interest in or authority to act for those entities.

478. The Verified Complaint alleges that, over a short period, Eidlisz falsely represented himself as a managing member of the property owners and caused eleven properties to be conveyed to Gelt Ventures LLC, an entity allegedly owned and operated by Eidlisz and Gold.

479. The Verified Complaint further alleges that contemporaneously with those purported transfers, Gelt obtained approximately $1.7 million in mortgage financing from Cake Mortgage Corp. and Champions Funding LLC and executed deeds of trust purporting to encumber the eleven allegedly stolen properties.

480. The alleged transactions occurred in two groups. On March 31, 2025, Eidlisz allegedly caused multiple properties to be transferred to Gelt, with Gelt obtaining corresponding mortgage loans from Cake on the same day. Additional allegedly unauthorized transfers and corresponding mortgage loans from Champions occurred on May 27, 2025.

481. The Verified Complaint alleges that Eidlisz and Gold were members of, had a remunerative interest in, operated and controlled, or were otherwise affiliated with Gelt and that Eidlisz, Gold, and Gelt obtained the mortgage loans as part of the allegedly fraudulent transactions.

482. The Pigtown allegations concern different victims and later properties, but they allege substantially similar conduct by Eidlisz and Gold: use of entities under their control, fraudulent real-property transfers, acquisition of mortgage financing secured by the properties, and conversion of the resulting transactions into substantial loan proceeds.

483. Plaintiffs plead the Pigtown allegations upon information and belief and as further evidence that the conduct alleged in this Complaint was not an isolated commercial dispute or a single closed transaction, but was part of repeated and continuing conduct involving the use of real property and mortgage financing to obtain money through allegedly fraudulent transactions.

484. Plaintiffs do not offer the AmeriTrust Complaint or the Pigtown Verified Complaint as proof of the matters alleged in them. Plaintiffs allege those matters upon information and belief and have independently reviewed the Land Records of Baltimore City, which confirm the recorded conveyances, the recorded deeds of trust, and the parties and dates described above.

485. To the extent discovery establishes that Eidlisz, Gold, or other RICO Defendants used or caused the use of interstate mails or wires in executing the Pigtown transactions, each such indictable use of the mails or wires constitutes additional racketeering activity under 18 U.S.C. §§ 1341 and/or 1343.

**The AmeriTrust Scheme — Subsequent Related Fraudulent Conduct**

486. The continuing and repeated nature of the racketeering activity is further demonstrated by the AmeriTrust Lawsuit).

487. The AmeriTrust Lawsuit names, among others, Conspirators Shraga Lerner, Benjamin Eidlisz, and Eluzer Gold, Appraisers Christopher Actie and Jason Taylor, REXTAR Title Services, LLC, and numerous entities allegedly owned, controlled, operated, and/or utilized by Lerner, Eidlisz, or Gold.

488. The AmeriTrust Complaint alleges that Lerner, Eidlisz, and Gold principally orchestrated an extensive real-estate mortgage-fraud scheme through special-purpose entities created and used to conceal their involvement and to obtain mortgage financing secured by Baltimore properties.

489. The AmeriTrust Complaint alleges that a special-purpose entity created or managed by Lerner or Eidlisz would acquire Baltimore real property, frequently for approximately $40,000 to $50,000, and that only months later, without corresponding improvements or material market changes, the property would be sold to another entity owned or controlled by Lerner, Eidlisz, or Gold at a price approximately three times greater, commonly around $200,000.

490. The AmeriTrust Complaint further alleges that financing for these transactions was obtained using appraisals and title reports that omitted the recent substantially lower-priced sale and that the appraisals represented the inflated resale price as a reasonable reflection of the property's value.

491. The AmeriTrust Complaint alleges that approximately ninety-one (91) loan applications utilizing this scheme were submitted to AmeriTrust and

that the fraudulent conduct caused AmeriTrust approximately fourteen million ($14,000,000.00) in losses.

492. The AmeriTrust Complaint further alleges that the mortgage-loan proceeds were paid to the selling entities at closing, that the purchasing entities had no intention of repaying the loans, and that the lenders were left substantially under-collateralized because the actual property values were only a fraction of the values represented in the transactions.

493. The AmeriTrust Complaint alleges that the borrowing entities thereafter defaulted virtually immediately and that AmeriTrust was left to pursue collection against special-purpose entities having no meaningful assets other than the substantially overvalued real property securing the loans.

494. The AmeriTrust Complaint expressly alleges that the same fraud was perpetrated against other lenders involving hundreds of additional properties and describes the scheme as having been repeatedly “copied and pasted” across transactions involving multiple lenders.

495. The AmeriTrust allegations involve a different lender and numerous additional mortgage transactions, but allege substantially the same participants, purpose, methods, and results alleged here: Lerner, Eidlisz, and Gold acting through controlled entities; rapid related-party resales of Baltimore properties at materially inflated prices; appraisals and title

information concealing materially lower prior sales; mortgage financing obtained on the basis of inflated property values; distribution of loan proceeds at closing; rapid default; and substantial losses to the lenders. These allegations provide further evidence that the racketeering activity alleged in this Complaint was neither an isolated commercial dispute nor a single closed transaction, but repeated conduct directed at obtaining mortgage-loan proceeds from multiple lenders through substantially similar fraudulent transactions.

496. The timing of the AmeriTrust transactions further demonstrates the continuity of the alleged racketeering activity. The last of the Loans made by Plaintiffs closed on February 12, 2024. AmeriTrust alleges that FirstLoans entered into its broker agreement with AmeriTrust on March 26, 2024, and submitted the first of the allegedly fraudulent AmeriTrust loan applications on April 8, 2024. Thus, the alleged mortgage-fraud activity involving the same principal Conspirators and substantially the same methods resumed with a different lender only fifty-six (56) days after Plaintiffs funded their last Loan.

**Pattern of Racketeering Activity**

497. The racketeering acts alleged herein were related because they shared common participants, purposes, victims, methods, and results.

498. The acts repeatedly involved using false or concealed information concerning real estate, borrowers, property values, leases, sales, ownership, closing requirements, or disposition of mortgage proceeds for the purpose of obtaining money through mortgage-finance transactions.

499. The racketeering activity was not confined to a single Loan, property, communication, or isolated transaction. It involved numerous separate properties, numerous separate Loans, repeated Loan applications and closings, repeated transmissions of underwriting and closing information, and repeated transfers of substantial Loan proceeds.

500. The predicate acts alleged in this Complaint, together with the related predicate acts alleged in the AmeriTrust Lawsuit and the Pigtown Verified Complaint, extended over a substantial period of time and constitute closed-ended continuity. The Loans at issue here were funded between June 13, 2023 and February 12, 2024. The AmeriTrust transactions began on April 8, 2024 and continued thereafter. The Pigtown transfers and the corresponding mortgage financing occurred on March 31, 2025 and May 27, 2025. The related racketeering activity therefore spans at least twenty-three (23) months.

501. The racketeering activity was not narrowly directed toward a single fraudulent goal against a single victim. It involved a large number and variety of predicate acts; separate schemes organized around different lenders and different groups of properties; and multiple distinct sets of victims, including Commercial Lender LLC, RCN Capital, LLC, AmeriTrust Mortgage Corporation, Cake Mortgage Corp., Champions Funding LLC, Pigtown Portfolio LLC, and East Baltimore Investments II, LLC. Each set of victims suffered a separate and distinct injury.

502. The scheme had no built-in ending point. It did not depend upon a single transaction, a single property, a single loan program, or a single lender, and it did not terminate when the Lenders stopped funding. When the Lenders' Loans ended on February 12, 2024, the same Conspirators resumed the same conduct against a different lender fifty-six (56) days later, and again against different victims in 2025, using the same methods and the same kind of controlled special-purpose entities. Obtaining mortgage-loan proceeds through materially false property values and concealed prior sales was the Enterprise's regular way of doing business.

503. The subsequent conduct alleged in the Pigtown Verified Complaint and further supports open-ended continuity as to Eidlisz and Gold because it alleges that approximately two (2) years after the Loans at issue here,

Eidlisz and Gold again used real-property transfers and mortgage financing to obtain approximately $1.7 million through an allegedly fraudulent series of transactions involving eleven additional properties.

504. The acts therefore constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5).

### Causation and RICO Injury

505. The purpose and foreseeable result of the racketeering activity directed toward Plaintiffs was to cause the Lenders themselves to transfer their money by funding Loans that they otherwise would not have funded.

506. The materially false Loan, appraisal, transaction, title, and closing information and withheld FILRPS and/or RPP material information, was supplied for the purpose of satisfying or appearing to satisfy the Lenders' underwriting and closing requirements and thereby inducing the Lenders to release the Loan proceeds.

507. The Lenders relied upon the fraudulent information and, as the direct and intended consequence of the racketeering activity, funded the respective Loans.

508. The Loan proceeds were thereafter transmitted to the Title Companies and distributed to sellers and other participants in the transactions.

509. Had the Lenders known the true facts, including FILRPS and/or RPP material information, Appraiser Fraud Bad Acts, concerning the material fraudulent information alleged herein, the Lenders would not have approved or funded the related Loans.

510. The RICO Defendants' racketeering activity therefore directly caused Plaintiffs to part with money that they otherwise would have retained.

511. The resulting injury was direct, concrete injury to Plaintiffs' business and property consisting of the Loan proceeds transferred in reliance upon the fraudulent scheme and remaining unrecovered after application of all payments, collateral recoveries, foreclosure proceeds, and other recoveries attributable to the respective Loans.

512. Plaintiffs' injury was not derived from an injury to another person. Plaintiffs were the intended targets of the fraudulent representations and the persons whose money the scheme was designed to obtain.

513. By conducting and participating, directly or indirectly, in the conduct of the Enterprise's affairs through the foregoing pattern of racketeering activity, the respective RICO Defendants violated 18 U.S.C. § 1962(c).

514. Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold the damages sustained by reason of the violation, together with the costs of this action and reasonable attorneys' fees.

WHEREFORE, Plaintiffs demand judgment against each Flipper, Fraudster, and Conspirator liable under 18 U.S.C. § 1962(c) for three times the actual damages directly and proximately caused by that Fraudster and Conspirator's participation in the Enterprise's pattern of racketeering activity, including Plaintiffs' unrecovered Loan proceeds attributable to the affected Loans, together with the costs of this action, reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), prejudgment interest to the extent permitted by law, and such other and further relief as the Court deems just and proper.

## COUNT XVI - RICO CONSPIRACY - 18 U.S.C. § 1962(d)
(RICO DEFENDANTS)

515. Plaintiffs adopt and incorporate by reference the allegations contained in paragraphs 1 through 514 of this Complaint, including the allegations concerning the association-in-fact Enterprise, the scheme to defraud the Lenders, the predicate acts of mail and wire fraud, and the resulting injury to Plaintiffs.

516. This Count is asserted only against the RICO Defendants.

517. At all relevant times, the RICO Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3).

518. As alleged in Count XV, the RICO Enterprise consisted of an association-in-fact of persons and entities who participated in repeated real-estate and

mortgage transactions for the common purpose of obtaining substantial Loan proceeds from the Lenders through materially false, misleading, concealed, and/or fabricated information.

519. The Enterprise's associates performed different but complementary roles in furtherance of that common purpose, including acquiring and reselling properties, obtaining financing through related Borrower entities, supplying or facilitating false Loan and transaction information, creating or using false appraisal or settlement information, controlling Loan closings and disbursements, failing to disclose the true nature of the scheme - including FILRPS and/or RPP material information - and receiving the resulting Loan proceeds.

520. Defendants Eluzer Gold, Benjamin Eidlisz, and Shraga Lerner knowingly agreed with one another, and with other participants identified herein, to further the affairs and common fraudulent purpose of the Enterprise.

521. Specific facts supporting that agreement include Eidlisz's email address being used on Gold's credit applications, and Eidlisz electronically entering Gold's name on at least one credit application on June 5, 2023.

522. Lerner participated through numerous entities used in repeated property-flipping transactions and profited from the resulting sales funded by the Lenders' Loans.

523. The respective Borrowers knowingly agreed to participate in the Enterprise by applying for and obtaining Loans in their names, supplying, adopting, or permitting the use of materially false underwriting and closing information, participating in the closings, and receiving the benefit of the Loan proceeds.

524. The respective Flippers knowingly agreed to participate in and further the Enterprise by supplying properties to the transactions, participating in rapid or simultaneous acquisition and resale transactions, supplying or concealing material transaction information, receiving Loan-funded sales proceeds, and participating in transactions made to appear to satisfy the Lenders' underwriting and closing requirements.

525. To the extent supported by the allegations applicable to a particular Defendant and Loan, the respective Title Companies and Escrow Agents knowingly agreed to further the Enterprise by using their control over settlement, title documentation, Closing Instructions, Settlement Statements, Loan proceeds, and disbursements to close and fund transactions despite materially false or concealed information.

526. The Title Companies and Escrow Agents received and handled the Lenders' funds and documents, conducted the settlements, and controlled the closing and disbursement process for the respective Loans.

527. This Count is not asserted against any Title Company, Escrow Agent, Appraiser, or other professional merely because that Defendant negligently performed professional services or happened to provide services to a participant in the Enterprise.

528. Liability under this Count is limited to those Defendants who knowingly agreed, expressly or tacitly, to facilitate the Enterprise's unlawful objective and understood the essential nature of the fraudulent scheme.

529. The conspiratorial agreement did not require every Defendant to know every other participant, participate in every Loan, perform the same function, or personally commit every racketeering act.

530. Rather, the agreement consisted of the respective Defendants knowingly joining or facilitating the common endeavor to obtain the Lenders' money through repeated mortgage transactions – Loans - supported by materially false or concealed information – including FILRPS and/or RPP material information - and agreeing that members of the Enterprise would commit acts of racketeering activity in furtherance of that objective.

531. The Defendants knew the essential nature of the scheme because each knowingly participated in one or more transactions in which false information concerning matters material to Loan approval, underwriting, valuation, ownership, CAC, purchase and sale transactions, title, settlement, or disposition of Loan proceeds was used to cause the Lenders to approve and fund Loans.

532. The false information used in furtherance of the conspiracy included, as applicable to the respective Defendant and Loan, false leases, false rental information, materially inflated appraisal information, fake renovations, fake renovators, false photographs, false or omitted prior-sale information, false ownership information, false sales prices, inaccurate CAC information, undisclosed flips, false or misleading Settlement Statements, disguised or unauthorized disbursements, Seller Not In Title transactions, undisclosed including FILRPS and/or RPP material information, and the other fraudulent conduct alleged throughout this Complaint.

533. The conspirators used these recurring methods as the false information used to obtain the Lenders' Loan proceeds.

534. The conspirators agreed that interstate wires, mails, and commercial carriers would be used, or their use was reasonably foreseeable, in

furtherance of the Enterprise's affairs and the fraudulent Loan transactions.

535. Those communications and transmissions included electronic Loan applications and credit applications, leases, appraisal information, title and settlement documents, Closing Instructions, Loan approvals, wire transfers of Loan proceeds to Title Companies, subsequent wire transfers to sellers and other recipients, and interstate shipment of Loan and closing documents.

536. Loan documents were transmitted by FedEx, Loan proceeds were wired into the Title Companies, and funds were thereafter wired from Title Companies to sellers.

537. The allegations in the AmeriTrust Complaint provide additional evidence that the conspiratorial agreement among Lerner, Eidlisz, and Gold was not limited to the Loans made by Plaintiffs. AmeriTrust alleges that the same three Conspirators principally orchestrated a substantially similar mortgage-fraud scheme through special-purpose entities they created, owned, controlled, and/or utilized to acquire and resell Baltimore properties at materially inflated prices and obtain mortgage financing from a different lender.

538. The AmeriTrust Complaint alleges that the scheme involved approximately ninety-one (91) additional loan applications and employed substantially the same recurring methods alleged herein, including rapid resales of recently acquired properties at substantially increased prices, appraisals and title information that omitted materially lower prior sales, the use of related special-purpose entities as sellers and purchasers, and the distribution of mortgage-loan proceeds at closing.

539. The timing of the AmeriTrust transactions further supports the continuing nature of the conspiratorial relationship. Plaintiffs funded their final Loan on February 12, 2024, while the AmeriTrust Complaint alleges that the first of the allegedly fraudulent AmeriTrust loan applications was submitted on April 8, 2024, only fifty-six (56) days later. Thus, the alleged conduct involving Lerner, Eidlisz, and Gold continued with a different lender almost immediately after the Loans at issue here ended.

540. Plaintiffs plead the AmeriTrust allegations upon information and belief as additional evidence that Lerner, Eidlisz, and Gold knowingly agreed to participate in and further a continuing mortgage-fraud endeavor, and that their agreement contemplated repeated use of substantially similar real-estate transactions, entities, appraisals, title information, financing, and

closing mechanisms to obtain mortgage-loan proceeds from multiple lenders rather than a single isolated series of Loans.

541. The Defendants knowingly agreed that at least one member of the conspiracy would commit two or more acts of racketeering activity, including acts indictable under 18 U.S.C. §§ 1341 and 1343, in conducting or furthering the affairs of the Enterprise.

542. Each conspirator need not personally have committed two predicate acts so long as the Defendant knowingly agreed to facilitate an endeavor that contemplated the commission of a pattern of racketeering activity by members of the Enterprise.

543. The racketeering acts contemplated and committed in furtherance of the conspiracy were related because they shared common purposes, participants, victims, methods, and results.

544. The conspiratorial activity extended beyond a single Loan or isolated transaction and involved numerous separate properties, Loans, applications, appraisals, closings, wire transmissions, and distributions of Loan proceeds.

545. The conspiracy continued for a sufficient period to permit the participants to carry out repeated mortgage transactions using

substantially similar methods and to obtain substantial Loan proceeds from the Lenders.

546. The subsequent alleged conduct involving Eidlisz and Gold further supports the continuing nature of the conspiratorial relationship and their willingness to use real-property transactions and mortgage financing to obtain money through allegedly fraudulent means.

547. The Verified Complaint filed by Pigtown Portfolio LLC and East Baltimore Investments II, LLC alleges that Eidlisz and Gold had no ownership interest in or authority to act for those entities, yet caused eleven (11) properties to be transferred to Gelt Ventures LLC, a company allegedly owned and operated by Eidlisz and Gold.

548. That Verified Complaint further alleges that, contemporaneously with the purported transfers, Gelt obtained approximately $1.7 million in mortgage financing from Cake Mortgage Corp. and Champions Funding LLC and executed deeds of trust against the eleven properties.

549. The alleged transfers and corresponding mortgage loans occurred in repeated transactions on March 31 and May 27, 2025.

550. The Verified Complaint further alleges that Eidlisz and Gold were members of, had a remunerative interest in, operated and controlled, or

were otherwise affiliated with Gelt and that Eidlisz, Gold, and Gelt obtained the mortgage loans as part of the allegedly fraudulent transactions.

551. Plaintiffs plead the Pigtown allegations upon information and belief as additional evidence that the agreement and conduct alleged herein were not isolated to a single transaction and that Eidlisz and Gold continued to participate in substantially similar fraudulent real-estate and mortgage activity.

552. Each Defendant against whom this Count is asserted knowingly joined, facilitated, or furthered the conspiracy with knowledge of its essential unlawful objective and with the intent that the Enterprise's fraudulent scheme succeed.

553. The conspirators committed and caused to be committed numerous overt acts in furtherance of the conspiracy, including preparing, transmitting, adopting, or using false Loan documents; causing properties to be appraised or represented at inflated values; concealing rapid flips or prior acquisitions; presenting false CAC and settlement information; closing Loans despite unsatisfied requirements; transmitting Loan documents and information through interstate wires and carriers; receiving Loan proceeds by wire; and distributing those proceeds among the participants.

554. The purpose and intended result of the conspiracy was to induce the Lenders themselves to part with their money by approving and funding Loans that the Lenders otherwise would not have made.

555. The conspiracy succeeded. The Lenders relied upon the materially false and misleading information and funded the respective Loans.

556. Had the Lenders known the true facts concerning the materially false appraisal, borrower, property, transaction, title, CAC, settlement, including FILRPS and/or RPP material information, and/or disbursement information alleged herein, they would not have approved or funded the affected Loans.

557. As a direct and proximate result of the conspiracy and the racketeering activity undertaken in furtherance of it, Plaintiffs suffered injury to their business and property consisting of the Loan proceeds transferred in reliance upon the scheme and remaining unrecovered after application of payments, collateral recoveries, foreclosure proceeds, and other recoveries.

558. The conspiracy therefore caused direct injury to Plaintiffs, who were the intended targets of the scheme and whose money the conspiracy was designed to obtain.

559. By knowingly agreeing to facilitate the conduct of the Enterprise's affairs through a pattern of racketeering activity, the respective Defendants violated 18 U.S.C. § 1962(d).

560. Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold the damages sustained by reason of the RICO conspiracy, together with the costs of this action and reasonable attorneys' fees.

WHEREFORE, Plaintiffs demand judgment against each Flipper, Fraudster, and Conspirator liable under 18 U.S.C. § 1962(d) for three times the actual damages directly and proximately caused by the RICO conspiracy, including Plaintiffs' unrecovered Loan proceeds attributable to the affected Loans, together with the costs of this action, reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), prejudgment interest to the extent permitted by law, and such other and further relief as the Court deems just and proper.

September 19, 2026

_______________/s/__________

William M. Rudow, Esquire
Federal Bar #: 09937
Rudow Law Group, LLC
9265 S. Highland Dr. 900172
Sandy UT 84093
(410) 542-6000
WilliamRudow@RudowLaw.com
Attorney for Plaintiffs, Commercial Lender LLC and RCN Capital, LLC